# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CHIEFTAIN ROYALTY COMPANY,

      Plaintiff,

v.

      Case No. 5:18-CV-01225-D

SM ENERGY COMPANY (including
predecessors, successors and affiliates),

      Defendant.

---

## SM ENERGY COMPANY'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING LEASE LANGUAGE AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

I.    RESPONSE TO STATEMENT OF UNDISPUTED FACTS. ......................... 1

II.   SM ENERGY'S STATEMENT OF ADDITIONAL FACTS. ........................ 3

III.  ARGUMENT AND AUTHORITIES .......................................................... 6

      A.  CRC FAILED TO ESTABLISH ITS ENTITLEMENT
          TO SUMMARY JUDGMENT. ................................................. 7

      B.  CRC'S MOTION MUST FAIL. ............................................... 8

      C.  CRC HAS NOT MET ITS SUMMARY
          JUDGMENT BURDEN WITH RESPECT TO "FUEL GAS." ............... 10

      D.  CRC'S UNSUPPORTED FUEL USE ARGUMENT
          IS BASED ON AN ERRONEOUS READING OF THE LAW. ............. 10

      E.  CRC IS NOT ENTITLED TO SUMMARY JUDGMENT
          UNDER ITS LEASE THAT EXPRESSLY AUTHORIZES SM
          ENERGY TO USE GAS TO BENEFIT THE LEASE. ................... 13

      F.  CRC'S MOTION IS LEGALLY INSUFFICIENT
          BECAUSE CRC DID NOT ADDRESS THE
          FACTORS REQUIRED BY *MITTELSTAEDT*. ....................... 16

      G.  CRC SEEKS AN IMPERMISSIBLE ABSTRACT
          RULING. ................................................................... 17

      H.  CRC'S ARGUMENTS APPARENTLY ARE BASED
          ON THE FALSE PREMISE THAT THE GAS MUST BE
          DELIVERED OFF THE LEASE TO AN INTERSTATE
          TRANSMISSION LINE IN ORDER TO SATISFY THE
          MARKETABLE PRODUCT REQUIREMENT. ....................... 18

          (1)  Any Duty to Create a Marketable Product at No Cost to
               the Lessor Does not Require that SM Energy Deliver the
               Gas to a Distant Market at an Interstate Transmission Line. ........ 18

(2)     Any Duty to Create a Marketable Product Does Not
Require that the Lessee Process the Gas at No Cost
to the Lessor. ................................................................ 20

(3)     Reineke's Position that No Midstream Fees May be
Charged to the Royalty Owner is Contrary to Oklahoma
Law. ................................................................ 22

I.     THE LANGUAGE OF EACH LEASE MUST BE EXAMINED
AND THE RULES OF CONTRACT CONSTRUCTION
APPLIED. ................................................................ 23

J.     THE IMPLIED COVENANT TO CREATE A MARKETABLE
PRODUCT. ................................................................ 25

(1)     The Covenant is Implied as a Matter of Fact, Based Upon
the Intent of the Parties, and Cannot be Implied Where it
is Inconsistent with Express Lease Terms. ................... 25

(2)     Express Words of Negation are Not Required. ............ 27

(3)     The Express Terms of CRC'S Oil and Gas Lease. ........ 29

CERTIFICATE OF SERVICE ................................................................ 32

# TABLE OF AUTHORITIES

## CASES

*Adams v. Bouchard,*
    591 F.Supp.2d 1191 (W.D. Okla. 2008) ........................................................ 8

*Ashland Oil & Refining Co. v. Cities Service Gas Co.,*
    462 F.2d 204 (10th Cir. 1972) .................................................................. 26

*Atlantic Richfield Co. v. Holbein,*
    672 S.W.2d 507 (Tex. App. – Dallas 1984, *writ ref'd, n.r.e.*) ................... 15

*Barby v. Cabot Corp.,*
    465 F.2d 11 (10th Cir. 1972) .................................................................... 21

*Bice v. Petro-Hunt, L.L.C.,*
    2009 ND 124, 768 N.W.2d 496 ............................................................... 14

*Bridenstine v. Kaiser Francis,*
    Case No. CJ-2001-1 (Okla. Dist. Ct., Texas County) ................................ 9

*Cactus Petroleum Corp. v. Chesapeake Operating, Inc.,*
    222 P.3d 12 (Okla. 2009) ......................................................................... 12

*Central States Prod. Corp. v. Jordan,*
    1939 OK 35, 86 P.2d 790 .................................................................... 28, 29

*Certain Underwriters At Lloyd's London v. Garmin Intern., Inc.,*
    781 F.3d 1226 (10th Cir. 2015) .................................................................. 6

*Chieftain Royalty Co. v. Dominion Exploration Midcontinent,*
    *Inc., et al.,* Case No. CIV-11-344-R (W.D. Okla.) ................................... 6

*Chieftain Royalty Co. v. JMA Energy Co.,*
    Case No. CJ-2012-3 (Okla. Dist. Ct., Roger Mills County) ...................... 6

*Chieftain Royalty Co. v. Laredo Petroleum Co.,*
    Case No. No. CJ-2012-4 (Okla. Dist. Ct., Roger Mills County) ............... 6

*Chieftain Royalty Co. v. QEP Energy Co.,*
  Case No. CIV-11-00212-R (W.D. Okla.) ...................................................... 6

*Chieftain Royalty Co. v. XTO Energy, Inc.,*
  Case No. CIV-11-29-KEW (E.D. Okla.) .................................................... 6

*Craig v. Champlin Petroleum Co.*, 435 F.2d 933 (10th Cir. 1971) .............................. 13

*Danciger Oil & Refining Co. of Texas v. Powell*, 154 S.W.2d 632 ........................... 27

*Davidson v. America Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003) ............................ 7

*Davon Drilling Co. v. Ginder*, 467 P.2d 470 (Okla. 1970) ...................................... 24

*Derakshan v. Tizzio*, 270 P.3d 215 (Okla. Civ. App. 2011) .................................... 23

*Devine v. Ladd Petroleum Corp.*, 805 F.2d 348 (10th Cir. 1986) ............................. 28

*Evers v. General Motors, Inc.*, 770 F.2d 984 (11th Cir. 1985) ............................. 1, 2

*Foster v. Merit Energy Co*, 282 F.R.D. 541 (W.D. Okla. 2012) ............................... 25

*Fox v. Cities Service Oil Co.*, 1948 OK 224, 200 P.2d 398 ...................................... 28

*Gazin v. Pan American Petroleum Corp.*, 1961 OK 300,
  367 P.2d 1010 ............................................................................ 26

*Great Western Oil & Gas Co. v. Mitchell*, 326 P.2d 794 (Okla. 1958) ...................... 24

*Hanna Oil & Gas Co. v. Taylor*, 759 S.W.2d 563 (Ark. 1988) ............................ 27, 28

*Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88 (1st Cir. 1993) ................................. 1

*Herrera v. United Airlines, Inc.*, 300 F.Supp.3d 1284 (D. Col. 2017) ........................ 8

*Hill v. Kaiser Francis*, 2012 U.S. Dist. LEXIS 139416
  (W.D. Okla. 2012) ......................................................................... 9

*Howell v. Texaco Inc.*, 2004 OK 92, 112 P.3d 1154 ...................................... 12, 20

*Imperial Colliery Co. v. OXY USA Inc.*, 912 F.2d 696 (4th Cir. 1990) ....................... 12

*In re Quintus Corp.*, 397 B.R. 710 (Bankr. D. Del. 2008) ..................................... 1

iv

*Indian Territory Illuminating Oil Co. v. Rosamond*, 1941 OK 410,
120 P.2d 349 ..................................................................... 24, 25, 26

*Johnson v. Jernigan,* 1970 OK 180, 475 P.2d 396 ..................... 20, 24

*Jones v. University of Central Oklahoma*, 1995 OK 138, 910 P.2d 987 ................. 26, 27

*Krug v. Helmerich & Payne, Inc.,* 2013 OK 104, 320 P.3d 1012 ..................... 27

*Lackey v. Ohio Oil Co.,* 138 F.2d 449 (10th Cir. 1943) ........................... 13, 14

*Ladd Petroleum Corp. v. Oklahoma Tax Comm'n,* 1989 OK 5,
767 P.2d 879 ..................................................................... 13

*Lumoa v. Potter,* 351 F.Supp.2d 426 (M.D. N.C. 2004) ..................... 8

*McCall v. Chesapeake Energy Corp.*, 164 P.3d 1120
(Okla. Civ. App. 2007) ..................................................... 12

