# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CHIEFTAIN ROYALTY COMPANY,

      Plaintiff,

v.

                                   Case No. 5:18-CV-01225-D

SM ENERGY COMPANY (including
predecessors, successors and affiliates),

      Defendant.

## SM ENERGY COMPANY'S RESPONSE TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND BRIEF IN SUPPORT THEREOF

# TABLE OF CONTENTS

OVERVIEW ........................................................................................ 1

ARGUMENTS AND AUTHORITIES ................................................. 2

I.      CRC BEARS THE BURDEN OF DEMONSTRATING THAT CLASS
        ACTION REQUIREMENTS ARE MET ...................................... 2

II.     THE RIGHT TO CLASS CERTIFICATION MUST BE DETERMINED
        FROM THE NATURE OF PLAINTIFF'S UNDERLYING CLAIMS ........... 2

III.    COMMONALITY IS LACKING ................................................. 3

        A.    "Affiliate Sales" under Oklahoma Law ....................... 4

        B.    "Best Price Available" .............................................. 7

        C.    Breach of Leases ..................................................... 9

        D.    "Marketability" ...................................................... 16

        E.    Fuel Gas ................................................................. 20

        F.    "Profit Fee" Claim and "Double Charges" Claim ...... 22

        G.    Unjust Enrichment ................................................. 23

        H.    Tortious Breach ..................................................... 23

        I.    Fraud ..................................................................... 24

IV.     PREDOMINANCE IS LACKING ............................................. 27

        A.    Breach of Lease/Implied Duty to Market ................. 28

        B.    Fraud ..................................................................... 28

        C.    Statutes of Limitation ............................................. 28

        D.    Damages ................................................................. 29

V.     TYPICALITY IS LACKING ................................................................. 32

VI.    ADEQUACY IS LACKING ................................................................. 38

VII.   SUPERIORITY IS LACKING .............................................................. 39

VIII.  CONCLUSION ................................................................................. 40

CERTIFICATE OF SERVICE ................................................................. 41

# TABLE OF AUTHORITIES

## CASES

*Anderson Living Trust v. WPX Energy Prod., LLC,*
306 F.R.D. 312 (D.N.M. 2015) .............................................................. 12, 28

*Austin v. Cockings*, 871 P.2d 33 (Okla. 1994) ................................................ 25

*Barry v. RJR Nabisco Holdings Corp.*, 148 F.R.D. 520 (S.D.N.Y. 1993)...................... 34

*Blackhawk Oil Co. v. Exxon Corp.,* 696 P.2d 337 (Okla. 1998)..................................... 33

*Brooks v. S. Bell Tel. & Tel. Co.,* 133 F.R.D. 54 (S.D. Fla. 1990) ................................ 33

*Broussard v. Meineke Discount Muffler Shops. Inc.,*
155 F.3d 331 (4th Cir. 1998)................................................................. 29, 38

*Cactus Petroleum Corp. v. Chesapeake Operating, Inc.,*
222 P.3d 12 (Okla. 2009) ...................................................................... 4, 5

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996)...................................... 3

*Chieftain Royalty Co. v. QEP Energy Co.,* 2012 WL 896412 (W.D. Okla.  2011).......... 8

*Chieftain Royalty Co. v. XTO Energy, Inc.,*
528 Fed. Appx. 938 (10th Cir. 2013) ............................................. 3, 19, 32, 33

*Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla. 1977)...................... 24

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013)........................................ 27, 29, 30, 31

*Consor v. Occidental Life Insurance Co.,* 469 F. Supp. 1110 (N.D. Tex. 1979)............ 38

*Cook v. G.D. Searle & Co.*, 759 F.2d 800 (10th Cir. 1985)............................................ 24

*Craig v. Champlin Petroleum Co.*, 435 F.2d 933 (10th Cir. 1971) ................................ 7

*Derakhshan v. Tizzio,* 270 P.3d 215 (Okla. Civ. App. 2011) ........................................ 37

*Drake v. Martin,* 30 Cal. App. 4th 984 (1994)................................................................ 36

*Foster v. Apache Corp.,* 285 F.R.D. 632 (W.D. Okla. 2012) ...................... 12, 13, 27, 28

*Foster v. Merit Energy Co.*, 282 F.R.D. 541, (W.D. Okla. 2012) ..................... 12, 27, 28

*Foye v. Eastover Bank For Sav.*, 811 P.2d 108 (Okla. Civ. App. 1991) ........................ 24

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ........................................................................................ 38

*Gillespie v. Amoco Prod. Co.*, No. CIV-96-063-M
(E.D. Okla. 1999) ................................................................................ 10, 14, 16, 17

*Hallaba v. Worldcom Network Services, Inc.*  196 F.R.D. 630 (N.D. Okla. 2000) ........ 34

*Handley v. Santa Fe Minerals, Inc.*, 849 P.2d 433 (Okla. Civ. App. 1992) ................... 33

*Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136 (1965) .................................................. 24

*Helmerich & Payne, Inc. v. State*, 935 P.2d 1179 (Okla. 1997) ..................................... 10

*Hill v. Kaiser-Francis Oil Co.*, 2010 WL 2474051 (W.D. Okla. 2010) ................... 25, 26

*Hill v. Marathon Oil Co.*, 2010 WL 2365447 (W.D. Okla. 2010) ........................... 25, 26

*Hinson v. Cameron*, 742 P.2d 549 (Okla. 1987) ............................................................. 24

*Hinton Travel Inn, Inc. v. Wichita Wayne, LLC*,
2012 WL 2789873 (W.D. Okla. 2012) ......................................................................... 37

*Howell v. Texaco, Inc.*, 112 P.3d 1160 (Okla. 2004) ................................................. 5, 19

*In re Amchem Products, Inc. v. Windsor*, 521 U.S. 591(1997) ................................. 27, 39

*In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir. 1996) ............................. 33

*In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305 (3d Cir. 2008) ............................ 27

*Kas v. Financial Gen. Bankshares, Inc.*, 105 F.R.D. 453 (D.D.C. 1984) ................. 38, 39

*Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405
(W.D. Okla. 1990) ..................................................................................................... 25, 29

*Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683 (N.D. Ga. 1983) .......................... 38

iv

*Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108 (C.D. Cal. 1978) .................... 29

*Lackey v. Ohio Oil Co.*, 138 F.2d 449 (10th Cir. 1943).................................................. 21

*Ladd Petroleum Corp. v. Oklahoma Tax Comm'n*, 1989 OK 5, 767 P.2d 879 ........... 6, 7

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65 (D.N.J. 1993) ........ 32

*Lobo Exploration Co. v. Amoco Production Co.*, 991 P.2d 1048
(Okla. Civ. App. 1999)...................................................................................................... 33

*McCall v. Chesapeake Energy Corp.*, 164 P.3d 1120 (Okla. Civ. App. 2007) ........... 4, 5

*McKnight v. Linn Operating, Inc.*, 2016 WL 756541 (W.D. Okla. 2016).......... 12, 28, 32

*Member Services Life Ins. Co. v. American Nat'l Bank and Trust Co.*,
130 F.3d 950 (10th Cir. 1997)......................................................................................... 23

*Meyers v. Southwestern Bell Tel. Co.*, 181 F.R.D. 499 (W.D. Okla. 1997) ................... 39

*Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (Okla. 1998) ..................... 16, 31

*Morrison v. Anadarko Petroleum Corp.*, 280 F.R.D. 621 (W.D. Okla. 2012) .............. 12

*Murray v. Holland*, 27 N.E.2d 126 (Ind. App. 1940) ..................................................... 36

*Mussellem v. Magnolia Petroleum Co.*, 231 P. 526 (Okla. 1924) ........................... 21, 22

*Naylor Farms Inc. v. Anadarko OGC Co.*, 2009 WL 8572026 (W.D. Okla. 2009)....... 25

*Panola Indep. Sch. Dist. No. 4 v. Unit Petroleum Co.*, 287 P.3d 1033
(Okla. Civ. App. 2012)................................................................. 7, 11, 12, 13, 39, 40

*Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66 (E.D.N.Y. 2000) ........... 34

*Pollock v. Energy Corp. of Am.*, 2013 U.S. Dist. LEXIS 141139 (W.D. Pa. 2013)....... 12

*Rees v. BP America Production Co.*, 211P.3d 910 (Okla. Civ. App. 2008)................... 17

*RJB Gas Pipeline Co. v. Colorado Interstate Gas Co.*, 813 P.2d 1 ............................... 24

*Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252 (W.D. Okla. 1997)................. 6

*Rodgers v. Tecumseh Bank*, 756 P.2d 1223 (Okla. 1988)................................................. 24

*Roye Realty & Developing, Inc. v. Watson,* 2 P.3d 320 (Okla. 1996) ........................... 10

*Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228 (11th Cir. 2000)......................... 3

*Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000) ................... 3

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981) .................................................................. 27

*Spelman v. F&M Bank & Trust Co.,*
Fed. Sec. L. Rep. (CCH) ¶92, 543 (N.D. Okla. 1981) .................................................... 34

*Spivak v. Petro-Lewis Corp.,* 120 F.R.D. 693 (D. Colo. 1987) ............................... 38, 39

*Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) ........................... 32, 33

*Steiger v. Commerce Acceptance of Oklahoma City, Inc.,*
455 P.2d 81 (Okla. 1969) ........................................................................................ 36, 37

*Strack v. Cont'l Res., Inc.*, 405 P.3d 131 (Okla. Civ. App. 2017) .......... 12, 14, 17, 19, 20

*Tara Petroleum Corp v. Hughey*, 630 P.2d 1269 (Okla. 1981) ............................... 5, 6, 8

*Thacher v. Int'l Supply Co.,* 54 P.2d 376 (Okla. 1936)................................................. 23

*The Tipton Home, Tr. v. Burlington Resources Oil & Gas Co.,*
Case No. 111,735 (Okla. Civ. App. 2015) ......................................... 4, 12, 13, 16, 17, 19

*Tucker v. BP Am. Prod. Co.,* 278 F.R.D. 646 (W.D. Okla. 2011) ................................. 12

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,*
725 F.3d 1213 (10th Cir. 2013)............................................................................. 2, 3, 19

*Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541 (2011) .......................... 2, 3, 4, 9, 13, 27

*Warren v. The Reserve Fund, Inc.*, 728 F.2d 741 (5th Cir. 1984) ................................. 34

