# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Chieftain Royalty Company, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Case No. CIV-11-177-D |
| | § | |
| SM Energy Company (including predecessors, | § | |
| successors and affiliates), Enervest Energy | § | |
| Institutional Fund XIII-A, L.P., Enervest Energy | § | |
| Institutional Fund XIII-WIB, L.P., Enervest | § | |
| Energy Institutional Fund XIII-WIC, L.P., | § | |
| Enervest Operating, L.L.C. and Fourpoint | § | |
| Energy, LLC, | § | |
| Defendants. | | |

## SUPPLEMENTAL EXPERT REPORT

### ERIC R. KRAUSE, MBA

ERIC R. KRAUSE

7/8/19

DATE

# I.  INTRODUCTION AND NATURE OF INVOLVEMENT

1.  My name is Eric Krause.  I have been retained by SM Energy Company ("SM Energy" or "Defendant") in the matter of Chieftain Royalty Company v SM Energy Company (including predecessors, successors, and affiliates), Enervest Energy Institutional Fund XIII-A, L.P., Enervest Energy Institutional Fund XIII-WIB, L.P., Enervest Energy Institutional Fund XIII-WIC, L.P., Enervest Operating, L.L.C., and FourPoint Energy, LLC (collectively, "Defendants").  I previously filed an expert report in this matter on December 4, 2018.  Unless otherwise stated below, I incorporate my opinions that report herein.  After submitting my expert report, Plaintiff's counsel filed a *Reply in Further Support of its Motion for Class Certification and Brief in Support Thereof*.  SM Energy has asked me to issue this supplemental report in order to provide the factual and evidentiary distinctions between this matter and the United States Court of Appeals (herein "USAC") affirmation of class certification in *Naylor Farms, Inc. et al., v. Chaparral Energy, LLC. (*herein, *Naylor Farms).*

# II.  CREDENTIALS AND INFORMATION REVIEWED

2.  My credentials remain the same as set forth in my previous report.

3.  Attached, as Appendix B-Supplemental, is an updated listing of cases in which I have testified.  Applied Economics is now being compensated at the rate of $395 per hour for my work on this matter.  This compensation is not dependent in any way upon the outcome of this litigation or upon reaching any particular opinion or conclusion.

4.  In the course of my work in this matter, Applied Economics staff and I have reviewed documents and materials produced by the parties in discovery.  I have also procured and reviewed information from public sources.  A listing of all these materials is attached to this

report as Appendix C-Supplemental.  If any additional relevant or supplemental information or data becomes available to me, I will supplement this report as appropriate.

## III. DISTINCTIONS BETWEEN THE NAYLOR FARMS, INC. ET AL., V. CHAPARRAL ENERGY, LLC MATTER AND THIS MATTER

5.   As discussed in detail throughout this report, the facts and circumstances present and highlighted by the Courts in the *Naylor Farms* decision are materially different from the facts and circumstances in this matter. The most notable difference is the existence of evidence demonstrating substantially greater levels of diversity in this matter related to:

a)   The royalty obligations included in putative class leases in this matter;

b)   The marketing arrangements under which the class gas was sold;

c)   The physical gas composition and what is necessary to meet the marketable condition standard; and

d)   The methods in which the Defendant paid royalties to putative class members.

6.   Similarly, in the Tenth Circuit Court of Appeals decision in the *Naylor Farms* matter, the Court noted that Chaparral failed to address at all the Plaintiff's damages model and why it would not be sufficient for calculating damages for each of the class members.  In contrast, my filed report in this matter highlighting the inadequacy and inability of the Plaintiff's damage model to properly calculate damages and account for the significant diversity that exists amongst the *Chieftain* putative class members.[1]

7.   I discuss each of these topics in further detail below.

---

[1] See, for example, my report filed December 4, 2018, paragraphs 49 – 60, 65 – 79, 108 – 122.

8.    As I demonstrated in my December 4, 2018 report, there exists a substantial amount of diversity in royalty payment clauses and obligations in the proposed class in this matter that range from explicit obligations to more generalized provisions regarding how the Lessee should calculate and pay royalties.[2]  The leases produced in discovery in this matter reflect a substantial level of diversity of lease forms containing a wide variety of royalty payment standards across the class even after taking into account the defined exclusions in the class definition (to the extent taking the defined exclusions into account is even possible).  Each lease must be evaluated and considered individually in its totality and in concurrence with the gas composition and marketing arrangements applicable to each well in each period in order to properly discern the proper royalty payment obligation for each potential class member.

9.    The lack of perceived diversity in the proposed class members' leases played a critical role in the Tenth Circuit Court of Appeals' affirmation of class certification in _Naylor Farms_. Specifically, the lack of diversity led the USAC to accept the District Court's finding that a common question existed in "whether Chaparral breached the [implied duty to market]" because "[c]ritically, in doing so the district court first narrowed the class to include only those royalty owners whose leases contain" _Mittelstaedt_ Clauses.   This is a critical distinction from the proposed _Chieftain_ class.  In this matter, I am not aware of the Plaintiff limiting its proposed class to only _Mittelstaedt_ type leases.   The USAC noted the importance of the District Court's decision to limit the class to leases containing a _Mittelstaedt_ Clause rendering "such an individualized [lease language] analysis unnecessary."[3]   However, in this matter,

---

[2] See, for example, my report filed December 4, 2018, paragraphs 31 – 48.
[3] _Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC_, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019.

there are many different royalty payment obligations found in the putative class members' leases as discussed at length in my December 4, 2018 report.[4]

10. Further serving to contrast the facts in the *Naylor Farms* matter and this matter is the fact that the Plaintiff in *Naylor Farms* reviewed and categorized each of the putative class members' leases, and excluded leases that did not contain the IDM or wasn't classified as a *Mittelstaedt* lease. Notably, the USAC stated "this is precisely what a plaintiff should do to establish commonality under these circumstances." However, based on my review of the evidence, the Plaintiff in this matter has not performed the same comprehensive and accurate categorization or review of leases to establish the commonality it asserts. Based on the USAC's findings in *Naylor Farms*, the plaintiffs have not fulfilled their burden of establishing commonality as the USAC stated "a plaintiff should do."