*Mercury Inv. Co. v. F.W. Woolworth Co.,* 1985 OK 38, 706 P.2d 523 ........... 27

*Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203 (Okla. 1998) .. 11, 16, 17, 18, 19,
..................................................................... 20, 22, 25, 29, 30

*Murray v. City of Tahlequah,* 312 F.3d 1196, (10th Cir. 2002) ........... 7, 8, 23

*Mussellem v. Magnolia Petroleum Co.,* 1924 OK 297, 231 P. 526 .............. 14

*New Dominion v. Parks Family Co.,* 2008 OK CIV APP 112,
216 P.3d 292 ..................................................................... 26

*Oklahoma City, Okl. v. Dulick,* 318 F.2d 830 (10th Cir. 1963) ............... 17, 18

*Oklahoma Plaza Investors v. Wal-Mart Stores,* 155 F.3d 1179
(10th Cir. 1998) ............................................................... 28

*Panhandle Cooperative Royalty Co. v. Cunningham,*
495 P.2d 108 (Okla. 1972) ................................................... 24

*Panola Independent School Dist. No. 4 v. Unit Petroleum Co.,*
2012 OK CIV APP 94, 287 P.3d 1033 ..................................... 25

v

*Pitco Production Co. v. Chaparral Energy, Inc.,* 2003 OK 5,
    63 P.3d 541 ..................................................................................... 24

*Presier v. Newkirk,* 95 S.Ct. 2330 (1975) .................................................. 17

*Rees v. BP America Production Co.,* 2009 OK CIV APP 37,
    211 P.3d 910 ................................................................................... 19

*Rogers v. Heston Oil Co.,* 1984 OK 75, 735 P.2d 542 ........................... 25, 26

*Rolland v. Primesource Staffing, LLC,* 457 F.Supp.2d 1221
    (D. Col. 2006)............................................................................... 25, 26

*Roye Realty & Developing, Inc. v. Watson,* 2 P.3d 320
    (Okla. 1996) ....................................................................................... 24

*Smoot v. Chicago R.I. & P.R. Co.,* 378 F.2d 879 (10th Cir. 1967) .................. 6

*Sondrol v. Placid Oil Co.,* 23 F.3d 1341 (8th Cir. 1994) ......................... 11, 12

*Socialist Workers Party v. Leahy,* 927 F. Supp. 1554 (S.D. Fla. 1996) ........... 7

*State ex rel. Commissioners of Land Office v. Cities Service Oil Co.,*
    1957 OK 272, 317 P.2d 722 ......................................................... 20, 21

*Trainor v. Apollo Specialties, Inc.,* 318 F.3d 976 (10th Cir. 2002) ............ 6, 19

*Treff v. Galeta,* 74 F.3d 191 (10th Cir. 1996) ............................................... 7

*TXO Production Corp .v. State ex rel. Comm'rs of the Land Office,*
    1994 OK 131, 903 P.2d 259 ............................................................... 25

*U.S. v. Roberts,* 88 F.3d 872 (10th Cir. 1996) ............................................ 11

*U.S. v. Various Slot Machines on Guan,* 658 F.2d 697
    (9th Cir. 1981) ...................................................................................... 1

*Waechter v. Amoco Production Co.,* 537 P.2d 228 (Kan. 1975) .................. 11

*Webster v. Offshore Food Service, Inc.,* 434 F.2d 1191 (5th Cir. 1970) ......... 1

*Wilds v. Universal Resources Corp.,* 1983 OK 35, 662 P.2d 303 ............ 28, 29

*Wolfe v. Texas Co.,* 83 F.2d 425 (10th Cir. 1936) ........................................... 26

*Wood v. TXO Production Corp.,* 1992 OK 100, 854 P.2d 880 .................. 24, 25, 27, 28

*Woodmont, Inc. v. Daniels,* 274 F.2d 132 (10th Cir. 1959) ............................ 23

## STATUTES

15 O.S. § 155 (1961) ......................................................................................... 24

## RULES

Fed.R.Civ.P. 56(c)(1) ...................................................................................... 1, 3

Fed.R.Civ.P. 56(e) ........................................................................................... 1, 3

Fed.R.Evid. 705 ..................................................................................................... 1

## MISCELLANEOUS

Black's Law Dictionary (7th ed. 1999) ............................................................ 11

3 E. Kuntz, *Law of Oil and Gas* § 40.5 at 351 (1989) ...................................... 21

Williams & Meyers, *Oil and Gas Law* vol. 8 at 829
    (Matthew Bender 2003) ............................................................................. 11, 12

3951016.1:730119:00332

SM Energy Company ("SM") hereby responds to Chieftain Royalty Company's ("CRC") Motion for Partial Summary Judgment Regarding Lease Language ("Motion"). Because the putative class members' leases and claims are not before this Court (*see* SM's Motion to Strike CRC's Motion for Partial Summary Judgment filed this date), SM submits the following in response to CRC's **individual claim** regarding lease language.

## I.  RESPONSE TO STATEMENT OF "UNDISPUTED FACTS."

1.  SM admits that from September 16, 2005 until March 1, 2015, it operated and owned working interests in the Duncan Shores 1-1, the Duncan Shores 2-1, and the Avanzini 3-1H wells, in Coal County, Oklahoma. SM sold these wells to Bravo Natural Resources on March 1, 2015. SM also admits that CRC has owned royalty interests in these wells since May 28, 2015. *See* Ex. 1 submitted herewith, at Bates No. 002078.

2.  CRC has failed to carry its burden on summary judgment of establishing this fact by admissible evidence, or evidence that could be controvertible to admissible evidence under Fed.R.Civ.P. 56(c)(1) and 56(e), as the affidavits submitted do not include CRC's actual lease.[1] SM admits that its lease with CRC is the basis of SM's

---

[1] *See Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir. 1993) (on summary judgment, rejecting plaintiff's reliance on Fed.R.Evid. 705, which allows an expert to give opinion testimony, together with supporting reasons, without disclosure of the underlying facts or data, as "largely inapposite"); *Webster v. Offshore Food Service, Inc.,* 434 F.2d 1191, 1193 (5th Cir. 1970) ("[T]he grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert testimony."); *U.S. v. Various Slot Machines on Guam,* 658 F.2d 697, 700 (9th Cir. 1981) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts...."); *In re Quintus Corp.,* 397 B.R. 710, 719 (Bankr. D. Del. 2008) ("An expert's opinion based on mere allegations that are not supported by the

obligation to pay royalty on production from the three Coal County wells above.

3.    This statement is a contention of law. The facts underlying this contention –
the lease itself – are not in CRC's summary judgment record. SM disputes CRC's legal
conclusions as to the effect to be given to the lease instrument. No factual response by
SM is required because CRC has failed to carry its summary judgment burden of proof.
CRC is not seeking summary judgment based upon an alleged failure to disclose
information on check stubs, so insofar as its ¶ 3 includes that purported fact, it is
immaterial and should not be considered. However, the evidence shows that CRC was
aware of the manner in which royalties were calculated prior to its purchase of the Coal
County lease in 2015.[2] *See* Ex. 2 submitted herewith. The evidence also shows that a
"TRO" fee was **not** being deducted from its royalties. *See* Statement of Additional  Facts
("AF"), *infra,* at 10. At the very least, this creates an issue of fact which precludes
summary judgment.

4.    CRC does not have a lease of the type described in paragraph 4 of CRC's
Statement of Undisputed Facts ("CS").

5.    *See*  response in ¶ 3, above.

6.    CS ¶ 6 is a contention of law.

7.    CRC does not possess a lease of the type set forth in CS ¶ 7.

---

record… are meaningless."); *Evers v. General Motors, Corp.,* 770 F.2d 984, 986-87 (11th
Cir. 1985) (rejecting expert opinion that "fail[ed] to provide specific facts from the record
to support its conclusory allegations").
[2] In addition, this lawsuit was originally filed in 2011. Through discovery, it is obvious
that CRC became aware of the method by which SM Energy calculated its royalties prior
to acquiring its 2015 lease.

8.	CRC has failed to carry its burden on summary judgment of establishing this fact by admissible evidence under Fed.R.Civ.P. 56(c)(1) and 56(e), as the pooling order referenced in the affidavits and summary submitted by CRC do not include the actual pooling order. Moreover, this purported fact is irrelevant to the issue of whether CRC's lease, as a matter of law, prohibits all deductions, and is further irrelevant because the leases and claims of the unnamed putative class members are not currently before this Court, making CRC's "royalty pot" theory irrelevant.