*Wathor v. Mutual Assur. Adm'rs, Inc.,* 87 P.3d 559 (Okla. 2004)............................ 23, 24

*Watts v. Atlantic Richfield Co.,* 115 F.3d 785 (10th Cir. 1997) .......................................8

*Weber v. Mobil Oil Corp.,* 243 P.3d 1 (Okla. 2010)..................................................... 24

*Whisenant v. Strat Land Exploration Co.*, 429 P.3d 703
(Okla. Civ. App. 2018) 429 P.3d 703 (Okla. Civ. App. 2018) .................... 12, 13, 17, 20

*Woodmont, Inc. v. Daniels,* 274 F.2d 132 (10th Cir. 1959) ............................................ 37

## STATUTES

12 O.S. § 95(A)(1) ............................................................................................ 29

12 O.S. § 95(A)(3) ............................................................................................ 29

15 O.S. § 59 ...................................................................................................... 25

16 O.S. §14 ....................................................................................................... 36

16 O.S. §18 ....................................................................................................... 36

52 O.S. § 570.12 ............................................................................................... 26

52 O.S. § 570.12(A)(10) ................................................................................... 26

## RULES

F.R.C.P. 23 ........................................................................................................ 32

F.R.C.P. 23(a) ..................................................................................................... 2

F.R.C.P. 23(a)(2) .............................................................................................. 27

F.R.C.P. 23(a)(4) ......................................................................................... 38, 39

F.R.C.P. 23(b) ..................................................................................................... 2

F.R.C.P. 23(b)(3) ......................................................................................... 27, 39

## MISCELLANEOUS

Stephen A. Brown and Mine K. Yucel, "The Pricing of Natural Gas in U.S. Markets,"
Economic Review – Second Quarter 1993 ...................................................... 19

Webster's Third New International Dictionary (Unabridged)
Merriam-Webster, Inc. 1185 (1986) ................................................................ 5

**Chieftain Royalty Company v. SM Energy Company**
**W.D. of Okla.; Case No. CIV-18-1225-D**
**APPENDIX OF EXHIBITS**
**SM Energy's Response to Plaintiff's Motion for Class Certification**

Exhibit 01 – Spears Lease

Exhibit 02 – Second Expert Report of Kris Terry dated December 4, 2018

Exhibit 03 – *Tipton Home* Slip Opinion dated November 24, 2015

Exhibit 04 – Deposition of David Whitcomb taken April 30, 2012

Exhibit 05 – Deposition of Kris Terry taken July 11, 2018

Exhibit 06 – Deposition of Kyle Pearson taken July 12, 2018

Exhibit 07 – Gas Purchase Agreements [filed under seal]

Exhibit 08 – Expert Report of Kyle Pearson dated December 4, 2018

Exhibit 09 – Expert Report of Eric R. Krause dated December 4, 2018

Exhibit 10 – Exhibit 55 to Kris L. Terry Deposition taken July 11, 2018

Exhibit 11 – Representative Check Stub

Exhibit 12 – Exhibits 59.1 through 59.3 to Kris L. Terry Deposition taken July 11, 2018

Exhibit 13 – Chieftain Correspondence and E-mail String

Exhibit 14 – Mineral Deed from Pagos Resources, LLC to Chieftain Royalty Company
dated May 28, 2018

Exhibit 15 – Mineral Deed dated November 7, 2013

Exhibit 16 – Mineral Deed dated April 1, 2010

Exhibit 17 – Economic Review Article

Exhibit 18 – *Gillespie* Slip Opinion dated January 11, 1999

The Defendant, SM Energy Company ("SM"), hereby responds to Plaintiff Chieftain Royalty Company's ("CRC") Motion for Class Certification ("Motion").

## OVERVIEW

This case involves 126 gas wells located in Coal County, Oklahoma. SM is lessee under multiple leases covering lands in Coal County. Chieftain claims to have succeeded to the interest in one such lease, the "Spears Lease". Ex. 1. The Spears Lease covers interests in three wells - the Duncan Shores 1-1, the Duncan Shores 1-2, and the Avanzini 3-1H wells ("Spears Wells). Second Expert Report of Kris L. Terry, attached as Ex. 2, at ¶¶9, 10. The Spears Lease contains the following royalty payment language:

> "To pay lessor for gas of whatsoever kind or nature (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, 1/4 of the gross proceeds received for the gas sold, used off the premises or in the manufacture of products therefrom, **but in no event more than 1/4 of the amount actually received by the lessee**, said payments to be made monthly."

(Emphasis added).

The Spears Wells are connected to the Coal County gathering system previously owned by SM's prior affiliate, Four Winds Marketing, LLC ("FW").[1] The wells were

---

[1] As a basis for certification, CRC argues that gas from all 126 wells was "commingled," so that all gas became subject to "the same midstream processes." Motion at 1. However, each well is judged based on its individual quality characteristics. FW (like any midstream purchaser) may accept or reject any natural gas receipts that impede its ability to resell and redeliver into the second or third markets on the transmission pipelines. Moreover, CRC's commingling theory fails to account for the fact that the commingled gas stream that reaches each plant is potentially a combination of Class gas and non-Class gas (produced by wells not at issue in this matter). Therefore, CRC's commingling theory is not relevant to this putative Class, and could act to the benefit or detriment of the putative Class members.

operated by SM, which sold gas from the wells to FW at the wellhead pursuant to gas purchase contracts with FW.

## ARGUMENTS AND AUTHORITIES

### I. CRC BEARS THE BURDEN OF DEMONSTRATING THAT CLASS ACTION REQUIREMENTS ARE MET.

A class can be certified only if it meets all four requirements of F.R.C.P. 23(a), and one of the separate requirements of F.R.C.P. 23(b). CRC is required to affirmatively demonstrate (1) "numerosity," (2) common issues of law or fact, (3) "typicality," and (4) "adequacy." F.R.C.P. 23(a). CRC must also establish that common questions of law or fact "predominate," and that a class action is "superior." F.R.C.P. 23(b). The party seeking certification of a class action has the burden of satisfying all requirements for certification by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2548 (2011). Rule 23 does not set forth a mere pleading standard; CRC must affirmatively demonstrate compliance with the Rule. *Id.* at 2551. This Court has "an independent obligation" to conduct a rigorous analysis before determining the requirements for certification have been met, which may involve looking at the merits of CRC's claims. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,* 725 F.3d 1213, 1217 (10th Cir. 2013). SM admits that numerosity is met in this case. However, CRC cannot sustain the remaining burden here.

### II. THE RIGHT TO CLASS CERTIFICATION MUST BE DETERMINED FROM THE NATURE OF PLAINTIFF'S UNDERLYING CLAIMS.

Under Rule 23, the Court must engage in a "rigorous analysis" to determine if CRC has satisfied its burden to strictly prove the Rule 23 requirements. *Roderick,* 725 F.3d at

1217. This analysis requires the Court to probe behind the pleadings, scrutinize the probative value of proffered evidence, consider both parties' evidence, and make determinations that "overlap the merits of the Plaintiff's underlying claim." *Wal-Mart,* 131 S.Ct. at 2551-52. "In deciding whether to certify the proposed class here, the Court must go beyond the face of the pleadings to determine the nature of the Plaintiffs' and class claims" because "a court must understand the claims, defenses, relevant facts, and the applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996). In a royalty class action, the Court must conduct a rigorous analysis of (1) each putative class member's oil and gas leases to determine if there is a common obligation, and (2) the marketability of the gas at issue.[2]

## III.   COMMONALITY IS LACKING.

A class action's principal purpose is accomplished by requiring that there be common questions which, "when answered as to **one** class member [are] answered as to **all**" class members. *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F. Supp. 2d 942, 954 (E.D. Tex. 2000) (emphasis added). Thus, a question is "common" if it is subject to generalized proof applicable to the class as a whole. *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000). It is not sufficient that the putative class members simply

---

[2] In *Chieftain* and *Roderick,* the Tenth Circuit reversed certification orders finding it was error to (1) relax the "strict burden of proof," by requiring the defendant to disprove that commonality had been satisfied, and (2) fail to rigorously analyze the leases and the marketability of gas. *Chieftain Royalty Co. v. XTO Energy, Inc.,* 528 Fed. Appx. 938, 942 (10th Cir. 2013); *Roderick,* 725 F.3d at 1218.

share common "interests" or "questions." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Walmart*, 131 S. Ct. at 2551 (citation omitted). Because "[a]ny competently crafted class complaint literally raises common 'questions[,]'" *Id.*, there must also be common **answers**:

> "What matters to class certification … is not the raising of common 'questions' - even in droves - but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Id.* (italics in original; citation omitted). Stated differently, the common contention "must be of such a nature that it is capable of classwide resolution," meaning that its determination will "resolve an issue that is central to the validity of each one of the claims **in one stroke**." *Id.* (emphasis added). It must be determinative "of all the class members' claims for relief[.]" *Id.* at 2552.

A.    <u>**"Affiliate Sales" under Oklahoma Law:**</u> Oklahoma law recognizes that the issue of affiliate sales is not a common question suitable for class certification. *See The Tipton Home, Tr. v. Burlington Res. Oil & Gas Co., LP,* Case No. 111,735 (November 24, 2015) (attached hereto as Ex. 3), Slip op. at 16.

CRC, however, argues that because SM's prior affiliate, FW, purchased gas from the wells at issue pursuant to gas purchase agreements with SM, those contracts must automatically be disregarded because they are not "true sales." Motion at 6 n.10. This is not the law in Oklahoma. In *Cactus Petroleum Corp. v. Chesapeake Operating, Inc.,* 222 P.3d 12 (Okla. 2009), and *McCall v. Chesapeake Energy Corp.,* 164 P.3d 1120 (Okla. Civ. App. 2007), the issue central to both cases was whether charges and fees paid between a

parent and subsidiary were subject to challenge by plaintiff working interest owners asserting the impropriety of such charges and fees. The courts affirmed that transactions between the parent and subsidiary were not improper *per se,* because the parent and subsidiary were separate entities, and the costs at issue were customary and reasonable. 222 P.3d at 19; 164 P.3d at 1126-27.