11. As I stated in my December 4, 2018 report, the royalty payment obligation diversity was a key consideration for the Oklahoma Court of Civil Appeals in its decision to deny class certification in the *Strack v. Continental* and *Whisenant v. Strat Land* matters.[5] Because the Plaintiff in this matter has not sought to limit its proposed class to putative members with *Mittelstaedt* leases, the royalty payment obligation facts and circumstances in this matter are substantially more similar to those present in the *Strack* and *Whisenant* matters than the *Naylor Farms* matter. The USAC cites both of these decisions in its opinion in *Naylor Farms*, yet the USAC does not mention these cases with respect to its discussion on lease diversity because no parallel could be drawn due to the existence of substantial lease diversity in the *Strack and Whisenant* matters (as well as this matter) that was not present in the *Naylor*

---

[4] See my report dated December 4, 2018, paragraph 28 – 41.
[5] See my report dated December 4, 2018, paragraph 43.

*Farms* matter due to the plaintiff's voluntary restriction of the class definition to *Mittelstaedt* leases.

<u>Marketing Arrangements and Gas Disposition</u>

12.     As I discussed in my December 4, 2018 report, the Defendant has been an active seller in the Oklahoma wellhead markets and downstream markets.  Over the period at issue, numerous contracts related to SM Energy's sales of gas in this matter are sales at the wellhead or a nearby CDP.[6]  By entering into these various types of contracts at the wellhead, SM Energy is participating in the wellhead market.  In *Naylor Farms*, borrowing from *Wood v. XTO*, the USAC stated, "that the IDM imposes a duty to get the product <u>*to the place of sale*</u> in marketable form" [further emphasis added], indicating that the location of the gas sale is a relevant factor in examining the IDM.[7]  A key fact noted in *Naylor Farms* was that Chaparral "elect[ed] to participate in the high-pressure-pipeline market" and the Plaintiff presented class-wide evidence of this fact, which contributed to certification of a class in *Naylor Farms.*

13.     SM Energy participates in numerous markets, including the wellhead market based on its actual sale of gas in the wellhead market.  Thus, the USAC's reasoning and determination in *Naylor Farms* regarding the commonality of marketing arrangements does not apply to this matter based on demonstrable differences in facts.[8]  The USAC's emphasis on "the place of sale" highlights exactly the type of individualized inquiries that have to be made on an owner-by-owner basis, which proves there are not common questions that can be answered with generalized class-wide proof.  Moreover, it is my understanding that in the *Roderick v. XTO*

---

[6] See, for example SM-005255-SM-005256, gas sold on the Enogex system was subject to an affiliate contract between SM Energy and Four Winds while SM separately sold gas on the Enbridge system through an arm's length contract. See SM_00005247.

[7] *Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC*, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019.

[8] See my report dated December 4, 2018, paragraphs 50 to 60.

matter, the same Tenth Circuit Court of Appeals stated clearly that it was, in fact, possible for gas to be marketable at the well. This recognition is significant because, when gas is marketable at the well, a lessee like SM Energy can satisfy its royalty obligations under the implied duty to market by paying royalty based on the proceeds realized from selling gas production in the wellhead market.[9]

14.    Lastly, as I discussed at length in my December 4, 2018 report, SM Energy marketed its gas production in a variety of different ways over the period at issue under various types of marketing arrangements, including a notable diversity of terms. This further serves to highlight the underlying factual differences between *Naylor Farms* and this matter because the USAC determined in *Naylor Farms* that "[t]he vast majority of contracts at issue [in *Naylor Farms*] are POP contracts."[10] Such a statement cannot be made regarding the marketing contracts that SM Energy uses to market its Oklahoma gas production.

15.    Combined with the complexities introduced by the differences in lease language, the various marketing arrangements SM Energy utilizes result in a diversity of how production and royalties are accounted for to SM Energy's royalty owners and substantial settlement diversity throughout the putative class. This further distinguishes the facts and circumstances in this matter from those present in the *Naylor Farms* matter. SM Energy does not pay all royalty owners the same way, nor is it obligated to, based on the terms of its leases and the manner in which it markets its gas production.

---

[9] See *Order and Judgment, Chieftain Royalty Company v. XTO Energy, Inc.*, in the United States Court of Appeals, Tenth Circuit. No. 12-7047.
[10] *Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC*, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, page 3.

16.   As was discussed at great length in my previous report, there exists significant diversity and complexity regarding the physical nature, quality, and composition of the gas sold from across the putative class members' wells.   By extension, this leads to apparent factual differences between the gas composition and gas marketability at the well in this matter versus those present in _Naylor Farms_.   Specifically, the District Court in _Naylor Farms_ found that "an individualized gas-quality analysis is nevertheless 'unnecessary' in this case because ... all the gas at issue 'require[d]' _at least one_ GCDTP service 'to become marketable.'"[11]   As a result of this finding, the District Court then concluded that "the question of when the gas became marketable can be answered via generalized, class-wide proof."[12]   However, in this matter, not all gas requires at least one of the GCDTP services defined by the USAC in its _Naylor Farm_ ruling to become marketable.[13]   The prevalence of wellhead sales of gas by SM Energy underscores that not all gas requires at least one of the GCDTP services.

17.   To the extent costs were, in fact, incurred and deducted from royalty owners, that cost must be evaluated to determine if it was necessary to make the gas marketable for every single well in the class in this case.   That is to say, in order to reach a conclusion that this class could be certified, it is necessary for the Plaintiff to establish that absolutely <u>none</u> of the gas at issue in this case was marketable without gathering and processing, which is a highly disputed factual issue.   Not only has the Plaintiff not established that gathering and processing is needed to make the gas from each putative class well marketable with any facts or evidence,

---

[11] _Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC_, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, page 18.
[12] _Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC_, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, page 20.
[13] See my report dated December 4, 2018, paragraphs 108 – 116.

the Defendant has affirmatively demonstrated processing is <u>not</u> necessary to make the gas from each of the putative class wells marketable.

18. Even if one were to accept the Plaintiff's unfounded theory of marketability, an individual analysis of the gas composition is required to determine the point at which gas becomes marketable. The Plaintiff contends that the gas must meet interstate pipeline quality specifications in order to be marketable. As I noted in my December 4, 2018 report, gas could meet interstate quality specifications naturally when sold off the lease.[14] Again, under this scenario, the allegedly impermissible processing costs would not include all of the costs incurred, and an apportionment of the costs incurred to reach the specific interstate pipeline quality specifications versus the additional processing that occurred for economic reasons would be necessary.[15] These types of facts and circumstances were not presented by the Defendant in the *Naylor Farms* matter and were not considered by the USAC in reaching its decision, further serving to highlight the predominating differences and distinctions between *Naylor Farms* and the *Chieftain* matter.

19. My report in this matter includes a review of at least some of the evidence regarding the diversity of gas composition present across the putative class members' wells in this matter. This evidence clearly presents differing circumstances that were not presented to or considered by the Court in the *Naylor Farms* matter.