9.	Denied. Not all royalty owners were paid in the same manner. *See* Deposition transcript of Kris L. Terry ("T. Tr.") attached hereto as Ex. 3, at 31:9-32:11; 32:23-33:16; 33:17-34:12; 37:2—15: 39:2-13; 46:14-21; 63:1-7; 67:16-24. However, this purported fact is irrelevant to the issue of whether CRC's lease, as a matter of law, prohibits all deductions, and is further irrelevant because the leases and claims of the unnamed putative class members are not currently before this Court.

10.	This purported fact is irrelevant to the issue of whether CRC's lease, as a matter of law, prohibits all deductions, and is further irrelevant because the leases and claims of the unnamed putative class members are not currently before this Court.

## II.	SM ENERGY'S STATEMENT OF ADDITIONAL FACTS

1.	From September 16, 2005 until March 1, 2015, SM owned working interests in the Duncan Shores 1-1, the Duncan Shores 2-1, and the Avanzini 3-1H wells, in Coal County, Oklahoma, in which CRC obtained a royalty interest on May 28, 2015. Ex. 1 at Bates Nos. 002078 and 002088. SM sold these wells to Bravo Natural Resources on March 1, 2015.

2. CRC's lease with SM expressly grants SM "the right to use, free of cost, gas, oil and water produced on said land for its operations thereon, except water from wells of lessor." *Id.*

3. CRC's lease requires payment of royalties on gas used off the leased premises, and all other gas produced from a gas well, of:

> 1/4 of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than ¼ of the actual amount received by the lessee. . . .

*Id.*

4. The gas produced from each of the wells covered by CRC's lease is sold on the lease, and thus is marketable at the wellhead. Ex.4, Deposition transcript of Kyle Pearson ("P. Tr."), at 71:7-10; 122:24-123:2; Ex. 5 - Ex. 62 attached thereto.

5. SM's affiliate company, Four Winds ("FW"), purchased gas from the wells covered by CRC's lease at the wellhead. Ex. 6, Deposition transcript of David Whitcomb ("W. Tr.") at 44:10-11; 123:23-124:1; 208:16-21; P. Tr. at 71:7-13. SM made no deductions to the amounts paid to it by FW. P. Tr. at 121:1-8; W. Tr. at 208:5-21.

6. FW also purchased gas at the wellhead from at least 15 unaffiliated third-party producers owning wells connected to the Coal County gathering system, under contract terms identical or similar to SM's contracts with FW. In some instances, FW's contracts with SM were on **better** terms. *See* P. Tr. at 79:13-80:3; 142:13-143:10; Whitcomb Tr. at 45:18-22; 213:19-214:5.

7. SM also tested FW's contract prices against third-party terms on a semi-annual base. W. Tr. at 65:13-22; 210:22-211:6; 213:5-214:5; P. Tr. at 132:1-24;134:12-

20; 135:5-15.

8. The prices received by SM from FW were consistently higher than the prices received by SM in 18 wells in Coal County where SM did not operate the wells but sold gas pursuant to joint operating agreements. P. Tr. at 143:11-144:6; Ex. 7 - Ex. 64 to Pearson deposition. In addition, the gathering rate charged by Centerpoint to FW for Coal County wells was reasonable. P. Tr. at 61:1-64.11; Ex.8, Ex. 67 to Pearson Deposition.

9. SM did not use any gas for operations which did not pertain to CRC's lease, and so did not receive any proceeds for gas allegedly used from CRC's well off the leased premises. T. Tr. at 163:12-14.

10. SM did not deduct any fuel gas fees, "TRO" or gathering fees, or compression fees from CRC's royalties. T. Tr. at 29:16-30:23; 67:5-15; 70:1-4; P. Tr. at 90:16-21; W. Tr. at 36:2-5. In fact, CRC has never received a royalty payment check from SM for the three wells it currently owns an interest in because SM sold its interests in the three wells before CRC acquired its royalty interest. T. Tr. at 62:17-21.

11. CRC claims it was not paid for any fuel gas allegedly use and any natural gas liquids allegedly extracted. To the extent this claim relates to payments made to CRC's predecessors in interest, this claim fails since such parties were paid for fuel and natural gas liquids when they were paid on the Btus in the gas stream when it passed through the gas meter on the lease. P. Tr. at 140.11-142:12; 147:19-22; W. Tr. at 187:4-22.

12. CRC is a knowledgeable, sophisticated, and experienced royalty owner, as evidenced by the fact that CRC has filed several class action lawsuits raising the same or

5

similar issues as those raised in this case as the class representative of putative classes of royalty owners.[3]

13. CRC was aware of the manner in which SM calculated royalties prior to its purchase of the Coal County lease in 2015.[4] Ex. 2 and footnote 2. Moreover, CRC's predecessor in interest, Michael J. Weeks, individually and as trustee, was also aware of the manner in which SM calculated royalty. T. Tr. at 113:21-114:6; 116:4-117:11; 118:5-17; 145:16-20; Ex. 9 - Exs. 59.1-59.3 to Terry deposition.

## III.  ARGUMENT AND AUTHORITIES

"Summary judgment is appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Certain Underwriters At Lloyd's London v. Garmin Intern., Inc.,* 781 F.3d 1226, 1230 (10th Cir. 2015). "[T]he relief contemplated under Rule 56 is drastic, and should be applied with caution to the end that the litigants will have a trial on bona fide factual disputes." *Smoot v. Chicago R.I. & P.R. Co.,* 378 F.2d 879, 883 (10th Cir. 1967). "Under the rule no margin exists for the disposition of factual issues, and it does not serve as a substitute for trial of the case nor require the parties to dispose of litigation through the use of affidavits." *Id.* "The moving party bears the ultimate burden of establishing its right to

---

[3] *See* publicly available records in *Chieftain Royalty Company v. QEP Energy Company,* No. CIV-11-00212-R (W.D. Okla.); *Chieftain Royalty Company v. XTO Energy, Inc.,* No. CIV-11-29-KEW (E.D. Okla.); *Chieftain Royalty Company v. JMA Energy Company,* No. CJ-2012-3, Roger Mills County, Okla.; *Chieftain Royalty Company v. Laredo Petroleum Company,* No. CJ-2012-4, Roger Mills County, Okla.; and *Chieftain Royalty Company v. Dominion Exploration Midcontinent, Inc., et al.,* No. CIV-11-344-R (W.D. Okla.).

[4] CRC was generally aware of SM's royalty calculation method as to other wells it owned at the time as early as 2010. *See* W. Tr. at 75:22-76:1 and Ex. 2.

summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial." *Trainor v. Apollo Specialties, Inc.,* 318 F.3d 976, 982 (10th Cir. 2002). "The nonmovant is given 'wide berth to prove a factual controversy exists.'" *Davidson v. America Online, Inc.,* 337 F.3d 1179, 1182 (10th Cir. 2003).

## A. CRC FAILED TO ESTABLISH ITS ENTITLEMENT TO SUMMARY JUDGMENT.

To be entitled to summary judgment, the movant must present evidence that is legally sufficient:

> The moving party must demonstrate that the facts underlying **all** the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied, notwithstanding that the non-moving party has introduced no evidence whatsoever.
>
> *Socialist Workers Party v. Leahy,* 927 F. Supp. 1554, 1555 (S.D. Fla. 1996).[5]

CRC has the burden to establish that no genuine issue exists as to any material fact. Only if the movant meet its initial burden of showing the absence of any genuine issue of fact does the burden shift to the responding party to show that a controversy of fact exists. In *Murray v. City of Tahlequah*, 312 F.3d 1196, 1200 (10th Cir. 2002), the Tenth Circuit stated:

> [T]he burden on the nonmovant to respond arises only if the summary judgment motion is properly 'supported' as required by Rule 56(c). Accordingly, summary judgment is "appropriate under Rule 56(e) only when the moving party has met its initial burden under Rule 56(c). If the evidence produced in support of the summary judgment motion does not meet this burden, 'summary judgment must be denied

---

[5] Moreover, even if the burden shifted, SM satisfied it here. "The nonmoving party is not required to produce evidence in a form that would be admissible at trial, 'but the content or substance of the evidence must be admissible.'" *Treff v. Galeta,* 74 F.3d 191, 195 (10th Cir. 1996); *accord Rolland v. Primesource Staffing, LLC,* 457 F.Supp.2d 1221, 1224 (D. Col. 2006).