CRC relies upon *Howell v. Texaco, Inc.,* 112 P.3d 1154 (Okla. 2004)*,* for the proposition that SM's gas purchase agreements with FW were an improper basis for calculating royalty payments. Motion at 25. *Howell* did not involve an affiliate sale, but instead involved gas produced pursuant to "market value" leases, and transferred between *two **divisions** of the same entity* - Texaco, Inc. *Id.* at 1157. The *Howell* court characterized the transaction as an ***intra***-company[3] sale since it was between Texaco's production division and Texaco's gas plant division. *Id.* Here, the evidence shows that CRC has a "gross proceeds" lease, not "market value" lease. Moreover, *Howell* is not on point because there was no "intra-company" sale.

In addition, CRC's citation of *Tara Petroleum Corp v. Hughey*, 630 P.2d 1269 (Okla. 1981), as controlling is erroneous. *Tara* did not involve a "proceeds" lease, but a "market price" lease. *Id.* at 1272. Moreover, the *Tara* court made clear that common control alone does not mean that the sale is automatically ignored. The court also required that in order to ignore the separate legal existence of two corporate entities, it must appear "either

---

[3] "Intra" is a prefix denoting "within" or "on the inside." "Intra-company" is defined as "being or occurring within a company." Webster's Third New International Dictionary (Unabridged) Merriam-Webster, Inc. 1185 (1986).

(1) that the separate corporate existence is a design or scheme to perpetrate fraud, or (2) that one corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another corporation." *Id.* Thus, CRC must establish not only common control but also that (1) FW is a design or scheme to perpetrate fraud or (2) FW was merely an instrumentality or adjunct of SM. *Id.*; *see also Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1268 (W.D. Okla. 1997) (finding under *Tara* that one of these two elements must be proven in order for a court to disregard the separate legal existence of two corporate entities). CRC has failed to provide any such evidence.[4]

Instead, the evidence shows that, in addition to purchasing gas from SM, FW also purchased gas at the wellhead from at least 16 unaffiliated third-party producers owning wells connected to the Coal County gathering system, on terms identical or similar to SM's contracts with FW.[5] SM also tested FW's contract prices against third-party terms on a semi-annual base.[6] This evidence establishes that SM's contracts with FW were fair. *See Ladd Petroleum Corp. v. Oklahoma Tax Comm'n*, 1989 OK 5, 767 P.2d 879, 883 (a

---

[4] In fact, there are important and valid reasons for producing companies to form gathering or midstream service companies. SM representatives testified that FW was formed in order to move the gas to locations downstream in hopes of getting a better price, and to facilitate the marketing of the gas and the ability to pay the appropriate taxes under Oklahoma Tax Commission regulations. Deposition transcript of David Whitcomb attached as Ex. 4, at 59:18-60:1; 61:8-10; 62:4-63:10; 86:16-87:4; 115:2-17; Deposition transcript of Kris L. Terry attached as Ex. 5, at 165:22-166:1; 170:5-13. It was also necessary to create a separate marketing entity because of confidentiality issues present when dealing with third-party purchasers. Deposition transcript of Kyle L. Pearson attached as Ex. 6, at 65:1-17; 66:2-21; 68:2-6; 134:12-135:14.

[5] Ex. 6 at 79:13-80:3; 142:13-143:10; Ex. 4 at 45:18-22; 213:19-214:5; Gas Purchase Agreements attached hereto as Ex. 7.

[6] Ex. 4 at 65:13-22; 210:22-211:6; 213:5-214:5; Ex. 6 at 132:1-24; 134:12-20; 135:5-15.

producing entity may enter into a sales contract with a related purchasing entity when the terms of the contract are identical to contracts entered into by the purchasing entity with third-party producers); *Craig v. Champlin Petroleum Co.*, 435 F.2d 933, 938-39 (10th Cir. 1971) (affiliate sales contracts are not *ipso facto* to be ignored but must be examined for fairness).[7]

**B.     "Best Price Available":** CRC's assertion that an implied duty to obtain the best price is a common question is wrong because SM does not owe an implied duty to all class members.

SM owes different obligations to different royalty owners because the **source** of SM's obligations to them differs. SM did not owe any implied duty to a force pooled royalty owner prior to May 8, 2012, when such a duty was statutorily provided.[8]

SM also does not owe any contractual or implied duty to the class members who are royalty owners under leases with other producers, because SM is not a party to any oil and gas leases with these royalty owners. SM's only duty to these putative class members is to pay them properly under the statute.

---

[7] To accept CRC's position would hold that, while a contract between FW and an unaffiliated producer on the same terms and conditions as a contract between FW and SM could be considered for purposes of calculating royalty payments, those same exact contract terms must be disregarded as to contracts between FW and SM, simply because there is an affiliate relationship. This is neither logical, nor the law.

[8] *See Panola Indep. Sch. Dist. No. 4 v. Unit Petroleum Co.*, 287 P.3d 1033 (Okla. Civ. App. 2012) (reversing certification order because defendant owed varying obligations to its lessees compared to force pooled royalty owners).

Where an implied duty does exist, a producer has a "duty to market the gas produced from a well and to obtain the best price and terms available." *Watts v. Atlantic Richfield Co.,* 115 F.3d 785, 794 (10th Cir. 1997). "The burden of proving that a gas purchase contract was unfair or unreasonable **at the time it was entered into** is on the lessor seeking additional royalty." *Tara, supra* at 1274 (emphasis added).

Thus, it would be necessary to review each lease, each gas purchase agreement, the circumstances existing **at the time** each was executed, including geographic area, proximity to gathering and transportation facilities, gas quality issues, production activities, the types of users and number of competing purchasers in the area (all of which will differ from well to well)[9], the terms available to SM at that time and place, the efforts SM undertook to achieve the best price, and whether the royalty owner is in privity of contract with SM, to determine whether CRC and the putative class members were paid royalties on the "best price available" for gas from their individual wells. *Chieftain Royalty Co. v. QEP Energy Co.,* 2012 WL 896412, *8 (W.D. Okla. 2016) (denying certification of claim that producer failed to secure best terms).

CRC claims that the royalty owners did not receive the "best price available" because of affiliate sales. Motion at 25. However, the "affiliate sales" issue will require a review of the individual third-party contracts by which FW purchased gas from other producers, and the purchases made pursuant to those contracts, on a month-by-month, well-by-well basis, to determine whether the prices SM received from FW were comparable to

---

[9] Expert Report of Kyle L. Pearson attached as Ex. 8, at ¶¶14-21, 23-27, 29

the prices FW was paying third parties. As such, resolution of this issue for CRC will not result in resolution of this issue for the putative class members with leases in wells other than the Spears Wells.

C.    **Breach of Leases:** First, granting CRC's Motion would take the mistaken position that the class definition here covers only those royalty owners with "gross proceeds received for the gas sold, used off the premises, or in the manufacture of products therefore, but in no event more than ¼ of the actual amount received by the lessee" leases, like CRC. While it is true that CRC only has such a lease, the proposed class definition is not limited to royalty owners with the same or similar lease. SM's expert has reviewed the pertinent leases available to date, and has identified at least 30 different lease royalty provisions, including royalty provisions based upon "the market price at the well," "the market value at the wellhead," "the market price for gas sold," "the proceeds at the mouth of the well, at the prevailing market rate," "percent of proceeds received," and delivery of gas in kind. Ex. 2 at ¶33. Royalty calculations and point of valuation will differ among these various royalty provisions. *Id.* at ¶¶34-40. Thus, determining whether a "gross proceeds" provision, such as CRC's, will permit deductions will not be determinative of the same questions with respect to any other royalty provision. As such, the questions raised by CRC do not constitute "common questions" capable of resolution "in one stroke." *Wal-Mart,* 131 S. Ct. at 2551.[10]

---

[10] CRC attempts to avoid the effect of this diversity by arguing its "royalty pot" theory. Motion at 21-22. What CRC does not discuss is that it would be necessary for CRC to put on evidence of its own lease and all other leases in each "royalty pot" to determine how much SM allegedly "shorted" each royalty pot. Only with that determination could the

Second, a claim based upon insufficient royalty payments will be governed by the royalty clause of the oil and gas leases to which CRC and putative class members were party. The royalty due under a lease will be governed by the wording of the particular royalty clause.[11] Thus, in order to determine whether SM improperly deducted post-production costs from the royalties owed to CRC and the putative class members, and whether an amount of money is owed to CRC or the putative class members for any unlawful deductions, the Court would first have to examine each of the royalty payment provisions contained in each of the leases applicable to the 126 wells involved in this case. There are hundreds of leases involved in this case involving approximately 4,500 royalty owners. The royalty payment provisions in this case are not identical among the leases, but vary in form and content.[12] By SM's count,[13] there are at least 30 different types of royalty

---

Court calculate the amount which SM allegedly underpaid. Even if the implied duty to market existed for a unit "royalty pot," the royalty payment provisions in the leases differ (even in leases where an implied duty exists), and it would be necessary to review each of those provisions in calculating what the "royalty pot" should have been.

Under CRC's "royalty pot" theory, it is virtually impossible for an individual royalty owner to determine if its royalty payments are correct. Each month, the royalty owner would have to know (and interpret), (1) the terms of every oil and gas lease and pooling order; (2) the number of acres represented by each lease or pooled interest; (3) which working interest owners owned each lease or pooled interest, and in what percentages; (4) which working interest owners were selling gas each month; (5) the percentage of gas sales each month allocated to each working interest owner; (6) the terms of each sale of gas by each working interest owner each month; and (7) how much each working interest owner was required to pay into each "royalty pot," all of which will differ from "pot to pot." These individualized inquiries preclude certification even under CRC's "royalty pot" theory.

[11] *See Roye Realty & Developing, Inc. v. Watson,* 2 P.3d 320 (Okla. 1996); *Helmerich & Payne, Inc. v. State,* 935 P.2d 1179 (Okla. 1997); *Gillespie v. Amoco Prod. Co.,* No. CIV-96-063-M (E.D. Okla. 1999) (attached as Ex. 18), at 7 n.7.

[12] *See* summary submitted as Exhibit C to Ex.2.

[13] CRC itself has identified 81 different royalty payment clauses. CRC Ex. 28.1. CRC seeks to avoid the effect of this diversity by "grouping" the leases into four "categories" of leases,

provisions used in the individual leases, requiring payment of royalties on any number of bases, which, in addition to the provision in CRC's lease, include the varying royalty provisions set forth above. The mere fact of the diversity of royalty clauses alone makes this case inappropriate for class certification.