*Royalty Payment Methodology*

20. The USAC in *Naylor Farms*, quoting *Roderick,* stated, "material differences in damages determinations" will only destroy predominance if those "individualized issues will

---

[14] See my report dated December 4, 2018, paragraphs 87.
[15] This was discussed in greater detail in the Expert Report of Kyle L. Pearson, dated November 27, 2018.

overwhelm . . . questions common to the class."[16]  As I outlined in my December 4, 2018 report, unlike the defendant in *Naylor Farms*, SM Energy and its successors did not utilize a common royalty payment methodology for all the potential class members in this matter.[17]

21.  Ultimately, the way SM Energy pays royalty for a given month is a function of: 1) where the gas was sold; 2) the contractual terms found in the various marketing arrangements; 3) the revenues, volumes, and costs found on the remittances sent to SM Energy by the purchasers; 4) the relevant royalty obligations set forth in the leases; 5) how SM Energy recorded the revenues, volumes, and costs into SM Energy's revenue accounting system and 6) the owner-by-owner cost exemptions set up by SM Energy in its revenue accounting system.

22.  Over the relevant period, SM Energy had an interest in are approximately 126 Coal County gas-producing wells.[18]  Defendant acquired the Coal County wells and gathering system effective October 2001.  The gas produced from wells in Coal County operated by the Defendant or that the Defendant has operated during the relevant time period was largely marketed under an affiliate contract between Four Winds Marketing, LLC (herein, "Four Winds") and St. Mary Land Exploration Company that was originally inherited through the acquisition but was then altered numerous times over the class period.[19]   Defendant was, and continues to be, an active seller in the Oklahoma wellhead market.

23.  The pricing terms under SM Energy's Coal County marketing arrangement reflected the value of the gas at the point or location that the title transferred (at the well) and by which Defendant was paid for that sale.[20]  The marketing arrangement for any particular well in any

---

[16] *Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC*, United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, page 34.
[17] See my report dated December 4, 2018, paragraphs 49 – 60.
[18] SM.016263 – SM.016273.
[19] SM003146.
[20] These sales occurred exclusively at the wellhead.  It is worth noting that the term "wellhead sales" in the natural gas industry vernacular includes sales made at meters into the first-connected pipelines, which are typically located close to the actual wellhead.

given month will have a direct impact on the way royalty was calculated and paid to the members of the class. The volumes that are booked in conjunction with the revenue recorded for a well demonstrate the measured or allocated sales volume of gas at the various sales locations. As noted above, the location in this matter at which SM Energy recorded its sales volume is the "wellhead," or more precisely at the meter contracted for as the gas exits the leased premises and is delivered into the first connected pipeline.

24. SM Energy's predecessor, St. Mary's Land & Exploration Company, acquired the Coal County Gathering System effective October 1, 2001, assuming all purchase and sales contracts in effect at the time and subsequently entering into new contracts itself.[21] SM Energy inherited marketing arrangements and employed a revenue accounting procedure which called for Working Interests, Overrides, and Royalty Interest owners to all be paid the same for a given well.

25. From the effective date of acquisition from St. Mary's through November 2003 production, monthly prices were based on the Reliant Energy ("Reliant") pipeline system index price in the "Prices of Spot Gas Delivered to Pipelines" table in the first issue of the Inside F.E.R.C.'s Gas Market Report, less the actual gathering fees and gathering fuel percentage assessed by Reliant, less 20% or 15% of the remaining value depending on the vintage of the well's first production.[22] Beginning in December 2003, all wells were subject only to the 15% retention with the same monetary deductions as described above. However, the third-party Centerpoint fuel rate incurred was fixed at 2.5% instead of actual fuel incurred.

26. Beginning with June 2005 production, while SM continued selling the gas at the wellhead, SM Energy paid royalties for gas sold on the Coal County System based on 100% of the Reliant

---

[21] Deposition of Thomas Ferguson, May 8, 2012.
[22] SM003146.

East first of the month index price less a $0.105 Centerpoint third-party gathering fee and a fixed fuel percentage amount of 2.5%.[23]  In addition to the $0.105 Centerpoint gathering fee and fixed Centerpoint fuel, a portion of the royalty owners, depending on their lease obligations, were charged a $0.09 transportation fee ("TRO fee").[24]

27.  It is worth noting that not every royalty owner was charged the TRO fee and that SM Energy only deducted the TRO fee from an owner if it was determined that the lease allowed for such a deduction.  The varying treatment of owners as it relates to the deductions creates the need for an individualized inquiry to determine not only if the fee was actually charged by the Defendant, but also to determine if such a charge was allowed by the obligations set forth in each individual lease.  I note that based on my review of the revenue accounting data provided to me in this matter, the Plaintiff itself, as well as all its predecessor interest holders (Pagosa and The Michael J. Weeks Revocable Trust), was never charged a TRO fee on its Coal County interests.[25]  However, numerous other owners in the same wells were, in fact, charged the TRO fee.[26]

28.  Beginning in April 2006, the index price for purposes of the price calculations changed from Reliant East to a fixed percentage between the FERC Centerpoint East f.o.m. index price and the Gas Daily average beginning in June 2006 while the adjustments for gathering, compression, and fuel remained the same.[27]  This royalty valuation methodology held through June 2011 with a few notable exceptions: (1) the actual TRO fee charged to the

---

[23] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34.
[24] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34; This fee increased from $0.2165 (4/1/2006-11/30/2008) to at least $0.2576 (12/1/2008-9/30/2010).  It is worth noting that during this period, the Working Interest and Overriding Royalty Interest owners continued to only receive 85% of the index price, less deductions.
[25] See CONFIDENTIAL –SM.016263 – SM.016273.
[26] For example, the royalty owner Susan Garnett (Owner Number 47425) in the Duncan Shores 1-1 well was charged the TRO fee in all months while the Michael J. Weeks Revocable Trust owner (Owner Number 90330) was not for the same well in the same periods.
[27] For Royalty Interest owners, this value was 80% FERC Centerpoint East f.o.m., and 20% Gas Daily avg. For Working Interest Owners and Overrides, this value was 75% FERC Centerpoint East f.o.m. and 25% Gas Daily avg (4/1/2006-11/30/2008) and 80%/20% (12/1/2008-6/30/2011).

subset of Royalty Interest owners who were actually charged the fee was adjusted to $0.13/MMBtu in March 2007, $0.18/MMBtu in April 2009, and $0.17/MMBtu in October 2010; (2) the Centerpoint fuel fee changed to actual fuel incurred beginning April 2009; and (3) the Centerpoint gathering fee charged to Working Interest Owners and Overrides increased to $0.57, and later $0.51, in December 2008 and April 2009, respectively.[28] Additionally, the value of Condensate (drip) collected and sold was passed through to all owners from the effective date October 1, 2001 through September 2009.[29]