**even if no opposing evidentiary matter is presented."**

(Emphasis in original). CRC has not met its burden.

Here, the burden does not shift because CRC has not addressed all material facts. Specifically, CRC has not addressed the applicable royalty clause in its entirety. Further, CRC has not included any facts underlying the conclusory statement of its expert, Daniel Reineke, that SM deducts or charges fees; nor has CRC included any facts addressing the marketability of the gas prior to any purported deduction of fees or even identified what specific post-production costs CRC alleges SM took related to its specific lease.[6] The conclusory statements in the Affidavit of CRC's' expert, Mr. Reineke[7], are insufficient to support summary judgment because they are not supported by any specific facts or evidence tied to a specific well and lease. *See* footnote 1, *supra.*

## B.    CRC'S MOTION MUST FAIL.

The Oklahoma Supreme Court has rejected the notion that summary judgment is appropriate in the very case upon which CRC relies.

---

[6] In fact, CRC has never received a royalty check from SM for the three wells it currently owns an interest in. *See* AF No. 10.

[7] Because CRC does not reference specific paragraphs from Mr. Reineke's affidavit or any other affidavit, it is impossible for SM to know what paragraphs or documents referenced therein CRC is relying upon. However, there are numerous references in those affidavits to documents which are third-party documents, for example, CRC's Exs. 6, 9, 11-23, 31, 33-37, 42, 44, 48, and 63.6, 17, and summaries which are not endorsed by any witness, including CRC's Exs. 38 and 40. None of these documents are authenticated. Therefore, they are inadmissible hearsay and cannot be considered. *Adams v. Bouchard,* 591 F.Supp.2d 1191, 1203-04 (W.D. Okla. 2008); *Lumoa v. Potter,* 351 F.Supp.2d 426, 430, 432 (M.D. N.C. 2004) (rejecting document summarizing statements and testimony from other witnesses and other exhibits); *Herrera v. United Airlines, Inc.,* 300 F.Supp.3d 1284, 1295 (D. Col. 2017) (inadmissible hearsay may not be relied upon at the summary judgment stage).

CRC seeks an adjudication of issues surrounding an oil and gas lease on summary judgment. In support, CRC attaches an order entered in the *Pummill* case after a three day bench trial (CRC's Ex. 43). What CRC does not disclose is that these same lawyers tried to have lease language adjudicated on summary judgment in the *Pummill* case and that approach was flatly rejected by the Oklahoma Supreme Court

On August 6, 2012, the district judge in the *Pummill* case granted summary judgment to the plaintiffs on lease language. *See* Opinion submitted herewith as Ex. 10. The court held that certain language in oil and gas leases did not negate the implied covenant to market. *Id.* at 8. On August 24, 2012, the district judge in the *Pummill* case granted summary judgment to the plaintiffs on the issue of fuel gas. *See* Opinion submitted herewith as Ex. 11. The court held that royalty must be paid on fuel gas consumed off the lease. *Id.* at 11.

On appeal, the Oklahoma Supreme Court reversed the grant of summary judgment in both orders, finding that factual issues precluded summary judgment. *See* Opinion submitted herewith as Ex. 12. The case was remanded and eventually decided after an extensive bench trial. The Oklahoma Supreme Court has therefore ruled that the same issues which CRC seeks to adjudicate in its Motion are not appropriate for summary judgment.[8]

---

[8] CRC also relies upon an unauthenticated jury instruction allegedly given in *Bridenstine v. Kaiser Francis,* Case No. CJ-2001-1, District Court of Texas County (CRC's Ex. 63), and an opinion in *Hill v. Kaiser Francis,* 2012 U.S. Dist. LEXIS 139416 (W.D. Okla. 2012). Motion at 24-25. However, *Bridenstine* did not consider the jury instruction CRC claims it endorsed, because the operator did not elect to challenge that instruction – rather the opinion states that the operator challenged the instruction defining the implied

There are substantial fact issues as set forth below, related to the adjudication sought by CRC. Those fact issues preclude summary judgment.

## C.   CRC HAS NOT MET ITS SUMMARY JUDGMENT BURDEN WITH RESPECT TO "FUEL GAS."

CRC's Statement of Facts does not establish that CRC's lease contains a "Fuel Gas" clause, or that there was ever any gas "used" off the lease. Other than portions of quotations purportedly taken from leases, CRC does not cite a single fact about the gas purportedly "used," its condition, its sale, or its "use" for any purpose on or off the lease. For these reasons alone, CRC's Motion should be denied with respect to any "Fuel Gas" claims.

Moreover, none of the so-called "Fuel Gas" clauses purportedly quoted in CRC's Ex. 28.2 (which allegedly includes CRC's lease) so much as mention fuel. For example, the lease language requiring royalty to be paid on "gas sold, used off the premises, or in the manufacture of products therefrom" (CRC Ex. 28.2 at 1) does not mention gas used as fuel and there is no evidence in the record to support any inference or contention. As the moving party, CRC is not entitled to inferences from undisputed facts, let alone inferences from an absence of facts created by its own failure to meet its summary judgment burden. There is simply no basis for the Court to conclude that the quoted language has anything to do with fuel.

## D.   CRC'S UNSUPPORTED FUEL USE ARGUMENT IS BASED ON AN ERRONEOUS READING OF THE LAW.

---

covenant to market, (Ex. 13 at ¶15), which is not the same as the instruction provided to this Court, which concerns "Determining Whether Express Lease Provisions Apply."

CRC asserts that gas is used to power compressors in the gathering system and at the gas plant to create a marketable product. Motion at 6. CRC does not cite any precedential authority to support this position or include any numbered fact in its Statement of Undisputed facts or evidence that the gas so used was necessary to create a marketable product. Instead, CRC relies solely upon its view that such costs are always required to make a marketable product as a matter of law, and thus, are not deductible. CRC's argument is contrary to *Mittelstaedt v. Santa Fe Minerals,* 954 P.2d 1203, 1209 (Okla. 1998), as will be discussed in more detail below.

CRC's lease requires payment of royalties on gas used off the leased premises, and all other gas produced from a gas well, of

> "1/4 of the gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than the actual amount received by the lessee . . . ."

AF No. 3. SM did not receive any proceeds for the gas used off the leased premises. *Id.* at No. 9. The ordinary meaning of "proceeds" refers to the amounts obtained from an actual sale. The term "proceeds" is generally defined by Black's Law Dictionary (7th ed. 1999) as "the amount of money **received** from a sale." (Emphasis added). *See U.S. v. Roberts,* 88 F.3d 872, 877 (10th Cir. 1996) (common and ordinary usage of a statutory term not specifically defined by statute may be obtained by reference to a dictionary). In the oil and gas context, "proceeds," likewise, have been defined as "[t]he money **obtained** by an **actual sale**." Williams & Meyers, *Oil and Gas Law* vol. 8 at 829 (Matthew Bender 2003) (emphasis added). Oil and gas cases from other jurisdictions have also defined "proceeds" as requiring an actual sale of oil or gas. *See Waechter v.*

*Amoco Production Co.*, 537 P.2d 228, 249 (Kan. 1975) ("Proceeds ordinarily refer to the **money obtained** by an **actual sale**.") (emphasis added); *Sondrol v. Placid Oil Co.*, 23 F.3d 1341, 1343 (8th Cir. 1994) ("proceeds" means "the **money obtained** from an **actual sale**") (emphasis added); *Imperial Colliery Co. v. OXY USA Inc.*, 912 F.2d 696, 700 (4th Cir. 1990) (under "proceeds" lease, royalty is paid based "upon the amount of money **received** by the lessee upon its sale of gas") (emphasis added). CRC's lease with this clause, in plain terms, expresses the parties' intent that the amount received by SM from its sale of the gas controls and limits SM Energy's royalty obligation. SM can have no additional or greater obligation than to pay royalties based upon the proceeds received by SM upon its sale of the gas on the lease. Because SM did not receive proceeds for any gas used as "fuel," CRC is not entitled to summary judgment with respect to its lease with SM.[9]

---

[9] At pages 8 and 9 of its Motion, CRC argues that SM's wellhead sales were a "mere sham," citing to *Howell v. Texaco, Inc.,* 112 p.3d 1154 Okla. 2004), to argue that, because SM sells gas to FW pursuant to contracts with FW (an affiliated company), those contracts must automatically be disregarded and cannot be the basis for calculating royalty payments in Oklahoma. This is not the law in Oklahoma. First, *Howell* did not involve an affiliate sale, but instead involved gas produced pursuant to "market value" leases, and transferred between two divisions of the same entity - Texaco, Inc. *Id.* at ¶6, 1157. The *Howell* court characterized the transaction as an "intra-company" sale since it was between Texaco's production division and Texaco's gas plant division. *Id.* Here, the evidence shows that CRC's lease is a "gross proceeds" leases, not a "market value" leases. *See* AF No. 3. Moreover, *Howell* is not on point for purposes of affiliate sales because there was no "intra-company" sale in this case.