The Oklahoma Court of Appeals addressed a similar situation in *Panola, supra.* In *Panola,* the plaintiffs sought class certification against an operator for "underpayment of royalties based on deduction of post-production costs." In reversing the trial court's certification order, the Oklahoma Court of Civil Appeals recognized the myriad of interests which must be addressed in oil and gas royalty actions, and concluded those interests precluded class certification, because, *inter alia*:

> ...[T]he claims of royalty owners who acquired their interests pursuant to leases require a multiplicity of sub-classes. For example, in a lease where royalties are based on gross proceeds, the lessee ordinarily *may not* deduct a proportionate share of transportation, compression, dehydration, and blending costs when such costs are associated with creating a marketable product. However, the lessee *may* deduct such costs upon a showing (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the non-working interest.

> [W]here the lease bases royalties on market value at the wellhead but there is no actual arm's-length sale at the wellhead, market value at the wellhead may be established by the work-back method.
> ***

---

based upon whether CRC believes deductions are permitted or prohibited under those leases. CRC Exs. 28.2-28.5. However, even within these four purported "categories" of leases, numerous different forms of royalty payment clauses are present within each "category," including "gross proceeds," "net proceeds," "market value," "market price," and "at the mouth of the well." Each of these royalty clauses requires different payment methods and valuation points. As such resolving the effect of CRC's particular "gross proceeds" lease will not, "in one stroke," resolve the issue with respect to a royalty owner with a different lease.

Each of these lease types requires a different inquiry in determining
the royalty owner's claim for underpayment of royalties based on deduction
of post-production costs. Therefore, each lease type would require the
definition of a separate sub-class. We are unable to find a class action
combining claimants from all lease types is a superior method to adjudicate
these claims.

287 P.3d at 1036-37 (emphasis in original). Where this inquiry has been properly

performed, courts have routinely concluded that material variations in the terms of leases

destroy the commonality required in a class action.[14]

---

[14] *See Foster v. Apache Corp.,* 285 F.R.D. 632, 639-40 (W.D. Okla. 2012); *Foster v. Merit
Energy Co.,* 282 F.R.D. 541, 545 n.2 (W.D. Okla. 2012) (denying certification where
plaintiff did not perform individual inquiry of leases and wells required by *Mittelstaedt*);
*Morrison v. Anadarko Petroleum Corp.,* 280 F.R.D. 621, 625 (W.D. Okla. 2012) ("plaintiff
has not satisfied the commonality requirement due to the varying terms regarding royalty
valuations in her ad the putative class members' leases"); *Tucker v. BP Am. Prod. Co.,* 278
F.R.D. 646, 654-55 (W.D. Okla. 2011) ("The court finds the varying terms of hundreds of
leases, relating to matters such as the method for calculating royalty, allowance for post-
production charges or fuel use[,] and affiliate sales, demonstrate the inability to adjudicate
the claims of the named plaintiff and expect the same result to apply to all members of the
proposed class."); *McKnight v. Linn Operating, Inc.,* 2016 WL 756541, at *8 (W.D. Okla.
2016) (denying certification because determination of how much each royalty owner had
been paid and how much each should have been paid required "owner by owner and month
by month calculations"); *Tipton Home,* Slip op. at 12 (because of the variances in lease
language and overriding royalty interests,, and differing gas qualities and marketing
arrangements, plaintiffs "had not met their burden to show common merits questions could
be resolved in a single stroke"); *Strack v. Cont'l Res., Inc.,* 405 P.3d 131, 140 (Okla. Civ.
App. 2017) (reversing certification because "[e]ach of the types of royalty provisions will
require a different inquiry to determine a Class Member's claim for underpayment");
*Whisenant v. Strat Land Exploration Co.,* 429 P.3d 703, 707 (Okla. Civ. App. 2018)
(reversing certification because "[d]etermining Strat Land's liability, and the appropriate
damages to be awarded, to each of the royalty owners in the proposed class is not
susceptible to class-wide resolution 'in one stroke'"); *Anderson Living Trust v. WPX
Energy Prod., LLC,* 306 F.R.D. 312, 443 (D.N.M. 2015) (holding individual issues as to
lease terms, course of performance, and industry usage overwhelmed common issues, if
any); *Pollock v. Energy Corp. of Am.,* 2013 U.S. Dist. LEXIS 141139 (W.D. Pa. 2013)
(refusing to certify class seeking royalties for gas used off premises because of differences
in "free use" clauses);

SM has presented evidence regarding the varying lease language present here. Thus, as recognized by *Panola* and numerous other Oklahoma and federal cases (*see* footnote 14, *supra*) the answer to the question of whether SM breached its royalty payment obligations to CRC will not answer the question of whether SM breached its royalty payment obligations to the other putative class members whose royalty instruments are different from those of CRC. CRC attempts to dismiss the effect of this diversity by stating that in making royalty payments to CRC and the putative class members, SM paid CRC[15] and the putative class members "in a uniform manner." Motion at 23. However, even if there were "uniform payments" (which there were not), uniformity in payment methodology does not support a common question for purposes of class certification. *Whisenant,* 429 P.3d at 712. The court in *Foster,* 285 F.R.D. at 641, explicitly rejected the "common payment method" as a basis for class certification, with good reason. The issue in determining whether there are "common questions" is not whether the same questions may be asked as to each putative class member, but whether, through proving the answer to the question with respect to the named plaintiff will also answer the question as to each putative class member. *See Wal-Mart,* 131 S.Ct. at 2551.[16] Even assuming that CRC and the putative class members were paid "uniformly," this would not satisfy the requirement

---

[15] Again, CRC has never received a royalty payment from SM.

[16] *See also Tipton Home* (rejecting alleged uniform payment policy as a common question for purposes of class certification, stating, "The determination of what was actually required to be paid versus what [defendant] ultimately paid will be different for each Class Member depending on particular lease language…. Thus, the rights of the unnamed Class Members plainly cannot be adjudicated 'in one stroke.'") Slip op. at 16-17 (citing *Wal-Mart*).

of commonality. Simply because all royalty owners may have been **paid** in the same or a similar manner does not mean all or any of the royalty owners have been **improperly** paid. In other words, the issue is not whether all royalty owners were "treated the same," but whether, as a result of such treatment, the royalty owners have been underpaid under the terms of their leases. *See Strack,* 405 P.3d at 140; *see also Gillespie,* Slip op. at 7 n.7. As recognized by *Strack*, underpayment cannot be determined without examining each of the leases at issue to determine what was required to be paid, and comparing that with what in fact was paid. 405 P.3d at 140. It is only through such individual examination that this Court can determine if the "uniform" manner of payment resulted in payment of an amount less than was required by the individual royalty payment provision of each lease, and if so, by how much. Answering this question by examining CRC's lease would not answer this question as to any other royalty owner under any other lease.

However, the evidence shows that SM **did not**, **in fact**, pay all royalty owners "uniformly," but that royalty payments varied across royalty owners, and **across time**.[17]

---

[17] Throughout CRC's Motion, CRC cites to deposition testimony given by SM's then-representative, Thomas Ferguson, on May 8, 2012, regarding various payment and "marketability" issues. Motion at 6, 9, 10, 12, 13, 18, 21, 22, 24, 25, 31, 36. Mr. Ferguson's deposition was taken early on in the discovery process, when the facts were still being investigated and developed. It was also taken prior to the time CRC opted to focus solely on the Coal County wells for purposes of class certification. Much of that testimony was inaccurate at the time it was taken, is inaccurate now, and certainly does not reflect SM's current position. Subsequently, at the request of CRC, SM designated corporate representatives to testify on a number of subjects, including some of those testified to by Mr. Ferguson in 2012. SM designated Kris Terry and Kyle Pearson as its representatives on the various subjects, and produced them for deposition on July 11, 2018, and July 12, 2018, respectively. In the six years since Mr. Ferguson's deposition, SM engaged in additional research, and determined that much of Mr. Ferguson's testimony had been inaccurate in 2012, and is inaccurate now. Ms. Terry discussed some of those inaccuracies

For various time periods, various items which went into the pricing mechanism, and royalty calculations were amended.[18] Moreover, not all **royalty owners** were paid in the same manner.[19] The evidence shows that SM did not deduct any fuel gas fees, "TRO" or gathering fees, or compression fees from CRC's (or its predecessor's) royalties.[20] (In fact, CRC has never received a royalty payment check from SM for the three wells it currently claims to own an interest in, because SM sold its interests in the three wells before CRC acquired its royalty interest.)[21]

Whether or not SM paid royalty owners "uniformly" has no effect on whether a class should be certified. However, the fact that CRC (or rather, its predecessor) was paid royalties differently than other royalty owners is yet another reason why resolving the issue of whether or not CRC (or its predecessor) was paid correctly will not resolve this issue with respect to any other royalty owner.

---

in her deposition. *See, e.g.,* Ex. 5 at 19:5-20:1; 37:16-39:13; 70:10-72:1; 160:6-16; 166:2-170.13. To the extent Mr. Ferguson's 2012 testimony conflicts with Ms. Terry's and Mr. Pearson's more current and better-informed 2018 testimony, it should be disregarded.

[18] Namely, from October 2, 2001 through November 2003; December 2003 through May 2005; June 2005 through March 2006; April 2006 through May 2006; June 2006 through June 2011 (with variations within that time); and July 2011 forward. *See* Expert Report of Eric R. Krause attached as Ex. 9, at pp. 20-24; Ex. 2 at ¶¶62, 63, Ex. 6 at 48:17-49:6; 74:7-75:12; 76:4-13; 87:3-18; 90:10-24; 91:20-25; 95:10-96:2; 97:1-98:14; 98:18-99:2; 100:10-21; 101:9-5; 102:2-15; 105:21-107:4; 149:4-9; Ex. 5 at 31:9-19; 35:10-18; 68:19-23; 225:4-16; 229:17-230:2; 233:12-20; Ex. 55 to Kris L. Terry Deposition, attached hereto as Ex. 10.

[19] *See* Ex. 5 at 31:9-32:11; 32:23-33:16; 33:17-34:12; 37:2-15; 39:2-13; 40:2-7; 42:5-44:9; 46:14-21; 46:23-47:13; 63:1-7; 67:9-15; 67:16-68:12; 69:6-70:4; 93:4-8; 93:20-94:2; 94:24-95:2; 95:6-97:11; 98:10-22; 99:7-13; 100:4-10; 221:25-222:5; 230:3-12; Ex. 10.

[20] Ex. 5 at 29:16-30:23; 67:5-15; 70:1-4; Ex. 6 at 90:16-21; Ex. 4 at 36:2-5.