29. The contractual pricing calculation between SM Energy and Four Winds changed significantly beginning in production month July 2011. The new calculation method no longer involved paying royalty owners based on a value that was based solely on a gas index price. Instead, SM Energy began paying based on the proceeds that it realized from the sale of both residue gas and NGL products.[30]

30. One calculates the price for Residue Sales by summing the sales from the Laclede, Gavilon, and Centerpoint delivery points plus any Centerpoint Cashout amount, less a $0.105 system compression/gathering fee (the TRO fee[31]).[32]  However, beginning in July 2011, the royalty interest owners no longer incurred the Centerpoint gathering fee in the calculation of royalty. Additionally, similar to the period prior to July 2011, not all royalty owners were charged the TRO fee.  SM Energy only deducted the TRO fee from an owner if it was determined by the Defendant that the lease allowed for such a deduction.  I note that, like the period preceding

---

[28] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34.
[29] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34.
[30] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34; From July 2011 through October 2013, both Royalty Interest and Working Interest Owners incurred a double deduction for Centerpoint Fuel through an actual fuel deduction and because owners were paid on volumes fuel, i.e. net of fuel.  The formula referenced above became effective November 2013.
[31] Deposition of Kris Terry, July 11, 2018, 43:13-16.
[32] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34; Until October 2013, Royalty Interest owners were additionally charged a "CPS Fuel" fee.

July 2011, based on my review of the revenue accounting data provided to me in this matter, the Plaintiff itself, as well as all its predecessor interest holders (Pagosa and The Michael J. Weeks Revocable Trust), was never charged a TRO fee on its Coal County interests.[33] However, numerous other owners in the same wells were, in fact, charged the TRO fee.[34]

31.     The price calculation for NGL sales is the same for all owners and is calculated by summing the sales of each product from each of the delivery points (Centerpoint, Atlas Pod 1 Tupelo, Atlas Pod 2 Centralhoma, Atlas Mowdy Compressor, Atlas Pod 7, and Donovan Pod 7), subtracting out Processing and Gathering Fees (for Pods 1, 2, 7, and Mowdy), Centerpoint's Fuel/Shrink & Processing fees, and Pod 7's Operating fees, and then adding back the cashout total.[35]

32.     The substantive differences in royalty payment methodologies discussed in the preceding paragraphs clearly distinguish the facts and circumstances present in this case from those present in the *Naylor Farms* matter.  The USAC, in its affirmation of class certification, noted that there was no evidence of any royalty payment methodology diversity in Chaparral's royalty payments to the class in the *Naylor Farms* matter and that this fact contributed to the appropriateness of certification.[36]  This critical distinction further serves to distinguish this matter from the type of reasoning utilized in *Naylor Farms*.

---

[33] See CONFIDENTIAL –SM.016263 – SM.016273.
[34] For example, the royalty owner Susan Garnett (Owner Number 47425) in the Duncan Shores 1-1 well was charged the TRO fee in all months while the Michael J. Weeks Revocable Trust owner (Owner Number 90330) was not for the same well in the same periods.
[35] Deposition of Thomas Ferguson, May 8, 2012, Exhibit 34.
[36] *Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC,* United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, pages 33 to 34.

*Processing Costs*

33. In reaching its decision in the *Naylor Farms* matter, the USAC pointed to the Oklahoma Supreme Court's decision in *Mittelstaedt*, in which the court stated "[i]t is common knowledge that raw or unprocessed gas usually undergoes certain field processes necessary to create a marketable product. These field activities may include, but are not limited to, separation, dehydration, compression, and treatment to remove impurities."[37] However, when the USAC referenced this same section in its decision, it significantly broadened the types of services included in what is necessary to create a marketable product by adding gathering, transporting, and [processing] processes that were previously unmentioned by the Oklahoma Supreme Court decision in *Mittelstaedt*. The USAC defends its broadening of the Oklahoma Supreme Court's statements in *Mittelstaedt* by stating that neither party in *Naylor Farms* "identifies any legally significant distinctions between these services."

34. Processing, at least economically, is vastly different than the above-mentioned services. Natural gas processing is a complex process of extracting as many non-methane hydrocarbons and fluids (including NGLs such as ethane, propane, butane, and other products) from the gas stream in order to enhance and maximize the value of the gas product. However, it is important to note that while the value of the stream may be enhanced by the processing, it is not necessary for the gas from all wells to be processed in order to be marketable or to meet interstate pipeline standards for transportation.

35. Because the value of the natural gas liquids may be greater after being extracted and sold in liquid form in lieu of their value as BTUs in the gas stream, companies will often process the gas even when it is not necessary for pipeline standards in order to enhance the overall value

---

[37] *Naylor Farms, Inc.; Harrel's LLC, v. Chaparral Energy, LLC,* United States Court of Appeals for the Tenth Circuit, No. 17-6146, filed May 3, 2019, pages 8 to 9.

of the already marketable stream.  This is a choice made on a monthly, if not daily, basis based on a myriad of variables affecting the value of processing.  The relative price between natural gas and each of the natural gas liquids products, as well as the cost of the processing, all factor into the decision to process, which may not be necessary.  If it is economically prudent to process the gas based on the various commodity prices, as well as the cost of processing, then the owner of the gas may elect to process (as opposed to keep-whole their gas stream) in order to enhance the overall value of the gas stream for all parties.  This clearly sets processing apart from the other types of costs as discussed in the *Mittelstaedt* matter.

36.     Regardless, it is the case that in this matter, the Plaintiff's claim applies partly to processing, which oftentimes occurs downstream of the sales point.  The Plaintiff has presented no evidence that processing was necessary to make all the gas at issue in this matter marketable. In clear contrast, my previously-filed report highlight evidence that a material amount of the gas at issue in this matter did not, in fact, require processing to be in marketable condition (even under Plaintiff's unsupported definition of marketability).


*Class-Wide Damages*

37.     Another factor considered in *Naylor Farm*s was that the plaintiff "provided evidence that [its] expert can determine damages on a class[]wide basis through use of a model" and the fact that Chaparral, the defendant, "fail[ed] to explain why that model is inaccurate or unworkable."  However, as I noted in my December 4, 2018 report, the Plaintiff's expert has presented no proposed damages methodology that takes into account the various complexities that would burden any such calculation, such as lease obligation diversity, gas composition and marketability, actual royalty payment methodology, and other aspects of the calculation that warrant an individualized inquiry.