Second, there is nothing inherently nefarious about affiliate transactions. In *Cactus Petroleum Corp. v. Chesapeake Operating, Inc.,* 222 P.3d 12 (Okla. 2009), and *McCall v. Chesapeake Energy Corp.,* 164 P.3d 1120 (Okla. Civ. App. 2007), the issue central to both cases was whether charges and fees paid between a parent and subsidiary were subject to challenge by plaintiff working interest owners asserting the impropriety of such charges and fees. The courts affirmed that transactions between the parent and subsidiary

## E. CRC IS NOT ENTITLED TO SUMMARY JUDGMENT UNDER ITS LEASE THAT EXPRESSLY AUTHORIZES SM ENERGY TO USE GAS TO BENEFIT THE LEASE.

CRC's' argument relating to fuel use is also contrary to the clause of the CRC's lease that provides that SM Energy has the "right to use, free of cost, gas, oil and water produced on said land for its operations thereon." AF No. 1.

In *Lackey v. Ohio Oil Co.,* 138 F.2d 449 (10th Cir. 1943), the court, applying Oklahoma law, construed royalties clauses providing for royalties to be paid on gas used

---

were not improper *per se*, because the parent and subsidiary were separate entities, and the costs at issue were customary and reasonable. 222 P.3d at 19; 164 P.3d at 1126- 27.

There are important and valid reasons for producing companies to form gathering or midstream service companies to install pipelines, set meters, and provide other services related to the transportation of gas from the well to points downstream. SM representatives testified that FW was formed in order to move the gas to locations downstream in hopes of getting a better price, and to facilitate the marketing of the gas and the ability to pay the appropriate taxes under Oklahoma Tax Commission regulations. W. Tr. at 59:18-60:1; 61:8-10: 62:4-63:10; 86:16-87:4; 115:2-17; T. Tr. at 165:22-166:1; 170:5-13. It was also necessary to create a separate marketing entity because of confidentiality issues present when dealing with third-party purchasers. P. Tr. at 65:1-17; 66:2-21; 68:2-6; 134:12-135:14.

The evidence shows that FW also purchased gas at the wellhead from at least 15 unaffiliated third-party producers owning wells connected to the Coal County gathering system, on terms identical or similar to SM's contracts with FW. *See* AF No. 6. SM also tested FW's contract prices against third-party terms on a semi-annual base. AF No. 7. This evidence establishes that SM Energy's contracts with s were fair. See *Ladd Petroleum Corp. v. Oklahoma Tax Comm'n,* 1989 OK 5, 767 P.2d 879, 883 (recognizing that a producing entity may enter into a sales contract with a related purchasing entity when the terms of the contract are identical to contracts entered into by the purchasing entity with third-party producers); *Craig v. Champlin Petroleum Co.,* 435 F.2d 933, 938-39 (10th Cir. 1971) (recognizing that affiliate sales contracts are not ipso facto to be ignored but must be examined for fairness). To accept CRC's position would essentially hold that while a contract between FW and an unaffiliated producer on the same terms and conditions as a contract between FW and SM could be considered for purposes of calculating royalty payments, those same exact contract terms must be disregarded as to contracts between FW and SM, simply because there is an affiliate relationship. This is neither logical, nor the law. In any event, this disputed fact is another reason why CRC is not entitled to partial summary judgment.

off the leased premises. The court held that under Oklahoma law, "'the phrase 'used off the premises' . . . means 'gas appropriated to a purpose foreign to utilization' for the development of the lease." *Id.* at 451. The court relied on *Mussellem v. Magnolia Petroleum Co.,* 1924 OK 297, ¶ 40, 231 P. 526, 527. The court in *Mussellem* held, in connection with a clause allowing the lessee free use of gas on the leased premises, that:

> Another clause of the contract provides that the lessee should have free of cost any gas produced for the development and use "on" the premises. For any gas coming from an oil well and used "off" the premises, $ 50 per year was to be paid. The words "on" and "off" are correlatives, and to determine what the latter means might be best reached by a proper conception of what the word "on," as used in the lease, conveyed. It had no other meaning than used in connection with the development of the premises. The words "off the premises" had no other meaning to the parties than if the gas was appropriated to a purpose foreign to utilization for the benefit of development of the property itself. In other words, it did not have particular reference to place where used, but the purpose and objects of its use, to wit, one foreign to the development of the premises in question.

Similarly, in *Bice v. Petro-Hunt, L.L.C.,* 2009 ND 124, 768 N.W.2d 496, the court held that the lessee may use gas off the leased premises in connection with its processing operations, which benefited the lease. In *Bice,* an operator of wells in a field processed the gas produced from the well in the field to remove sulfide and liquid hydrocarbons and then sold the residue gas and other plant products at or downstream of the tailgate of the processing plant. Royalty owners brought a class action, alleging, among other claims, that the lessee did not have the right to use of residue gas off of the leased premises. The North Dakota Supreme Court affirmed the trial court's grant of summary judgment in favor of the lessee, Petro-Hunt, including the trial court's determination that Petro-Hunt "could use residue gas off of the leased premises without paying royalty on that gas." *Id.,* 768 N.W.2d at 502. In reaching that result, the court construed "free use" clauses that

provided:

> The leases state either the lessees "shall have the right to use, free of cost, gas, oil, and water produced on said land for its operation thereon" or the lessees "shall have free use of oil, gas and water from said land . . . for all its operations hereunder."

*Id.* at 503.

Petro-Hunt took residue gas already processed at the plant and used it as fuel at "the central tank batteries to heat, treat, and separate the oil, gas and water into separate streams." *Id.* The plaintiff royalty class asserted that the leases' "free use" clause only allowed the lessee to use gas free of cost if it used the gas on the leased premises. The court rejected this contention, reasoning as follows:

> Interpreting the "free use" clause to only allow Petro-Hunt to use residue gas on the leased premises could lead to an absurd result because it would require lessors who have a central tank battery on their property to bear the entire burden of the "free use" clause, notwithstanding benefits conferred on the other lessors. The record demonstrates the residue gas is used in furtherance of overall lease operations because it is used to fuel equipment which separates the oil, gas and water into separate streams, thereby allowing the Little Knife Gas Plant to process the gas into a marketable product and to recover other products sold at the plant tailgate. Since the residue gas is used in furtherance of the leased operations, we conclude the district court did not err in determining the "free use" clause allowed Petro-Hunt to use the residue gas off of the leased premises to fuel the central tank batteries.

*Id.* at 504. *See also Atlantic Richfield Co. v. Holbein,* 672 S.W.2d 507 (Tex. App. – Dallas 1984, *writ ref'd, n.r.e.*) (court held that under "free use" clause, the lessee was not required to pay royalties on fuel gas used to operate a compressor facility that compressed gas produced from the leased premises and from other lands).

Under the above case law, the "free use" clause authorizes SM to use gas produced from a lease that furthers operations of the lease, whether or not the gas is used

on or off the leased premises. As held in *Bice,* it would be wasteful and more costly to a lessor if a lessee was required to place a compressor or a processing plant on each lease in order to fall within the "free use" clause.

## F.     CRC'S MOTION IS LEGALLY INSUFFICIENT BECAUSE CRC DID NOT ADDRESS THE FACTORS REQUIRED BY *MITTELSTAEDT.*

CRC seeks a ruling from this Court that SM, under its lease with CRC, is not entitled to deduct "Midstream Service Fees" from CRC's royalties. Motion at 2. However, CRC has not addressed all of the factors required to make such a determination. Those factors are clearly set forth in *Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203, 1209 (Okla. 1998). Under *Mittelstaedt,* when the implied duty to create a marketable product at no cost to the lessee is present, post-production costs "may or may not be allocated, based upon the nature of the cost as it relates to the duties of the lessee created by the express language of the lease, the implied covenants, and custom and usage in the industry." *Id.*[10] Here, CRC did not set forth "the nature of the costs," "the express language of the lease," or the "custom and usage in the industry." Because CRC does not address the nature of any specific cost as it relates to SM's duties created by the leases, the implied covenants, and custom and usage, CRC is not entitled to summary judgment.