[21] Ex. 5 at 62:17-21.

**D.    "Marketability":** First, the issue of whether the minerals from the wells at issue are marketable at the wellhead does not present a common question of law or fact. In *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (Okla. 1998), the Court held that the propriety of deducting post-production costs required examination of the marketability of the gas, the reasonableness of the post-production costs, and whether revenues from sales transactions increased in proportion to the costs incurred.[22] *Id.* at 1205; *see also Gillespie, supra* at 6 n.6.[23] Further, "these costs must be examined on an individual basis" to determine if they meet the *Mittelstaedt* requirements. *Mittelstaedt* at 1208.

The court in *Tipton Home* addressed this same issue. In that case, which involved only 700 leases, with 26 different types of royalty provisions, and wells located "in different places, with different gas qualities and production conditions, differences in the custom and usage in the industry, as well the various marketing arrangements under which the gas is sold," the court held that an "individual inquiry as to the facts of each gas sale" was necessary, and that the class representatives had not "met their burden to show that the common merits questions raised can be resolved in a single stroke," citing *Wal-Mart.* Slip

---

[22] CRC complains that a *Mittelstaedt* analysis has not been done on a month-by-month basis. Motion at 7. Industry practice is to complete a thorough analysis of enhanced value on a long-term basis (over the well and/or field economic life) at the time a well is drilled and/or the field is developed. There is no guarantee of a processing upgrade on a month-by-month basis with calculations completed after the fact. In any event, this is a merits-related question, and whether or not a complete *Mittelstaedt* analysis has yet been done for all 126 wells on a month-by-month basis has no impact on whether a class can be certified.
[23] In *Gillespie*, the court noted the myriad of factors that "must be examined on an individual basis to determine if [post-production costs] are within the class of costs shared by a royalty interest owner," including whether (1) "the costs enhanced the value of an already marketable product," (2) "such costs are reasonable," and (3) "actual royalty revenues increased in proportion with the costs assessed against the nonworking interest." *Id.*

op. at 24, 26.

Whether gas for the 126 wells in this case is marketable at the well will depend, in the first instance, on whether CRC can establish a basis to ignore any of SM's gas purchase agreements with FW, which purchases gas from unaffiliated third-party producers at the wellhead on the same or better terms, and as such, are conclusive of marketability there. If CRC can overcome that hurdle, whether the gas is "marketable" will depend upon the individual physical characteristics of the gas, such as quality, quantity, available volumes, well capacity, pressure, Btu (heating content), and the amount of potentially recoverable liquefiable hydrocarbons. If the Court adopts a view of marketability beyond the physical characteristics of the gas, an analysis of numerous marketing factors is also necessary, including availability of markets, existence of alternate markets, existence of marketing facilities, location of the well, accessibility of markets, and industry custom and usage for each particular stream at each location. Both the physical characteristics of the gas and the various market factors will vary from well to well. Such individual examination precludes class certification. *Whisenant,* 429 P.3d at 709; *Strack,* 405 P.3d at 140; *Tipton Home* at 24, 26; *Gillespie* at 6-7; *see also Rees v. BP America Production Co.,* 211 P.3d 910, 912-13 (Okla. Civ. App. 2008).

These "marketability" variances are evident in this case. As shown by Ex. 8 hereto, the 126 wells at issue here vary widely in physical characteristics and gas quality, including, but not limited to, Btu, carbon dioxide content, and percentage of excess

nitrogen and total inerts.[24] Because both the Btu and GPM (gallons per thousand) of the gas produced from the 126 Coal County wells is unique to each individual well and varies considerably from well-to-well, the NGL recovery economics or processing costs required to meet pipeline transportation specifications will be different for each of the 126 wells. These differing economics will influence the cost of processing gas, and in turn, the costs that may be charged for processing the gas if the producer elects to sell gas at a downstream location.[25] These are just a few of the factors which would affect the "marketability" of the gas at issue under *Mittelstaedt,* and all would require an individualized determination on a well-by-well basis to assess marketability.[26] Thus, whether gas is "marketable" in this case does not present a common question, because the answer for royalty owners in one particular well will not resolve the inquiry with respect to royalty owners in any other well.

Second, CRC attempts to avoid the need for individual inquiry mandated in *Mittelstaedt* by claiming that **no** gas from any of the 126 wells at issue in this case is in "marketable condition," and that gas is only "marketable" when it meets interstate pipeline specifications and has actually been transported to the point of entry into the interstate

---

[24] For example, the Btu content for these wells varies between 961 Btu/scf and 1,293 Btu/scf. Ex. 8 at ¶31. The varying Btu content figures reflect material individual well variances in natural gas liquids content as well. Id. at ¶33. However, the Btu content for CRC's alleged Coal County wells are 1,047 Btu/scf, 1,072 Btu/scf, and 1,110 Btu/scf, which is not representative of the rest of the Coal County wells. Id. at ¶32.

The carbon dioxide content of these wells range from 0.07 mole% to 4.31 mole%. *Id.* at 30. The carbon dioxide content of CRC's three alleged Coal County wells are 1.67 mole%, 1.77 mole%, and 1.91 mole%, which is not representative of the rest of the Coal County wells. *Id.* at ¶39. The GPM content of CRC's three alleged Coal County wells is also not representative of the remainder of the Coal County wells. *Id.* at ¶36.

[25] *Id.* at ¶37.

[26] Ex. 8 at ¶42.

pipeline (Motion at 24-26). No case law exists to support this position. In fact, Oklahoma law expressly recognizes that gas may be marketable at the wellhead. *See Chieftain,* 528 Fed. Appx. at 943 (vacating certification order because the district courts had not performed a rigorous analysis to determine whether any of the gas was in marketable condition); *Roderick,* 725 F.3d at 1219 (same); *Howell,* 112 P.3d at 1159 (recognizing gas may be "marketable at the wellhead"); *Strack,* 405 P.3d at 140 ("The question of where and when particular gas is marketable is not settled in Oklahoma. In addition, there is no categorical rule with respect to when post-production costs may be considered for royalty valuation."); *accord Tipton Home* at 20.[27]

Within the oil and gas industry it is well-recognized that natural gas is produced or made marketable, or capable of being bought and sold, when it can be measured, delivered, and accepted into the first pipeline system following production activities at the well site. Ex. 8 at ¶¶14(a), 16.[28] Thus, for the gas here to be marketable, it need only meet the quality requirement of midstream pipeline companies in the area. [29] *Id.* at ¶23.

---

[27] *See also* Stephen A. Brown and Mine K. Yucel, "The Pricing of Natural Gas in U.S. Markets," Economic Review – Second Quarter 1993 (attached as Ex. 17), at 41: "As natural gas journeys downstream from the wellhead, it travels through collection systems, pipelines, and local distribution systems before it reaches its consumers. **Natural gas prices are observed in six separate markets**. Prices in these markets include **wellhead**, city gate, and four end-use prices." (Emphasis added).

[28] These characteristics of "marketable" natural gas are consistent with the American Gas Association Report No. 4A, describing natural gas contract measurement and specifications, which, in laymen's terms, states that to be marketable, natural gas must only be acceptable to the receiving pipeline at the well site, and capable of being utilized by the first purchaser in the ordinary course of business. Ex. 8 at ¶22.

[29] CRC submits as exhibits several alleged publications by companies not party hereto purportedly to establish what constitutes a "marketable" product. None of these documents are authenticated or learned treatises, some are not dated, and there is no way to know

In addition, gas produced from two wells in which CRC purports to own an interest – the Duncan Shores 1-1 and 1-2 wells – was very lean, dry gas, and therefore met the specifications of the third-party receiving pipeline owned by CenterPoint. Ex. 5 at 223:1-6. Thus, even under CRC's unsupported argument, gas from the Duncan Shores wells was marketable at the wellhead.

**E.**   **Fuel Gas:** Whether the leases involved in this action require royalty to be paid on "fuel gas," and whether SM breached an obligation to pay fuel gas, are not common questions. There is no common "fuel gas" obligation, because each of SM's leases must be construed taking into consideration the entire lease language, the custom and practice in the industry at the time, and the parties' course of performance.

CRC's expert acknowledges that not all of these leases contain an alleged "fuel gas" clause. CRC's Ex. 53 at 8. In addition, CRC's own exhibits establish that within those leases where such a clause allegedly appears, there are **numerous** variations of the basis upon which "fuel gas" royalties are to be calculated.[30]

---

under what circumstances or for what purpose they were prepared or used, and so are inadmissible hearsay. Certainly, a midstream company's belief as to what constitute a marketable product for a midstream company's purpose does not control what constitutes a "marketable" product for purposes of post-production cost deductions under *Mittelstaedt.* And as numerous courts have already recognized, when and where gas is "marketable" is unsettled under Oklahoma law. *Whisenant,* 429 P.3d at 709; *Strack,* 405 P.3d at 140. It certainly does not have to be "pipeline quality" or residue gas, as many of these documents claim.

[30] These include on the basis of "gross proceeds received," "but in no event more than x"; "gross proceeds" "at the prevailing market rate"; "gross proceeds received" "where the same is sold at the mouth of the well," or if not sold at the mouth of the well, "the market value thereof at the mouth of the well," but "in no event more than x of the actual amount received"; "at the market price at the well"; "proceeds at the mouth of the well, at the prevailing market rate"; "the value of all raw gas at the mouth of the well"; and "proceeds

Since these leases have materially different terms, with different points of valuation, and because the customs and practice change over time, resolving the "fuel gas" issue with respect to CRC's lease, which is a "gross proceeds received," "but in no event more than x of the actual amount received by the lessee," will not, "in one stroke," resolve that issue with respect to other royalty owners who have different lease clauses.

CRC's argument relating to fuel use also fails to address that numerous of the royalty owners' leases, including CRC's, contain a clause which specifically provides that SM has the "right to use, free of cost, gas, oil and water produced on said land for its operations thereon." Ex. 1.