38. Barbara Ley's rather wide range of the amount of "underpaid royalty from October 2001 through May 2015...will range from $55,000,000 to $75,000,000" is proof that the model is unworkable. Moreover, Ms. Ley supports her opinions on SM Energy's underpayment of royalties using *ipse dixit* statements and conclusions offered by Plaintiff's expert Daniel Reineke's report.[38]

39. To the extent that it is determined that Mr. Reineke's conclusions are unreliable, it would render Ms. Ley's report moot.

40. I note that while the majority of Ms. Ley's report appears to be related to merits issues, she also addresses the question of class certification by simply stating that "[b]ecause SM withheld royalties from all Class Members in the same way, the type of proof and calculation of damages that will be necessary can be performed uniformly on a class-wide basis."[39] The proposed class representative categorically did not ever have the same type of deductions as all other members of the class. However, I further note that Ms. Ley's erroneous conclusions regarding her ability to perform class-wide damages based on the presumption that all class members were paid identically only addresses one aspect of the equation necessary. She has performed no analysis into how her class wide damages would integrate an evaluation of the underlying obligations required by each individual lease.

As discussed above, these individual leases and the diversity of obligations were key considerations for the Oklahoma State Court of Appeals in their decision to deny class certification in the *Strack v. Continental* and *Whisenant v. Strat Land* and matters.[40] As stated above, the Court stated: "[e]ach of the types of royalty provisions will require a different

---

[38] Expert Report of Barbara Ley, dated October 5, 2018, page 22
[39] Expert Report of Barbara Ley, dated October 5, 2018, page 15.
[40] Billy J. Strack, et al., Appellees, vs. Continental Resources, Inc., Appellant, In the Court of Civil Appeals of the State of Oklahoma, No. 114,102 and Tony R. Whisenant, Appellee, vs. Strat Land Exploration Co, Appellant, In the Court of Civil Appeals of the State of Oklahoma, No. 115,660.

inquiry to determine a Class Members' claim for underpayment of oil or gas royalties. The determination of what was actually required to be paid versus what Continental ultimately paid will be different for each Class Member depending on particular lease language." I observe that in her report, Ms. Ley does not provide any proposed methodology for purposes of quantifying the alleged class-wide damages in this matter. Inherently, as an economist, part of my role in proffering an opinion related to whether this class should be certified would be dependent on the methodology proposed by the Plaintiff in order to calculate class-wide damages for each of the potential members of the class. In my opinion, without a viable methodology of this type put forward by the Plaintiff, certification of this proposed class would not be proper.

## IV. CONCLUSION

41. Due to the necessity of numerous individualized inquiries by lease, month, well, system, marketing arrangement, and purchaser into the circumstances connected to each well and owner within the putative class, as well as the need to analyze each of the individual leases and/or contracts of every proposed class member (including any changes over time), it is my opinion there are no "common" questions across the proposed class. Individualized inquiries predominate in resolving the claims of the class members, for the reasons discussed throughout the above sections.

42. In light of the Plaintiff's filing of its *Reply in Further Support of its Motion for Class Certification and Brief in Support Thereof*, the Defendant asked me to evaluate the facts and circumstances in the *Naylor Farms* matter in relation to those present in this matter. As discussed in detail throughout this report, it is my opinion that the facts and circumstances, as well as the evidence and arguments being presented in this matter, serve to materially distinguish it

from the *Naylor Farms* matter and thus, the findings in that matter by the District Court and the Tenth Circuit Court of Appeals are not relevant or instructive in this matter.

43.     My work in this matter is ongoing and if provided additional relevant information, I may supplement this report.

Eric R. Krause
List of Testimony 2008-2019
(client underlined)

1. Fridkin-Kaufman, Ltd., Plaintiff v. Gastar Exploration Texas L.P. fka First Source Gas L.P., et al, Defendant (In the 281st Judicial District Court of Harris County, Texas, Case No. 2008-74765) [Report]

2. Trust Venture Company, L.L.C. on Behalf of the Torch Energy Royalty Trust, Plaintiff v. Constellation Energy Partners, L.L.C., Defendant (In the Circuit Court of Tuscaloosa County, Alabama, Civil Action No. CV-2008-900751) [Hearing Testimony]

3. Hat Creek Energy, L.L.C., Plaintiff v. Gasco Production Company, Defendant (In the District Court, City and County of Denver, Colorado, Case No. 2012-CV-2055) [Report & Supplemental Report]

4. Fort Apache Energy, Inc. and Drilling Risk Management, Inc., Plaintiffs v. Gemini Insurance Company, Berkeley Oil & Gas Specialty Services, LLC, OCB Interests, L.L.C. f/k/a BC Johnson Associates a Unit of the Specialized Loss Adjusting Division of York Risk Services Ground, Inc., and J.H. Blades & Co., Inc., Defendants (In the 216th District Court of Kendall County, Texas, Case No. 12-066) [Designation]

5. Choice Exploration Inc.; LLOG Exploration Company, LLC; LLOG Exploration Texas, LP; Seidler Oil & Gas, LP; Overlord Energy Investments, LLC; Henderson Group, Inc.; Russo Exploration, LLC; Oil2 Eisenhower Prospect, LP; & Big "6" Drilling Company, Plaintiffs v. Weatherford U.S., LP; Weatherford International, Inc.; Weatherford Artificial Lift Systems, Inc.; Freudenberg Oil & Gas, LLC; MWW-MDV Operations, LP; MWW-MDV Properties, LP; MWW-GP, LLC; MDV-GP, LLC; Michael W. Ward; Michael D. Viator; Cameron International Corporation; Cameron, Inc.; & Cameron Solutions, Inc., Defendants (In the 269th District Court of Harris County, Texas, Cause No. 2013-18463) [Report, Supplemental Report & Deposition]

6. Bigie Lee Rhea, Plaintiff v. Apache Corporation, Defendant (In the United States District Court for the Eastern District of Oklahoma, State Case No. CJ-2014-170) [Affidavits, Report & Deposition]

7. In the Matter of the Marriage of K.S.L. and R.R.L. (In the 408th District Court of Bexar County, Texas, Case No. 2013-CI-05201) [Affidavit]

8. Energy Services Group, Inc., Plaintiff v. Quality Carriers, Inc. and Reagent Chemical & Research, Inc., Defendants (In the United States District Court for the Northern District of Texas, Fort Worth Division, Civil Action No. 4:14-cv-449-A) [Report & Supplemental Report]