With respect to express language of its lease, CRC relies solely on a few words or a single phrase excerpted from CRC's lease as supporting its request for a determination that costs may not be deducted from royalties. Whether or not costs may be deducted

---

[10] The Court further stated that "[g]enerally, custom and usage in the industry are used in determining the scope of duties created by the lease." *Id.* at ¶ 20, 954 P.2d at 1208.

from royalties cannot be determined based on a few words excerpted from a royalty clause of an oil and gas lease under *Mittelstaedt*.

Moreover, the **sole** fact relating to the purported deduction of costs from royalties stated by CRC in its CS is that SM allegedly charges royalty owners for services provided by midstream companies in gathering, compression, dehydration, treating, and processing gas produced from the wells in which CRC owns royalty interests. CS at ¶4. CRC does not discuss the nature of such costs or the circumstances under which the costs are incurred, as required by *Mittelstaedt*. CRC does not include any underlying facts, supported by the evidence, addressing whether the gas was marketable prior to the purported imposition of "midstream" fees or even whether SM actually sold the gas at the well. As stated in *Mittelstaedt:* "Post-production costs must be examined on an **individual basis** to determine if they are within the class of costs shared by a royalty interest." 954 P.2d at 1208 (emphasis added). But the evidence here shows that CRC's processors in interest were not charged any fuel gas or TRO fee, or a compression fee. AF No. 10.

## G. CRC SEEKS AN IMPERMISSIBLE ABSTRACT RULING.

CRC seeks a ruling that no midstream fees may be deducted from royalties. CRC seeks this ruling (which is contrary to Oklahoma law) without attempting to show the lease language that relates to specific wells, how gas from the specific wells is marketed and where it is sold, or any of the factors set forth in *Mittelstaedt*. Thus, CRC seeks an abstract ruling that is unrelated to the actual facts. An abstract ruling is not the proper subject of summary judgment. "[A] federal court [does not have] the power to render

advisory opinions....'" *Presier v. Newkirk*, 95 S.Ct. 2330, 2334 (1975); *accord*

*Oklahoma City, Okl. v. Dulick*, 318 F.2d 830, 831 (10th Cir. 1963) ("Federal courts have

no power to give advisory opinions or to adjudicate constitutional questions in the

absence of 'concrete legal issues, presented in actual cases, not abstractions.'")

**H.    CRC'S ARGUMENTS APPARENTLY ARE BASED ON THE FALSE PREMISE THAT THE GAS MUST BE DELIVERED OFF THE LEASE TO AN INTERSTATE TRANSMISSION LINE IN ORDER TO SATISFY THE MARKETABLE PRODUCT REQUIREMENT.**

**(1)    Any Duty to Create a Marketable Product at No Cost to the Lessor Does not Require that SM Energy Deliver the Gas to a Distant Market at an Interstate Transmission Line.**

CRC asserts that no "midstream fees" may be deducted from royalties because gas

is never in a marketable condition until it is in a condition to be received by a mainline

transmission pipeline.[11] As stated above, CRC did not include any facts, supported by

evidence, addressing the marketability of the gas produced from the wells at issue. CRC's

assertion is based upon the unstated assumption that any and all midstream fees are

incurred to make the gas marketable and cannot be deducted. CRC's implied assumption,

however, is contrary to *Mittelstaedt*. All of the costs discussed in *Mittelstaedt* involved

costs incurred **off** of the leased premises and before the gas entered the purchaser's

pipeline and, thus, fall within what CRC calls "midstream fees." *Mittelstaedt*, ¶ 3. 954

P.2d at 1205. Yet, the Court in *Mittelstaedt*, examining a lease that provided that royalties

were to be based upon the **gross proceeds** received for gas sold, held that the royalty

owners were required to bear their share of the "post-production costs of transporting,

---

[11] In fact, at least one of the wells covered by CRC's lease was in a condition to be received by a mainline transmission pipeline. T. Tr. at 223:1-11.

18

blending, compression, and dehydration" under certain circumstances (none of which are addressed by CRC in its Motion). *Mittelstaedt,* ¶ 30, 954 P.2d at 1210.[12] The Court held that post-production costs could be deducted under a gross proceeds royalty clause "when actual royalty revenues increase in proportion to the costs assessed against the royalty interest, when the costs are associated with transforming an already marketable product into an enhanced product, and when the lessee meets its burden of showing these facts." *Id.*[13]   *Mittelstaedt* expressly rejected the argument that midstream costs are never deductible under the implied covenant to market:

> The Mittelstaedts argue that when the sale is at a distant market the implied duty of the lessee under the lease is to pay for all of those costs associated with delivering the gas at the point of sale, i.e., to get the product to the place of sale in marketable form at the expense of the lessee. This view is incorrect as to distant markets.

*Id.* at ¶ 13, 954 P.2d at 1207.

Thus, CRC's premise that "midstream" services are always rendered to make gas marketable is false. For that reason alone, CRC's Motion should be denied.

The gas produced from each of the wells covered by CRC's lease is sold on the lease, and thus is marketable at the wellhead. AF at No. 4. However, even where gas is

---

[12] *See also Rees v. BP America Production Co.,* 2009 OK CIV APP 37, ¶ 4, 211 P.3d 910, 911 ("We think it sufficient to note that (1) gas produced by the wells in question was marketable at the wellhead, (2) the costs incurred between the wellhead and the pipeline tailgate to prepare the gas for introduction into the pipeline are post-production costs, and (3) the propriety of deducting those costs involves an individualized inquiry of the factors discussed in *Mittelstaedt* . . .'") (citations omitted).

[13] Even where summary judgment is sought on an issue as to which the opposing party has the burden of proof, the party moving for summary judgment still must carry its burden of showing the absence of any genuine issue of fact. *See Trainor,* 318 F.3d at 982. SM has produced evidence that the gas at issue here is marketable at the wellhead. AF at No. 4. Thus, CRC cannot claim there is an "absence of any genuine issue of fact" with regard to this issue.

not sold on the lease, that does not mean that the gas was not marketable at the well. *See, e.g, Mittelstaedt*, ¶ 13, 954 P.2d at 1207 (reaffirming *Johnson v. Jernigan,* 1970 OK 180, 475 P.2d 396, which allowed the lessee to allocate transportation costs to lessors when the point of sale is away from the lease when there is no market available at the lease); *id.* ¶ 20, 954 P.2d at 1208 ("[t]he lessee has a duty to provide a marketable product available to market at the wellhead or leased premises"); *Howell v. Texaco Inc.,* 2004 OK 92, ¶ 20, 112 P.3d 1154, 1160 ("royalty owners are entitled only to the value of the gas that is marketable at the wellhead"). Here, the gas was transported to distant markets in order to enhance the value of the gas and to receive a better price for the gas, for the benefit of both SM and CRC. *See* footnote 6, *supra.* Moreover, the costs associated with moving that gas are reasonable. *See* AF No. ¶8.

### (2) Any Duty to Create a Marketable Product Does Not Require that the Lessee Process the Gas at No Cost to the Lessor.

*Mittelstaedt* did not involve processing gas for the removal of natural gas liquids ("NGLs") and the sale of NGLs and residue gas. Under Oklahoma law, a lessee is not required, under the implied covenant to market, to build a processing plant, process the gas that is produced, and then sell and pay royalties on the value of NGLs and residue gas. In *State ex rel. Commissioners of Land Office v. Cities Service Oil Co.,* 1957 OK 272, 317 P.2d 722, the Court examined a royalty clause that required the lessee to deliver or to pay the market value of one-eighth of the casinghead gas produced from the lease. The plaintiff claimed that it was entitled to the market value of one-eighth of the products that had been extracted or processed from the casinghead gas, *i.e.*, NGLs and residue gas.

The court rejected this contention, holding:

> The substance and gist of plaintiff's complaint under the above quoted paragraph, viz., that defendant has not paid it 1/8th of the value, or sale price, of the constituents or products of the casinghead gas, stated no cause of action against defendant, in view of the fact that defendant's obligation, as to payment for casinghead gas produced under the lease, **could legally extend no further than paying 1/8th of the value of said gas in its natural form.**

*Id.,* ¶ 8, 317 P.2d at 727 (emphasis added).