In *Lackey v. Ohio Oil Co.,* 138 F.2d 449 (10th Cir. 1943), the court, applying Oklahoma law, construed royalty clauses providing for royalties to be paid on gas used off the leased premises. The court held that under Oklahoma law, "'the phrase 'used off the premises'... means 'gas appropriated to a purpose foreign to utilization' for the development of the lease." *Id.* at 451. The court relied on *Mussellem v. Magnolia Petroleum Co.,* 231 P. 526, 527 (Okla. 1924). The court in *Mussellem* held, in connection with a clause allowing the lessee free use of gas on the leased premises, that:

> Another clause of the contract provides that the lessee should have free of cost any gas produced for the development and use "on" the premises. For any gas coming from an oil well and used "off" the premises, $ 50 per year was to be paid. The words "on" and "off" are correlatives, and to determine what the latter means might be best reached by a proper conception of what the word "on," as used in the lease, conveyed. It had no other meaning than used in connection with the development of the premises. The words "off the premises" had no other meaning to the

if sold at the well, or if marketed by lessee off the leased premises, the x% of its market value at the well," just to name a few. CRC Exs. 28.2-28.5.

parties than if the gas was appropriated to a purpose foreign to utilization for the benefit of development of the property itself. In other words, it did not have particular reference to place where used, but the purpose and objects of its use, to wit, one foreign to the development of the premises in question.

*Id.*

Under the above case law, the "free use" clause authorizes SM to use gas produced from a lease that furthers operations of the lease, whether or not the gas is used "on" or "off" the leased premises. Thus, to determine whether a royalty owner had been underpaid for "fuel gas," this Court would first have to determine (1) whether the lease contained a "free use" clause, (2) whether SM had actually used any "fuel gas," (3) whether such use furthered the operations of the lease, and (4) using the particular point of valuation for alleged "fuel gas," whether SM had properly paid royalties. Again, resolving this issue for CRC will not resolve it in "one stroke" for royalty owners with differing lease clauses, or where those royalty owners' leases did not contain "free use" provisions. However, the evidence establishes that SM paid royalties on the Btu basis of the wellhead value for **all** gas produced.[31]

    **F.**    **"Profit Fee" Claim and "Double Charges" Claim:** Neither of these claims present a common question of fact. CRC's "profit fee" claim is essentially an argument that the price FW paid SM upon for gas at the wellhead for the first 3 ½ years SM owned the Coal County gathering system should not have been subject to a 15% or 20%

---

[31] Ex. 6 at 140:11-142:12; 147:19-22; Ex. 4 at 187:4-22; Ex. 2 at 13.

(depending on the vintage of the well) retention prior to being paid to SM. Motion at 17-18. CRC's "double charges" claim contends that the royalty owners were "double-charged" a "CenterPoint 2.5% Fuel Gas Fee and a 10.5¢ gathering fee for 28 and 46 months, respectively." Motion at 18. SM disagrees with CRC's characterization of these post-production costs. Nonetheless, even if CRC is correct, these "fees" were not charged across the entire proposed class period, so royalty owners who received their mineral interests or entered into new leases after these time periods would not have been charged these "fees." Moreover, it would be necessary to review each individual royalty owner's lease to determine if such "fees" were permitted during this time period. Resolving these issues for CRC will not resolve them with respect to the other putative class members.

**G.   Unjust Enrichment:** "Unjust enrichment" is an equitable claim, and Oklahoma law is clear that a plaintiff may not pursue an equitable remedy when the plaintiff has an adequate remedy at law. *See Thacher v. Int'l Supply Co.,* 54 P.2d 376 (Okla. 1936); *Member Services Life Ins. Co. v. American Nat'l Bank and Trust Co.,* 130 F.3d 950, 957 (10th Cir. 1997). Because CRC here has an adequate remedy at law, CRC is not entitled to any relief for the equitable claim of unjust enrichment. However, even if it were, it would, once again, be necessary to conduct an individualized comparison of what each royalty owner was paid and what it was entitled to be paid before this Court could determine whether SM had been "unjustly enriched" with respect to any royalty owner.

**H.   Tortious Breach:** Oklahoma law does not recognize a claim for tortious breach of contract, except in very limited circumstances not applicable here. The Oklahoma Supreme Court observed in *Wathor v. Mutual Assur. Adm'rs, Inc.,* 87 P.3d 559, 561 (Okla.

2004), that while contracts in Oklahoma contain an implied duty of good faith and fair dealing, "in ordinary commercial contracts, a breach of that duty merely results in damages for breach of contract, not independent tort liability." While Oklahoma courts have recognized a claim for tortious breach of contract in the context of insurance agreements, *Christian v. American Home Assur. Co.*, 577 P.2d 899 (Okla. 1977), they have repeatedly declined to extend that claim to other types of contracts.[32] There is no recognized claim for tortious breach of contract in the context of oil and gas leases. In any event, the same individualized analyses with respect to CRC's breach of contract claim would be necessary, in addition to an analysis of any facts giving rise to an intentional tort.

I.     **Fraud:** CRC's fraud claim is not a certifiable claim because CRC is required to prove every element of fraud for each putative class member. As an initial matter, CRC focuses on *Weber v. Mobil Oil Corp.*, 243 P.3d 1 (Okla. 2010), which is inapplicable. *See* Motion at 30-31. *Weber* was decided under state law governing state procedure and state requirements for class certification. Because the federal rules on class actions are procedural, federal law, not Oklahoma state law, will govern the requirements for class certification under Rule 23. *See Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136 (1965); *Cook v. G.D. Searle & Co., Inc.*, 759 F.2d 800, 803 n.5 (10th Cir. 1985). Accordingly,

---

[32] *See e.g., Rodgers v. Tecumseh Bank*, 756 P.2d 1223 (Okla. 1988) (Court rejected an effort to extend the claim of tortious breach of contract to commercial loan agreements); *RJB Gas Pipeline Co. v. Colorado Interstate Gas Co.*, 813 P.2d 1, 11 (Okla. Civ. App. 1989) (Court refused to extend a claim for tortious breach of contract to gas purchase contracts); *Hinson v. Cameron*, 742 P.2d 549, 554 (Okla. 1987) (Court refused to apply *Christian* to an at will employment relationship); *Foye v. Eastover Bank For Sav.*, 811 P.2d 108, 111 (Okla. Civ. App. 1991) (Court rejected claim for tortious breach of contract in real estate transaction).

*Weber* is neither binding nor persuasive.

To prove actual fraud, each putative class member would have to prove that each putative class member relied on a false representation to his or her detriment. *Austin v. Cockings*, 871 P.2d 33, 35 (Okla. 1994). Similarly, a claim for constructive fraud would require each plaintiff to prove that he or she was misled to his or her prejudice. *See* 15 O.S. § 59. There is no presumption of reliance in common law fraud cases. *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 411 (W.D. Okla. 1990). Where, as here, every putative class member must show detrimental reliance, there can be no common question as to fraud, because assuming, arguendo, that CRC could prove detrimental reliance, such proof would not establish detrimental reliance on the part of any other class member.

The Western District of Oklahoma has held that commonality is lacking for fraud claims and therefore, fraud claims are not amenable to certification as part of a class action.[33] In *Naylor,* the court found that "[w]ith regard to Plaintiff's fraud claims, both actual and constructive," commonality was lacking because proof of reliance was "undoubtedly an individualized determination." *Naylor Farms* at *6. In the *Hill* cases, the court held that "[w]hether class members relied on the information on royalty payment check stubs and did so reasonably, an essential element of a fraud claim, is a uniquely individualized question" and therefore fraud claims were "not subject to common proof."

---

[33] *Hill v. Marathon Oil Co.*, 2010 WL 2365447, *5 (W.D. Okla. 2010); *Hill v. Kaiser-Francis Oil Co.,* 2010 WL 2474051, *6 (W.D. Okla. 2010); *Naylor Farms v. Anadarko OGC Co.*, 2009 WL 8572026, *6 (W.D. Okla. 2009).

*Hill v. Marathon* at *5; *Hill v. Kaiser-Francis* at *6.

CRC claims that "Plaintiff's and Class members reliance on SM's misrepresentations on their check stubs is a common question." Motion at 31. Under Oklahoma law, a producer is required to disclose specific information on its check stubs, pursuant to 52 O.S. § 570.12. SM's check stubs comply with this statute.[34] Any other "specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment" are only "due to the owner upon request by the owner." 52 O.S. § 570.12(A)(10). CRC does not allege that it, or any other putative class member, has ever asked for or was denied any such "specific listing." In fact, CRC's predecessor-in-interest, Michael J. Weeks, contacted SM in 2006, after first production from the first Duncan Shores well, and discussed with an SM employee how royalty payments would be calculated for his well.[35] Robert Abernathy, CRC's principal, did the same thing prior to filing this lawsuit in 2011.[36] As a result of filing this lawsuit, he absolutely had knowledge of SM's royalty payment practices prior to acquiring the Spears Lease in May 2015.

It is obvious from just these two examples that whether a putative class member actually relied on the check stubs under attack must be examined individually, because clearly there are those putative class members who did not. Where, as here, every putative class member would have to show detrimental reliance on the check stubs at issue, there can be no common question as to fraud, because assuming, *arguendo*, that CRC could

---

[34] Ex. 2 at ¶61 and Ex. 11 (representative check stub).
[35] Ex. 5 at 113:21-114:6; 116:4-117:11; 118:5-17; 145:16-20; Ex.12 (Exs. 59.1-59.3 to Kris L. Terry deposition); Ex. 2 at ¶62.
[36] Ex. 13; Ex. 2 at ¶61.

prove its own detrimental reliance, such proof would not establish detrimental reliance on the part of any other class member.

## IV.   PREDOMINANCE IS LACKING.

CRC must not only prove that "there are questions of law or fact common to the class," F.R.C.P. 23(a)(2), but also that "the questions of law or fact common to the members of the class **predominate** over any questions affecting only individual members." F.R.C.P. 23(b)(3) (emphasis added). The predominance requirement "is far more demanding" than the commonality requirement. *In re Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Merit*, 282 F.R.D. at 561-62 (same). The Rule 23 "rigorous analysis" requires the district court "take a close look at whether common questions predominate over individual ones." *Comcast v. Behrend*, 133 S.Ct. 1426, 1432 (2013).

A predominance analysis has two parts. The "first focus must be on the substantive elements of the plaintiffs' cause of action and inquire into the proof necessary for the various elements. Second, after examining the proof necessary we must inquire into the form that trial on the issues would take." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981); *accord In re Hydrogen Peroxide Antitrust Lit.*, 552 F.3d 305, 311 (3d Cir. 2008). Unless liability can be resolved on a class-wide basis, class certification is not appropriate because common questions will not predominate. *Wal-Mart*, 131 S. Ct. at 2551.