9. Kevin L. Jeter, Joe A. Jeter, Barbara Lucas, James H. Miller, Sharon Rigsby Miller, Larry Smith, and Janice Sue Parker, Individually and as a Class Representatives on Behalf of All Similarly-Situated Persons, Plaintiffs v. Wild West Gas, LLC; Wild West Gas, Inc.; Bullseye Energy, Inc.; Fountainhead, LLC; and KRS&K, an Oklahoma General Partnership, Defendants (In the United States District Court for the Northern District of Oklahoma, Case No. 12-CV-411 JHP PJC) [Report, Supplemental Report & Deposition]

10. Carl O. Gurecky, Plaintiff v. <u>Zachry Exploration LLC and Zachry Exploration, Ltd., Defendants</u> (In the District Court Colorado County, Texas 25th Judicial District, Cause No. 23755) [Designation]

11. Roy McMullen, Plaintiff v. <u>Quad/Graphics Marketing, LLC, Defendant</u> (In the United States District Court in and for the Eastern District of Texas, Lufkin Division, Case No. 9:15-cv-00040-MHS) [Report]

12. Elster Oil and Gas, LLC, Claimant v. <u>Extraction Oil and Gas, LLC, Respondent</u> (American Arbitration Association, Case No. 01-15-0004-0836) [Report]

13. <u>Expro Engineering, Inc., Panther City Exploration Company, LLC, and Trinity East Energy, LLC, Plaintiffs</u> v. Weatherford International, LLC and Texas CES, Inc. d/b/a Basin Tool Company, Shale Tank Truck, and Mercer Well Service, and National Oilwell DHT, LP d/b/a National Oilwell Varco DHT, LP, Defendants (In the 68th Judicial District of Dallas County, Texas, Cause No. DC-14-13868) [Report]

14. Tony R. Whisenant, on behalf of himself and all others similarly situated, Plaintiffs v. <u>Strat Land Exploration Co., Defendant</u> (In the District Court of Beaver County, State of Oklahoma, Case No. CJ-2014-4) [Report & Hearing Testimony]

15. D&D Cajun Ventures, LLC and Eileen H. Baur, Plaintiffs v. Atlantic Richfield Company; Arco Oil & Gas Co.; Vista Resources, LLC; <u>Cody Energy, LLC; Cabot Oil & Gas Corporation; Union Oil Company of California</u>; Dunhill Exploration and Production, LLC; Dune Energy, Inc.; Brammer Engineering, Inc.; Phoenix Exploration Company, LP; White Oak Energy, LLC; White Oak Operating Company, LP; <u>Newfield Exploration Company</u>; Goldking Texas, Inc.; Texaco Exploration and Production, Inc.; <u>Chevron USA, Inc.</u>; Pan-Ok Production Company, Inc.; Henry Production Company; KMC Energy, LLC; and Bay Holdings, LLC, <u>Defendants</u> (in the 15th Judicial District Court of Vermilion Parish, State of Louisiana, Case No. 87,694) [Report & Deposition]

16. Fremak Industries, Inc., Claimant v. <u>ISMT Limited, Respondent</u> (International Court of Arbitration Case No. 20784/RD) [Report & Arbitration Testimony]

17. <u>Lancaster Management Services, Inc., Plaintiff</u> v. Chad Scott Nall, individually and d/b/a Setnique Tradeshow Services, and Your Labor Management, LLC, Defendants (In the District Court of Dallas County, Texas, 298th Judicial District, Case No. DC-15-08144) [Report, Supplemental Report & Hearing Testimony]

18. Prime Natural Resources, Inc., Plaintiff v. <u>Certain Underwriters at Lloyd's London, Syndicate Numbers 2020, 1084, 2001, 457, 510, 2791, 2987, 3000, 1221, 5000, Navigators Insurance Company, UK, Defendants</u> (In the District Court of Harris County, Texas, 281st Judicial District, Cause No. 2015-51137) [Designation, Report & Deposition]

19. Certain Underwriters at Lloyd's London and Certain Insurance Companies, Manti Exploration, LP, Shoreline Southeast, LLC, Ankor E&P Holdings Corporation, Dune Properties, Inc., Manti Exploration Operating, LLC, San Isidro Development Co., LC, Leeville West Energy, LLC, CC Bay, LLC, Winn Exploration Co., Inc., C. Douglas Jamba, LLC, D&C Energy Resources, Inc., Plaintiffs v. United States Steel Corporation and United States Steel Tubular Products, Inc., Defendants. (In the District Court of Lafourche Parish, State of Louisiana, 17th Judicial District, Cause No. 125577) [Report, Supplemental Report]

20. Robert E. Lee, Jr., Hitch Land & Cattle Company, and Suzanne V. Landess, Trustee of the Suzanne V. Landess Revocable Trust, Plaintiffs v. ConocoPhillips Company, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-14-01391-D) [Report & Deposition]

21. Duncan Frank, on behalf of himself and all others similarly situated, Plaintiffs v. Crawley Petroleum Corporation, Defendant. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-13-01193-R) [Report]

22. Portal Investments, LLC, Claimant v. Rival Holdings LLC, Douglas L. Johnson, Chad D. Johnson, Todd J. Johnson, Respondents. (JAMS Arbitration, Case No. 16372) [Report, Supplemental Report, Arbitration Hearing Testimony]

23. Chuck Travis Cowan, on behalf of himself and all others similarly situated, Plaintiff v. Devon Energy Corporation; and Devon Energy Production Company, LP (including affiliated predecessors and affiliated successsors), Defendants. (In the District Court of Pittsburg County, State of Oklahoma, Case No. CJ-2016-242) [Deposition]

24. Occidental Energy Marketing, Inc. and Oxy Ingleside LPG Pipeline, LLC, Plaintiffs v. NuStar Logistics, L.P., Defendant. (In the District Court of Harris County, Texas, 11th Judicial District, Cause No. 2015-39021) [Report]

25. Ryder Truck Rental, Inc., d/b/a Ryder Transportation Services, Plaintiff v. Maalt LP, et al, Defendants. (In the United States District Court for the Northern District of Texas, Dallas Division, Civ Action No. 3:15-CV-3325-N) [Report, Deposition, Trial Testimony]

26. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

27. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

28. Sutter Ranch Corporation, and Oklahoma corporation and Sutter Ranch Mineral Trust, Plaintiffs v. Cabot Oil & Gas Corporation, Lime Rock Resources, Apache Corporation, Defendants. (In the District Court of Ellis County, State of Oklahoma; Case No. CJ-2015-7) [Report]

29. KMD Operating Company, LLC, KMD Acquisitions, LLC, and California Resources Production Corporation, Claimants v. Innex California, Inc. and General Crude Company, Inc., Respondents. (Matter of Arbitration, CPR File No. G-16-32-C) [Report, Supplemental Report, Arbitration Hearing Testimony]