Similarly, in *Barby v. Cabot Corp.,* 465 F.2d 11 (10th Cir. 1972), the court construed a variety of royalty clauses, including clauses requiring payment (1) one-eighth of the proceeds if sold at the well, or if marketed off the leased premises, one-eighth of the market value at the well; (2) one-eighth at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom; (3) the market value at the mouth of the well of one-eighth of the gas sold or used, provided that on gas sold at the wells, the royalty shall be one-eighth of the amount realized from such sale; and (4) one-eighth of the proceeds from the sale of the gas, as such. *Id.* at n. 1. The court held that that the royalty owners were entitled only to the value of the unprocessed gas, *i.e.,* the gas as it was produced on the lease in its natural state.[14]

The holdings above are consistent with the general principles for construing oil and gas leases, which are discussed below. As discussed below, implied covenants are a matter of intent between the parties. It cannot be implied in this case that SM had a duty

---

[14] SM's position is also supported by Professor Eugene Kuntz, who stated that a lessee is not required to process gas, without cost to the lessor, under the implied covenant to create a marketable product. 3 E. Kuntz, *Law of Oil and Gas* § 40.5 at 351 (1989) ("There is, however, no reason to impose on the lessee the costs of refining or processing the product.").

under each oil and gas lease to construct the extensive facilities and plant necessary to process gas in order to extract NGLs and residue gas. CRC has not demonstrated that the parties had any intent that products resulting from the manufacturing process should be the basis for paying royalties, cost-free to the royalty owners. The processing of natural gas involves a huge undertaking and the installation of extensive facilities. An obligation of the magnitude argued by CRC would have been expressly stated, not left to implication. Therefore, CRC is not entitled to summary judgment.

**(3)      Reineke's Position that No Midstream Fees May be Charged to   the Royalty Owner is Contrary to Oklahoma Law.**

CRC's expert witness, Daniel Reineke, makes the categorical statement that all midstream fees are incurred to make the gas marketable. CRC's Ex. 51 at 22.  As shown above, Mr. Reineke's statement is contrary to Oklahoma law. Mr. Reineke's statement is entirely conclusory and is not based upon an examination of the facts of this case. Mr. Reineke does not address the wells at issue, the marketing of the gas produced from those wells, and what, if any, services are performed in connection with the gas produced form each well. Mr. Reineke's statement requires no response other than to state that his conclusion was expressly rejected by *Mittelstaedt. Mittelstaedt,* ¶¶ 13, 26.

*Mittelstaedt* expressly recognizes that gas may be marketable at the well and further holds that these costs may be proportionately charged against the lessor when the gas is delivered to a distant market if the costs are reasonable and incurred to enhance the value of an already marketable product. It is SM's position that the gas in this case was put in a marketable form at the well. However, it is not necessary for SM to present

evidence of that fact inasmuch as CRC's (1) position as to universal non-deductibility of these costs, (2) failure to recognize that gas may be a marketable at the well, and (3) failure to present any specific evidence that the gas is not marketable at the well requires denial of summary judgment. *See Murray,* 312 F.3d at 1200.

## I. THE LANGUAGE OF EACH LEASE MUST BE EXAMINED AND THE RULES OF CONTRACT CONSTRUCTION APPLIED.

CRC's argument is that the lessee may not deduct any costs allegedly necessary to make gas marketable unless the oil and gas lease explicitly specifies the exact costs that may be deducted and states that such costs may be deducted in order to prepare the gas for sale. CRC's argument is contrary to the Oklahoma Supreme Court decisions upon which they rely. Under Oklahoma law, the language of each lease must be examined in determining the proper payment of royalties, as discussed below.[15]

---

[15] It should be pointed out that CRC's argument that oil and gas leases are adhesion contracts is not supported by fact or law. CRC asserts that the leases are standard form contracts not subject to negotiation. This is not true. CRC itself points to 81 different royalty clauses in its exhibits. *See* CRC's Ex. 28.1. Moreover, CRC is a knowledgeable, sophisticated, and experienced royalty investor. AF No. 12. Therefore, it is not plausible for CRC to assert that the leases are contracts of adhesion, in which it had no say. In addition, CRC took its lease at issue here **after** this case was filed, and **after** it had knowledge of SM Energy's royalty payment methods. *See* AF No. 13. Armed with all its knowledge, it still chose to purchase the lease at issue, presumably so it could continue to serve as a class representative, after the sale to Enervest of its prior leases and the settlement relative thereto eliminated its claims. In no way can it be argued that CRC "had no say" in the matter. Moreover, because CRC knew of the manner in which SM calculated royalties prior to acquiring the May 2015 lease SM Energy (*see* AF No. 13) it does not have a claim against SM. *See Woodmont, Inc. v. Daniels,* 274 F.2d 132 140 (10th Cir. 1959) (finding "contractor cannot recover the benefit of his bargain after he learned of the true facts and contracted prospectively in the face of such knowledge"); *Derakhshan v. Tizzio,* 270 P.3d 215, 219 (Okla. Civ. App. 2011) (quoting from "Notes on Use" to OUJI-Civ. No. 18.11: "If the plaintiff learned of the actual facts before taking any action in reliance, for example, entering into a contract with another person, then the

As explained above, CRC relies on only a few words or a phrase taken out of context of its royalty clause in asserting that the implied covenant to market has not been "abrogated." However, an oil and gas lease is subject to the general rules governing the construction of contracts, including the rule that the intent of the parties is to be determined from reading the contract as a whole. *Indian Territory Illuminating Oil Co. v. Rosamond,* 1941 OK 410, ¶ 12, 120 P.2d 349, 353 ("In general the law relating to the interpretation of other contracts applies to" oil and gas leases.); *Roye Realty & Developing, Inc. v. Watson,* 2 P.3d 320, 329 (Okla. 1996); *Pitco Production Co. v. Chaparral Energy, Inc.,* 2003 OK 5, ¶ 14, 63 P.3d 541, 545-46. As explained in *Roye Realty*:

> Although oil and gas leases are to be construed against lessee and in favor of lessor, (citation omitted) the contract must be taken as a whole so as to "give effect to every part using each clause to help interpret the others and that apply the related rule of interpretation, 15 O.S. § 155 (1961), that the intention of the parties is to be ascertained from the writing alone if possible." *Panhandle Cooperative Royalty Co. v. Cunningham,* 495 P.2d 108, 113 (Okla. 1972). Oil and gas leases are to be construed in accord with reasonable intent of the parties, if ascertainable from the four corners of the contract. *Davon Drilling Company v. Ginder,* 467 P.2d 470, 472 (Okla. 1970). A fundamental precept of contract law in Oklahoma is that the law will not make a better contract than the parties themselves entered. The judicial function of this Court is to enforce the contract as it is written. *Great Western Oil & Gas Co. v. Mitchell,* 326 P.2d 794, 798 (Okla. 1958).

¶ 33, 2 P.3d at 329.

In *Mittelstaedt,* the Court made it clear that the language of each lease must be

---

plaintiff's claim must fail, not because of waiver but because of failure to meet the burden of proof on the issue of reliance"). The fact that CRC does not have any claim against SM is another reason why CRC is not entitled to partial summary judgment.

examined. For example, the Court pointed out that in its prior decisions[16] as to what costs may be borne by royalty owners, "the Court had to fix the rights and duties of the parties according to the language of the leases and the implied covenants that go with them." *Mittelstaedt,* ¶ *8,* 954 P.2d at 1205-1206. The Court further stated that it examines the language of the lease and: "We use the plain meaning of the terms when doing so." *Id.,* ¶ 9, 954 P.2d at 1206. The Oklahoma Court of Civil Appeals also determined that the language of each lease must be examined to determine what costs may be deducted. *Panola Independent School Dist. No. 4 v. Unit Petroleum Co.,* 2012 OK CIV APP 94, ¶ 20, 287 P.3d 1033 ("Each of these lease types requires a different inquiry in determining the royalty owners claim for underpayment of royalties based on deduction of post-production costs.").[17]

## J.  THE IMPLIED COVENANT TO CREATE A MARKETABLE PRODUCT

### (1)  The Covenant is Implied as a Matter of Fact, Based Upon the Intent of the Parties, and Cannot be Implied Where it is Inconsistent with Express Lease Terms.

The duty to create a marketable product, without cost to the lessor, is a part of the implied covenant to market. *Wood v. TXO Production Corp.,* 1992 OK 100, ¶ 11, 854 P.2d 880. In Oklahoma, covenants implied in oil and gas leases are implied in fact, not in law. *Rogers v. Heston Oil Co.,* 1984 OK 75, 735 P.2d 542, 545; *Indian Territory*

---

[16] *Johnson v. Jernigan,* 1970 OK 180, 475 P.2d 396; *Wood v. TXO Production Corp.,* 1992 OK 100, 854 P.2d 880, and *TXO Production Corp .v. State ex rel. Comm'rs of the Land Office,* 1994 OK 131, 903 P.2d 259.