This case cannot be certified because SM's varying obligations and varying leases, together with other issues typically involved in royalty underpayment cases, make individual questions predominate. *Foster*, 285 F.R.D. at 646 (holding that the predominance requirement was not satisfied because the court would have to resolve

individual questions related to lease language, industry custom and usage, whether individual members settled their claims in prior class actions, and whether class members were exposed to or relied on any representation by defendant); *Merit,* 282 F.R.D. at 562 (holding that the predominance requirement is not satisfied because a common payment practice cannot overcome the variations in lease language and other individual factors that *Mittelstaedt* requires the court to analyze); *Anderson,* 306 F.R.D. at *443 (holding that the royalty underpayment claim failed the predominance requirement because the Court would spend more time adjudicating individual issues, such as lease language, affirmative defenses like the statute of limitations, royalty owners' knowledge and expertise, diligence, and damages); *McKnight,* 2016 WL 756541 at *8 (denying motion to certify because individual inquiries required to determine liability and damages predominated).

A.  **Breach of Lease/Implied Duty to Market:** For the multiple reasons set forth above with respect to commonality, CRC's breach of contract and breach of the implied duty to market claims cannot be certified because any alleged common questions with respect to those claims do not predominate.

B.  **Fraud:** CRC's claims for fraud further preclude a finding of predominance. To prove fraud, each class member would have to prove that he relied on a false representation to his detriment, and that SM possessed an intent to deceive. Where, as here, every putative class member must show detrimental reliance, class certification must be denied.

C.  **Statutes of Limitation:** In addition, a vast portion of CRC's alleged damages hinges upon CRC's ability to avoid the applicable Oklahoma statutes of limitation

by proving individual facts, because CRC is seeking to recover damages going back almost eighteen years. The majority of the alleged damages period is beyond Oklahoma's five-year statute of limitations for actions on written contracts (12 O.S. §95(A)(1)) and the two-year statute of limitations for tort actions, including fraud. 12 O.S. §95(A)(3). Class certification is not appropriate where, as here, each putative plaintiff would have to show that the statute of limitations has been tolled for his or her claims. *See, e.g., Broussard v. Meineke Discount Muffler Shops. Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (reversing trial court's certification of class because "tolling the statute of limitations on each of Appellees' claims depends on individualized showings that are non-typical and unique to each" plaintiff); *Kelley*, 139 F.R.D. at 411 (denying class certification where "proof of compliance with the statute of limitations will vary from plaintiff to plaintiff"); *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 123-24 (C.D. Cal. 1978).

**D.    Damages:** CRC's Motion fails to present the expert damages evidence that is essential for certification under the United States Supreme Court's recent opinion in *Comcast, supra. Comcast* holds that for a Rule 23(b)(3) class like that here, the would-be class representatives must show, as an indispensable part of their proof that common questions predominate over individual questions, that damages can be proved on a class-wide basis. Furthermore, they must make that showing with evidence at the class certification hearing. *Comcast,* 133 S.Ct. at 1432-33. The Supreme Court stated that the class representative "must ... satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." Absent proof of a method for establishing damages on a class-wide basis, the Supreme Court held that "[q]uestions of individual damages calculations will inevitably

overwhelm questions common to the class." *Id*. at 1433.

CRC's damages witness submitted a written report (CRC Ex. 52) in this case which does not contain, or even refer to, any evidence establishing that damages may be calculated on a class-wide basis for any of CRC's alleged class causes of action. For the most part, her report contains little more than CRC's legal arguments for class certification under pre- *Wal-Mart, Comcast*, Western District of Oklahoma, and Oklahoma Court of Civil Appeals opinions (*see* footnote 14). All her report does is to create a purported global total, divorced from the legal claims of CRC or putative class members. Consequently, Ms. Ley's aggregate total of dollars "deducted" suffers from the same flaws as the "baseline" the economist projected in *Comcast*. *See* 133 S. Ct. at 1433-35. Ms. Ley's report assumes the validity of all of CRC's theories of class-wide liability, just like the one condemned in *Comcast*. The report also disregards all differences among the quality of various gas streams, configurations of pipeline systems and processing plants, and marketing arrangements and contracts. In the Supreme Court's language, the report fails the first stem of a damages study, which is "the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast*, 133 S. Ct. at 1435.

*Comcast* also requires that CRC show that damages are capable of being measured across the class, such that individual damages issues do not overwhelm common questions. *See* 133 S.Ct. at 1433 (finding respondents' damages model "falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the

class").

This specific ruling in *Comcast* reinforces the lack of predominance here. CRC contends gas is never marketable until processed to interstate pipeline quality. But this liability theory conflicts with Oklahoma law, under which questions of whether and where gas is a marketable product are issues of fact. *See Mittelstaedt.* Beyond dispute, gas can be and is marketable at the well. *Mittelstaedt,* 954 P.2d at 1208.

Moreover, express royalty terms, including those in the oil and gas leases at issue, can permit deduction of post-production costs, even when those terms do not specifically include the word "deductions." *See Mittelstaedt,* 954 P.2d at 1206 (stating the Court examines the language of the lease and "[w]e use the plain meaning of the terms when doing so."). Accordingly, it is impossible to tie CRC's liability theory in this case to any class-wide proof of damages. Different class members would be entitled to different damages, depending upon whether the gas produced from an individual well was, in fact, marketable, and whether post-production costs are deductible in the computation of different class members' royalties under express lease terms.

SM's extensive expert reports establish that damages cannot be determined on a class-wide basis for any of CRC's class claims.[37] Because CRC cannot satisfy the requirements of *Comcast* for the proposed class, CRC cannot prove Rule 23(b)(3)'s

---

[37] *See* Ex. 9 at ¶76 ("It is impossible to measure damages on a class-wide basis in this matter. Each of the aforementioned inquiries regarding issues such as marketing contracts and pricing formulas, costs incurred upstream of where the gas is first marketable (according to the Plaintiff) versus costs incurred downstream of where the gas is first marketable, as well as gas used versus gas sold, and the demonstrable diversity of the lease language for each of the owners will not reduce to a singular, common class-wide model").

requirement of predominance.

## V.   **TYPICALITY IS LACKING.**

To prove typicality under Rule 23, CRC must show that establishing its own claims will necessarily establish the essential elements of each class member's claims.[38] *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (reversing the district court's certification of a class where "a named plaintiff who proved his own claim would not necessarily have proved anybody else's claim"). "Common requests for relief [or] common legal theories do not establish typicality when the facts required to prove the claims are markedly different among class members." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 77 (D.N.J. 1993).

Typicality is not present here, not only because of differing royalty payment provisions, but because of SM's differing methods of paying royalty owners, as established above. In particular, royalty owners with "gross proceeds" leases, like CRC, were paid royalties differently than royalty owners with other types of leases.[39] In *McKnight, supra*, Judge Russell found that "the differing methods of paying the royalty owners and in particular the payment methodology used on production from [the plaintiff's well] renders the Plaintiff's claims not typical of the class claims." 2016 WL 756541 at *6; *see also Chieftain*, 528 Fed. Appx. at 943-944 (rejecting class certification where CRC's "array of theories," including XTO's "uniform payment methodology," required "fuller

---

[38] "The premise of typicality is simply stated: as goes the claim of the named plaintiff, so goes the claims of the class." *Sprague,* 133 F.3d at 399.

[39] Ex. 9 at ¶¶56, 59; Ex. 2 at ¶62; Ex. 5 at 29:20-30:17; 33:12-16; 69:6-13; 70:1-4; 224:7-13.

explanation").[40]

The same multiplicity of individual issues that defeats a showing of commonality and predominance in this case likewise precludes the existence of typicality. When, as shown here, there must be individual determinations of marketability, detrimental reliance, intent to deceive, limitations, and other issues, CRC cannot demonstrate that its claims are typical of other potential class members' claims. By proving its own claims, CRC would not thereby prove the claims of even one other putative class member. Typicality is therefore lacking, and class certification is not appropriate.

In addition, typicality is not present when the named plaintiff's circumstances or legal theories differ from those of the putative class members.[41] Absent typicality, it would be unfair to bind either the absent class member (if CRC's claims fail) or SM (if CRC prevails) to the results of CRC's claims. *See Sprague, supra.* Given these concerns, courts "have repeatedly held representatives' claims to be atypical if they are grounded in factual situations differing from those of other class members." *Brooks v. S. Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla. 1990).

---

[40] CRC's reliance on *Handley v. Santa Fe Minerals, Inc.,* 849 P.2d 433 (Okla. Civ. App. 1992), *Blackhawk Oil Co. v. Exxon Corp.,* 969 P.2d 337 (Okla. 1998), and *Lobo Exploration Co. v. Amoco Production Co.,* 991 P.2d 1048 (Okla. Civ. App. 1999), is misplaced. These cases are distinguishable for other reasons. In *Handley,* the class certified involved leases containing a single, identical provision; *Blackhawk* involved claims by producers against operators, and only four forms of contracts using virtually identical language; and *Lobo* involved claims between a working interest owner and producer, not royalty claims.

[41] "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1082 (6th Cir. 1996).

Stated more simply, the inquiry becomes: given the particular claims and defenses of the class representative, and the claims and defenses available to the class members, does the class representative have any incentive to vigorously pursue the claims and defenses of the class? This inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *Hallaba v. Worldcom Network Services, Inc.* 196 F.R.D. 630, 643 (N.D. Okla. 2000) (citation omitted) (finding claims of class representative not typical of class at issue where plaintiff's claims were based upon Missouri law, since "Plaintiff has no incentive to pursue a claim based on a different legal standard.") (emphasis in original).

Concomitant with the concern that a class representative will have no incentive to pursue claims or defenses he does **not** possess is the fear that, where a representative **does** possess unique claims or defenses, they will become the focus of the litigation. "In such situations courts have held that certification should be denied since the unique defenses may become the focus of the entire litigation and divert much of the representatives' attention from the suit as a whole. The resulting effect is that the remaining members of the class are severely disadvantaged by the named plaintiff's representation."[42] *Spelman v. F&M Bank & Trust Co.*, Fed. Sec. L. Rep. (CCH) ¶92,543 (N.D. Okla. 1981).[43] In this case, CRC's claims are subject to limitations and/or defenses which, on their face, may not

---

[42] Regardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with unique defenses. *Barry v. RJR Nabisco Holdings Corp.,* 148 F.R.D. 520, 521 (S.D.N.Y. 1993).