30. Ashcraft Group, LLC for itself and all others similarly situated, Plaintiffs v. Silver Creek Oil & Gas, LLC, Defendant. (In the United States District Court for the Eastern District of Oklahoma; Case No. 16-CV-388-RAW) [Report, Deposition]

31. Stellar Oil & Gas, LLC, Plaintiff v. BlueCrest Cosmopolitan, LLC, Defendant. (In the District Court of Harris County, Texas, 80th Judicial District, Cause No. 2017-04220) [Report]

32. Michael Kernen for himself and all others similarly situated, Plaintiffs v. Casillas Operating, LLC and Casillas Petroleum Corporation, Defendants. (In the District Court of Garvin County, State of Oklahoma, Case No. CJ-17-186) [Declaration, Deposition]

33. Antero Resources Corporation, Plaintiff v. Washington Gas Light Company and WGL Midstream, Inc., Defendants. (In the District Court of the City and County of Denver, Colorado, Case No. 2017CV33930) [Report, Supplemental Report, Updated Supplemental Report, Rebuttal Report]

34. State of Oklahoma ex rel., Commissioners of the Land Office, Plaintiff v. Apache Corporation, Defendant. (In the District Court in and for Beckham County, State of Oklahoma, Case No. CJ-17-1) [Declaration]

35. Richard L. Kuffa and Denise D. Kuffa, Claimants v. Statoil USA Onshore Properties, Inc. f/k/a StatoilHydro USA Onshore Properties, Inc., Respondent. (American Arbitration Association, Scranton, Pennsylvania, Case No. 1-17-0005-6012) [Report, Deposition]

36. San Isidro Development Company, LC and San Isidro Energy Company, LLC, Plaintiffs v. BHP Billiton Petroleum Properties (N.A.), LP F/K/A Petrohawk Properties, LP, et al, Defendants. (In the 36th Judicial District Court of McMullen County, Texas, Cause No. M-15-0050-CV-C) [Disclosure]

37. Chieftain Royalty Company, for itself and all other similarly situated, Plaintiffs v. SM Energy Company (including predecessors, successors and affiliates), Enervest Energy Institutional Fund XIII-A, L.P., Enervest Energy Institutional Fund XIII-WIB, L.P., Enervest Energy Institutional Fund XIII-WIC, L.P., Enervest Operating, L.L.C. and FourPoint Energy, LLC, Defendants. (In the United States District Court for the Western District of Oklahoma, Case No. CIV-11-177-D) [Report]

38. Hitch Enterprises, Inc., on behalf of itself and all others similarly situated, Plaintiffs v. Key Production Company, Inc., Defendant (In the District Court of Texas County, Oklahoma, Case No. CJ-2017-01) [Report, Rebuttal Report, Supplemental Report]

39. Baker Hughes Oilfield Operations, LLC and Baker Petrolite, LLC, Claimant v. BlueCrest Alaska Operating LLC, Respondent. (The American Arbitration Assocation Under the Commercial Rules, Case No. 01-17-0007-3892) [Report, Reply Report]

40. Perry Cline, on behalf of himself and all others similarly situated, Plaintiff v. <u>Sunoco, Inc. (R&M) and Sunoco Partners Marketing & Terminals, LP, Defendants</u>. (In the United States District Court for the Eastern District of Oklahoma, Case No. 17-cv-00313-JHP) [Report, Deposition]

41. <u>Marc Marrocco and Antonio Albanese, directly and derivatively on behalf of Centurion Logistics, LLC, and directly and derivatively on behalf of Centurion Pecos Terminal, LLC, a Texas Limited Liability Company, Plaintiffs</u> v. James Ballengee, Ballengee Interests, LLC, John Calce, Chris A. Mott, Tom Ramsey, Stampede Tx Energy, LLC, Centurion Midstream Group, LLC, Centurion Terminals, LLC, Centurion Brownsville Terminal, LLC, James Hock, Vispi Jilla, and JupiterMLP, LLC, Defendants and Centurion Pecos Terminal LLC, a Texas Limited Liability Company, Nominal Defendant. (In the District Court of Dallas County, Texas, B-44th Judicial District, Cause No. DC-16-07706) [Report, Declaration]

Chieftain Royalty Company v. SM Energy Company, et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| Bates Numbered Documents | | | |
| Chieftain-SM 002083 | Chieftain-SM 002087 | | |
| Chieftain-SM 002088 | | | |
| Chieftain-SM 002095 | Chieftain-SM 002097 | | |
| Chieftain-SM 002098 | Chieftain-SM 002099 | | |
| SM.016262 | SM.016274 | | |
| SM.0248379 | SM.0248398 | | |
| SM.0248448 | SM.0248461 | | |
| SM.026935 | SM.027040 | | |
| SM.260935 | SM.261080 | | |
| SM.338000A | | | |
| SM.403816 | | | |
| SM_00005247 | | | |
| SM_004114 | SM_004118 | | |
| SM_005249 | SM_005254 | | |
| SM_011509 | | | |
| SM_011510 | | | |
| SM_011511 | | | |
| SM_011512 | | | |
| SM000001 | SM000002 | | |
| SM000040 | SM000055 | | |
| SM000056 | SM000058 | | |
| SM000091 | SM000102 | | |
| SM000103 | SM000118 | | |
| SM000119 | SM000133 | | |
| SM000134 | SM000138 | | |
| SM000175 | SM000188 | | |
| SM000263 | SM000276 | | |
| SM000277 | SM000293 | | |
| SM000364 | SM000374 | | |
| SM000375 | SM000421 | | |
| SM000422 | SM000429 | | |
| SM000524 | SM000530 | | |
| SM000531 | SM000548 | | |
| SM000549 | SM000558 | | |
| SM000588 | SM000599 | | |
| SM000628 | SM000642 | | |
| SM000643 | SM000649 | | |
| SM000677 | SM000689 | | |
| SM000694 | SM000708 | | |
| SM000709 | | | |
| SM000716 | SM000730 | | |
| SM000732 | SM000755 | | |
| SM000846 | SM000853 | | |
| SM000862 | SM000898 | | |
| SM000915 | SM000928 | | |
| SM000929 | | | |
| SM000953 | | | |
| SM000958 | SM000974 | | |
| SM000975 | SM000984 | | |
| SM000985 | SM000999 | | |
| SM001000 | SM001004 | | |
| SM001008 | SM001021 | | |
| SM001024 | SM001032 | | |
| SM001053 | SM001063 | | |
| SM001087 | SM001097 | | |
| SM001101 | SM001113 | | |
| SM001126 | SM001163 | | |
| SM001164 | SM001198 | | |
| SM001234 | SM001243 | | |