[17] As stated by one court: "If anything is clear from the Court's opinion in *Mittelstaedt,* it is that there are few all-embracing rules governing allocation of costs to royalty interests, at least once the gas has enough pressure behind it to get it off the lease. . . ." *Foster v. Merit Energy Co,* 282 F.R.D. 541, 550 (W.D. Okla. 2012).

*Illuminating Oil Co. v. Rosamond*, 1941 OK 410, 120 P.2d 349, 354. The covenant does

not arise out of public policy but is implied in fact to carry out the intent of the parties.

*Id.* In *Indian Territory,* the Court said:

> [I]mplied covenants do not arise out of public policy …. That such covenants are part
> of the lease, embodied therein in order to carry out the evident intention of the
> contracting parties, seems reasonably well settled.

*Indian Territory*, ¶ 14, 120 P.2d at 354. *See also New Dominion v. Parks Family Co.,*

2008 OK CIV APP 112, ¶ 13, 216 P.3d 292, 296 ("Implied covenants arise from the

written lease of the parties, they are not simply created by the Supreme Court as a matter

of universal justice."); *Wolfe v. Texas Co.,* 83 F.2d 425, 432 (10th Cir. 1936) ("In the

absence of an express provision in an oil and gas lease with respect to marketing the

production, there is an implied duty on the part of the lessee to make diligent efforts to

market the production in order that the lessor may realize on his royalty interest.").

Thus, the implied covenant "becomes a part of the lease only where its inclusion

in the lease is <u>not inconsistent with other terms of the lease</u>." *Rogers,* 735 P.2d at 546.

*See also Ashland Oil & Refining Co. v. Cities Service Gas Co.,* 462 F.2d 204, 213 n. 9

(10th Cir. 1972) (implied covenant to market exists under a lease in the absence of an

express provision negativing such an implication); *Gazin v. Pan American Petroleum*

*Corp.,* 1961 OK 300, 367 P.2d 1010, syl. 2 (stating that a covenant to market could be

implied "[w]here oil and gas lease does not, in express terms, provide for the marketing

of the product . . . ."); *Jones v. University of Central Oklahoma,* 1995 OK 138, ¶¶ 9, 11 ,

910 P.2d 987 ("[A] contract will not be implied . . . against the express declaration of the

person to be charged. . . . [I]f an express contract between the parties is established, a

contract covering the identical subject cannot be implied, because an implied agreement cannot coexist with the express contract.").

In *Krug v. Helmerich & Payne, Inc.*, 2013 OK 104, 320 P.3d 1012, the Oklahoma Supreme Court reaffirmed the rule that implied covenants of oil and gas leases arise from the intention of the parties as expressed in the language of the lease itself:

> "An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument."

Id., ¶ 36 (quoting *Danciger Oil & Refining Co. of Texas v. Powell*, 154 S.W.2d 632, 635).[18]

### (2)     **Express Words of Negation are Not Required.**

There is no requirement that the implied covenant be negated by words expressly stating that the parties disclaim the implied covenant to market. This is demonstrated by the very case cited by CRC, *Wood v. TXO Production Corp.*, 854 P.2d 880 (Okla. 1992). *Wood* involved the issue of whether the lessee had the right to deduct compression costs that were incurred **on the lease** and before the gas entered the purchaser's pipeline. The Court in *Wood* did **not** hold that words expressly dealing with compression costs are the only words that can indicate that costs of compression may be deducted. In fact, the Court's discussion in *Wood* of *Hanna Oil & Gas Co. v. Taylor*, 759 S.W.2d 563 (Ark.

---

[18] This rule is not unique to oil and gas leases. It is applicable to other types of leases and contracts as well. *Mercury Inv. Co. v. F.W. Woolworth Co.*, 1985 OK 38, 706 P.2d 523, 530.

1988) is contrary to such an argument. The Court pointed out that in *Hanna* the court stated that if the lessee's intention was to be able to deduct compression costs from royalties, they could have made a reference to "net proceeds." 854 P.2d at 881. Thus, the Court recognized that words expressly addressing compression costs are not necessary for such costs to be deductible.

The fact that an explicit statement identifying specific types of costs that may be deducted is not necessary is also shown by other cases discussing negation of implied covenants under Oklahoma law. For example, although the parties did not expressly disclaim the lessee's implied duty to restore the leased premises, the Oklahoma Supreme Court held that such a duty could not be implied where the oil and gas lease expressly authorized the lessee to erect structures on the leased premises and to remove all structures, machinery and equipment upon termination of the lease. *Fox v. Cities Service Oil Co.,* 1948 OK 224, 200 P.2d 398. Similarly, in *Oklahoma Plaza Investors v. Wal-Mart Stores,* 155 F.3d 1179, 1180 (10th Cir. 1998), the court held that a covenant of continuous use could not be implied where the lease expressly allowed the lessee to assign or sublease the premises. *See also Devine v. Ladd Petroleum Corp.,* 805 F.2d 348, 350-351 (10th Cir. 1986) (court held that express agreement to drill two additional wells on leased property precluded any implied covenant to drill any further wells to protect against drainage or to further develop, stating "the law is clear that express covenants do control over implied covenants."); *Wilds v. Universal Resources Corp.,* 1983 OK 35, ¶ 13, 662 P.2d 303, 306 ("The presence of an express provision on drilling the initial well eliminates the need for the implied covenant relating thereto on the general principle that

express lease provisions negate the implication of covenants on the same subject matter."); *Central States Prod. Corp. v. Jordan,* 1939 OK 35, 86 P.2d 790, syl. 1 ("Where an oil and gas lease contains an express stipulation for delay in development . . . an implied covenant for development will not be permitted to change the agreement of the parties.).

**(3)**     **The Express Terms of CRC's Oil and Gas Lease**

CRC's lease provides for royalties on "gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, 1/4 of the gross proceeds received . . . **but in no event more than 1/4 of the actual amount received by the lessee.**"[19] AF No. 3 (emphasis added). CRC argues that under *Mittelstaedt,* CRC may not deduct any "midstream fees" from royalties under "gross proceeds" clauses. CRC's argument is contrary to the Oklahoma Supreme Court's decision in *Mittelstaedt* and the express terms of the lease.

In *Mittelstaedt,* the Court held that a clause providing for royalties based upon the "gross proceeds" received by the lessee, "when considered by itself, prohibits a lessee from deducting a proportionate share of transportation, compression, dehydration, and blending costs when such costs are associated with creating a marketable product." 954 P.2d at 1205. The Court further held, however, "that the lessor must bear a proportionate

---

[19] CRC's lease illustrates that lease language cannot be read in isolation. Here, royalty calculated based upon 1/4 of the gross proceeds must then be examined to see if it is more than "1/4 of the actual amount received" by SM, which could result in a reduction of the royalties.

share of such costs if the lessee can show (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest."

*Id.* The Court further stated:

> In *Johnson v. Jernigan*, 475 P.2d 396 (Okla. 1970) we explained that gross proceeds "has reference to the value of the gas on the lease property without deducting any of the expenses involved in developing and marketing the dry gas to this point of delivery." *Id.* 475 P.2d at 399. Thus, "gross proceeds" does indicate an amount without deduction from, or charge against, the royalty interest, <u>but only when the point of sale occurs at the leased premises.</u>

*Id.* at 1206 (emphasis added). CRC did not address the circumstances under which costs could be deducted as held in *Mittelstaedt.* Therefore, CRC is not entitled to summary judgment.

WHEREFORE, SM prays that this Court deny CRC's Motion for all the reasons stated above, and that SM be awarded its costs, attorneys' fees and such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ J. Kevin Hayes
J. Kevin Hayes, OBA #4003
Pamela S. Anderson, OBA #11613
**HALL, ESTILL, HARDWICK, GABLE,**
**GOLDEN & NELSON, P.C.**
320 South Boston Avenue, Suite 400
Tulsa, OK  74103-3708
Telephone (918) 594-0400
Facsimile (918) 594-0505
**ATTORNEYS FOR DEFENDANT**
**SM ENERGY COMPANY**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the Following ECF registrants:

Robert N. Barnes
Patranell Lewis
Michael Angelovich
Bradley E. Beckworth
Jeffrey J. Angelovich
Neil Smith
Susan Whatley
Lisa Baldwin
Trey Duck

/s/ J. Kevin Hayes

3951531.1:225960:00209