[43] *Accord Warren v. Reserve Fund, Inc.*, 728 F.2d 741 (5th Cir. 1984); *Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66 (E.D.N.Y. 2000).

be available against other class members, and which would limit CRC's claim for contract damages and preclude any claim by CRC for fraud.

CRC purportedly acquired its interest in the three Spears Wells in Coal County from Pagosa Resources, LLC, by mineral deed dated May 28, 2015. *See* Ex. 14. The mineral deed purports to grant CRC the right to "receive all unpaid royalties and revenues accrued or accruing to grantor's benefit, including all claims or causes in contract or tort associated therewith, even if such royalty revenues were owned prior to the execution of this instrument."

Pagosa acquired its interest from Michael J. Weeks by mineral deed dated November 7, 2013. *See* Ex. 15. That mineral deed specifically provides that Pagosa is to receive bonuses, rents, royalties, production payments or monies of any nature accrued from and after **January 1, 2014**. So while CRC may have acquired rights to Pagosa's underpaid royalty claims for the three New Wells in Coal County, those claims would be limited to underpaid royalties from and after January 1, 2014, and not before.

Subsequent to a March 28, 2018 settlement conference, CRC obtained a Mineral Deed from Michael Weeks and the Michael Weeks Revocable Trust ("Weeks") dated May 28, 2018, purporting to convey any rights Weeks owned to CRC. Ex. 14. However, that Mineral Deed was not effective to convey **personal rights** retained by Weeks when it conveyed its real property interests to Pagosa by way of the November 7, 2013 mineral deed. Weeks, at that point, retained only its **personal** claims to royalties prior to January

1, 2014.[44] However, even if the Mineral Deed was effective to transfer personal underpayment claims prior to January 1, 2014, Weeks obtained its interest from Legacy Royalty, LLC, by mineral deed dated April 1, 2010. Ex. 16. Thus, CRC certainly cannot bring claims prior to the effective date of the Legacy Royalty mineral deed, and thus does not have claims which are typical of the claims of other putative class members for other time periods.

In addition, CRC's predecessor, Weeks, was aware of the manner in which SM calculated royalty.[45] And CRC was generally aware of SM's royalty calculation method as to other wells it owned at the time as early as 2010.[46] It was certainly aware of the manner in which SM calculated royalties prior to its acquisition of its Coal County lease in 2015, since it filed this lawsuit in 2011. Yet it chose to acquire yet another interest subject to a lease with SM in 2015. Oklahoma law is clear that a "defrauded party, after discovering the fraud, must stand toward the other party at arm's length and must not make any new agreements or engagements respecting it. If he does so, he condones and waives the fraud." *Steiger v. Commerce Acceptance of Oklahoma City, Inc.,* 455 P.2d 81, 82 (Syllabus at 5)

---

[44] *See Drake v. Martin,* 30 Cal. App. 4th 984, 994-95 (1994) (holding transfer of title to real property did not transfer rights seller may have had under the land sale contract with his grantor); *Murray v. Holland,* 27 N.E.2d 126 (Ind. App. 1940) (holding quit-claim deed passed interest in real estate – a property right – but that personal rights do not transfer with deeds); 16 O.S. §18 ("a quitclaim deed … shall convey all right, title and interest of the maker thereof in and to the **premises** therein described") (emphasis added); 16 O.S. §14 ("The words 'land,' 'real estate' and 'premises' when used…in any instrument relating to real property… shall be deemed …to include lands, tenement and hereditaments….") (Emphasis added).

[45] Ex. 5 at 113:21-114:6; 116:4-117:11; 118:5-17; 145:16-20; Ex. 12; Ex. 2 at ¶62.

[46] Ex. 4 at 75:22-76:1; Ex. 2 at ¶61, Ex. 13.

- 36 -

(Okla. 1969).[47]

In this case, even after learning of the manner in which SM calculated royalties prior to filing this lawsuit, and **after** filing this lawsuit, when it **clearly** knew of the manner in which SM calculated royalties, CRC, voluntarily, and with full knowledge of the facts, chose to purchase the interest subject to the SM least that it now attempts to use to support its fraud claims. CRC has clearly waived any claims in that regard. Thus, CRC is subject to a defense by SM to which other putative class members may not be subject.

Moreover, the Duncan Shores wells in which CRC claims to own interests produce lean, dry gas at the wellhead which meets the pipeline specifications of the third-party transmission pipeline. Ex. 5 at 223:1-11. CRC argues that none of the gas from any of the putative class wells is marketable at the wellhead because it does not meet these specifications. Notwithstanding CRC's assertions, the gas from two of the Spears Wells demonstrably meets these specifications. Thus, CRC, at least as to these two wells, does not have a claim that the wellhead gas is not in a "marketable condition," even under CRC's erroneous definition.

When the proposed class representative is subject to unique defenses which threaten

---

[47] *See also Hinton Travel Inn, Inc. v. Wichita Wayne, LLC,* 2012 WL 2789873, *5 (W.D. Okla. 2012) (a defrauded party who discovers the fraud but continues to contract with the defrauder has condoned the conduct and waived the fraud) (citing *Steiger,* supra); *Woodmont, Inc. v. Daniels,* 274 F.2d 132 140 (10th Cir. 1959) (finding "contractor cannot recover the benefit of his bargain after he learned of the true facts and contracted prospectively in the face of such knowledge"); *Derakhshan v. Tizzio,* 270 P.3d 215, 219 (Okla. Civ. App. 2011) (quoting from "Notes on Use" to OUJI-Civ. No. 18.11: "If the plaintiff learned of the actual facts before taking any action in reliance, for example, entering into a contract with another person, then the plaintiff's claim must fail, not because of waiver but because of failure to meet the burden of proof on the issue of reliance").

to become the focus of litigation, class certification is improper. *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990). In such event, the requisite typicality is lacking. *Id.* And where knowledge of alleged conduct varies from plaintiff to plaintiff, class certification is "impossible." *Broussard*, 155 F.3d at 342.[48] Class certification is also inappropriate where a class representative has **atypical claims**, as well as defenses. *Consor v. Occidental Life Ins. Co. of Calif.*, 469 F. Supp. 1110, 1115 n.3 (N.D. Tex. 1979) (citation omitted). In cases where a class representative lacks a claim possessed by the class, the class representative is viewed as lacking "the kind of personal stake in the litigation that would insure adequate representation of the interest of the class members." *Consor, supra.*

In this case, the claims potentially available to CRC differ from those available to a majority of the putative class members, **because it is highly unlikely that its fraud claim can survive a waiver or limitations challenge.** In addition, its claims are **limited in time.**

## VI.   ADEQUACY IS LACKING.

Rule 23(a)(4) permits class certification only if the "representative parties will fairly and adequately protect the interests of the class." "If the representatives' claims are not typical of the class, they cannot adequately protect the interests of the absent class members."[49] *Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1984); *Spivak*

---

[48] *Accord Kleiner v. First Nat'l Bank of Atlanta,* 97 F.R.D. 683, 693 n. 11 (N.D. Ga. 1983); *Sprague,* 133 F.R.D. at 398

[49] Further, in the absence of questions common to the putative class, and in light of the individualized inquiries demanded by the claims in this case, it is clear that no prospective class member could be an adequate class representative under Rule 23(a)(4), because no individual can fairly represent the putative class members' diverse, fact-intensive claims.

120 F.R.D. at 698 (same).[50] The same reasons that keep CRC from meeting the requirements of typicality prevent it from being an adequate class representative. Because CRC cannot demonstrate that the requirements of Rule 23(a)(4) have been met in this case, certification of the putative class must be denied.

## VII.   SUPERIORITY IS LACKING.

To satisfy Rule 23(b)(3), CRC must prove both predominance and superiority. SM has shown above that CRC cannot prove predominance. CRC also cannot meet its burden of proving that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). In determining superiority, the key question is how, if at all, CRC's claims could be tried on a class-wide basis.

In *Panola, supra* the Oklahoma Court of Civil Appeals reversed an order certifying a class action alleging the defendant had "improperly reduced the price upon which it paid royalties by deducting improper fees for gathering, compression, fuel use, and marketing." 287 P.3d at 1034. The court held that a class action was not the superior method to adjudicate this claim for several reasons. First, the implied covenant to market, upon which the claims were based, did not apply to class members by virtue of an Oklahoma Corporation Commission force pooling order issued prior to May 8, 2012. *Id.* at 1036. Second, the court found individual inquiry was required into the leases, the marketability

---

*Kas, supra.*

[50]*See also Amchem Prods.,* 521 U.S. at 626 n.20 (1997) ("The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)....") (citation omitted); *accord Meyers v. S.W. Bell Tel. Co.,* 181 F.R.D. 499, 501 (W.D. Okla. 1997).

of the gas, and the wellhead value of the gas. *Id.* at 1036-37. As a result, the court found that a class action was not a superior method to adjudicate the royalty owners' claims for post-production costs. *Id.* at 1037. Other courts agree. *Supra* at n.14.

The claims asserted by CRC involve issues which inherently necessitate individual review. Determination of the uniquely individual questions that must be answered for each putative class member here will splinter this case into innumerable mini-trials and jury instructions and verdict forms that will be almost impossible to draft or understand. Such a fragmented inquiry is inherently unmanageable, and any efficiency gains from the class action device will be lost. A class action is not the superior method for the fair and efficient adjudication of a controversy when, as here, each class member's claim requires individual adjudication. Furthermore, given the lack of typicality as demonstrated above, there is significant necessity for individual control of the claims that would be subsumed in the putative class.

## VIII. <u>CONCLUSION</u>

Because CRC cannot meet its burden under F.R.C.P. 23 of proving commonality, predominance, typicality, adequacy, superiority and manageability, and for the reasons stated above, its Motion for Class Certification must be denied.

Respectfully submitted,

*/s/ Pamela S. Anderson*
J. Kevin Hayes, OBA #4003
Pamela S. Anderson, OBA #11613
**HALL, ESTILL, HARDWICK, GABLE, GOLDEN &
NELSON, P.C.**
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3708
Telephone (918) 594-0400
Facsimile (918) 594-0505
**ATTORNEYS FOR DEFENDANT
SM ENERGY COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the Following ECF registrants:

Robert N. Barnes
Patranell Lewis
Emily Nash Kitch
Michael Angelovich
Bradley E. Beckworth
Jeffrey J. Angelovich
Neil Smith
Susan Whatley
Lisa Baldwin
Trey Duck


*/s/ Pamela S. Anderson*
Pamela S. Anderson


3967953.1:730119:00332