Chieftain Royalty Company v. SM Energy Company, et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| SM001382 | SM001394 | | |
| SM001424 | SM001432 | | |
| SM001872 | SM001902 | | |
| SM001903 | SM001911 | | |
| SM001920 | SM001930 | | |
| SM001931 | SM001972 | | |
| SM001993 | SM002058 | | |
| SM002107 | SM002246 | | |
| SM002247 | SM002261 | | |
| SM002291 | SM002312 | | |
| SM002371 | SM002382 | | |
| SM002383 | SM002386 | | |
| SM002396 | SM002414 | | |
| SM002415 | SM002422 | | |
| SM002447 | SM002467 | | |
| SM002507 | SM002516 | | |
| SM002517 | SM002523 | | |
| SM002528 | SM002538 | | |
| SM002539 | SM002566 | | |
| SM002605 | SM002615 | | |
| SM002616 | SM002619 | | |
| SM002620 | SM002646 | | |
| SM002647 | SM002668 | | |
| SM002669 | SM002673 | | |
| SM002677 | SM002690 | | |
| SM002696 | SM002704 | | |
| SM002705 | SM002707 | | |
| SM002717 | SM002731 | | |
| SM002736 | SM002746 | | |
| SM002757 | SM002769 | | |
| SM002775 | SM002788 | | |
| SM002795 | SM002806 | | |
| SM002807 | SM002816 | | |
| SM002817 | SM002845 | | |
| SM002935 | SM002945 | | |
| SM002946 | | | |
| SM002965 | SM002978 | | |
| SM002987 | SM003001 | | |
| SM003002 | SM003006 | | |
| SM003008 | SM003018 | | |
| SM003039 | SM003055 | | |
| SM003118 | SM003133 | | |
| SM003134 | SM003143 | | |
| SM003146 | SM003156 | | |
| SM003162 | SM003220 | | |
| SM003225 | SM003248 | | |
| SM003249 | SM003272 | | |
| SM003273 | SM003321 | | |
| SM003322 | SM003338 | | |
| SM003339 | SM003365 | | |
| SM003431 | SM003433 | | |
| SM003441 | SM003453 | | |
| SM003463 | SM003478 | | |
| SM003479 | SM003503 | | |
| SM003504 | SM003566 | | |
| SM003597 | SM003602 | | |
| SM003612 | SM003625 | | |
| SM003689 | SM003693 | | |
| SM003740 | SM003750 | | |
| SM003751 | SM003758 | | |

Chieftain Royalty Company v. SM Energy Company, et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| SM003761 | SM003772 | | |
| SM003779 | SM003814 | | |
| SM004127 | SM004132 | | |
| SM005021 | SM005025 | | |
| SM005033 | SM005069 | | |
| SM005070 | | | |
| SM005071 | SM005075 | | |
| SM005076 | SM005093 | | |
| SM005094 | SM005120 | | |
| SM005121 | SM005147 | | |
| SM005148 | SM005168 | | |
| SM005169 | SM005184 | | |
| SM005186 | SM005204 | | |
| SM005205 | SM005216 | | |
| SM005217 | SM005246 | | |
| SM-005255 | SM-005256 | | |
| SM-005257 | | | |
| SM005285 | | | |
| SM-008237 | | | |
| **Case Law & Code** | | | |
| | | | 52 Okl.St.Ann. Sec. 570.12 |
| | | | *Billy J. Strack, et al. v. Continental Resources, Inc.* |
| | | | *Howell v. Texaco, Inc.* |
| | | | *L. Ruth Fawcett v. Oil Producers, Inc. of Kansas* |
| | | | Order and Judgment (*Chieftain Royalty Company v XTO Energy, Inc .*) |
| | | | *Tony R. Whisenant v. Strat Land Exploration Co.* |
| **Court Documents and Correspondence** | | | |
| | | 10/2/2017 | Defendant SM Energy Company's Motion for Protective Order and Brief in Support |
| | | 10/5/2018 | Expert Report of Alyce Hoge with Exhibits |
| | | 10/5/2018 | Expert Report of Barbara A. Ley with Exhibits |
| | | 10/5/2018 | Expert Report of Daniel T. Reineke with Exhibits |
| | | 7/2/2012 | Expert Report of Kris L. Terry with Exhibits |
| | | 12/4/2018 | Expert Report of Kris L. Terry |
| | | 12/4/2018 | Expert Report of Kyle Pearson |
| | | 8/31/2012 | First Amended Complaint |
| | | 4/10/2017 | Order |
| | | 11/28/2017 | Order |
| | | 2/22/2011 | Petition |
| | | 6/29/2016 | Plaintiff's Amended Supplemental Response to Interrogatory No. 8 |
| | | 10/1/2012 | Rebuttal Expert Report of Kris L. Terry with Exhibits |
| | | 6/7/2019 | Plaintiff's Reply in Further Suport of Its Motion for Class Certification and Brief in Support Thereof |
| | | 9/18/2014 | Second Amended Complaint |
| | | 2/21/2017 | Third Amended Complaint with Exhibits |
| **Depositions and Exhibits** | | | |
| | | 4/30/2012 | Deposition Transcript of David Whitcomb with Exhibits |
| | | 7/11/2018 | Deposition Transcript of Kris Terry with Exhibits |
| | | 5/2/2012 | Deposition Transcript of Robert Abernathy with Exhibits |
| | | 5/8/2012 | Deposition Transcript of Thomas Ferguson with Exhibits |
| **Publicly Available Document** | | | |
| | | 1/20/2014 | FourPoint Energy and EnerVest Agree to Partner in the Anadarko Basin, PNRnewswire |
| | | 11/5/2013 | SM Energy - SM Energy Enters into Agreement to Divest Anadarko Basin Assets, sm-energy.com |
| **Other Documents** | | | |
| | | | 482508AA_LEASE |
| | | | 484828D_LEASE |

Chieftain Royalty Company v. SM Energy Company, et al.
Documents Received by Eric Krause

| Beginning Bates Number | Ending Bates Number | Date | Document Description |
|---|---|---|---|
| | | | 484836AR_LEASE |
| | | | 492548_LEASE |
| | | | Final Retained Lease List - September 9 - Plaintiff.xlsx |
| | | | Gas Quality Data 2006-2013 |
| | | | Missing_BA_Mapping.csv |
| | | | Plant Statements Marketing Data 2008-2013 |