# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHIEFTAIN ROYALTY COMPANY, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 5:18-cv-01225-J |
| SM ENERGY COMPANY, et al., | § § § | |
| Defendant. | § § | |

**PLAINTIFF'S MOTION TO STRIKE THE SUPPLEMENTAL EXPERT REPORTS OF KYLE L. PEARSON (DKT. NO 73-1) AND ERIC R. KRAUSE (DKT. NO. 73-2), AND ALL PORTIONS OF DEFENDANT'S SURREPLY IN OPPOSITION TO PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION (DKT. NO. 73) THAT CITE, QUOTE, OR OTHERWISE RELY ON THE SUPPLEMENTAL EXPERT REPORTS**

Plaintiff Chieftain Royalty Company ("Plaintiff"), for itself and all others similarly situated, files this its Motion to Strike the Supplemental Reports of Kyle L. Pearson (Dkt. No. 73-1) and Eric R. Krause (Dkt. No. 73-2) and All Portions of Defendant's Surreply in Opposition to Plaintiff's Reply in Further Support of its Motion for Class Certification (Dkt. No. 73) that Cite, Quote, or Otherwise Rely on the Supplemental Expert Reports, and would respectfully state as follows:

## BACKGROUND

1. On June 26, 2019, Defendant SM Energy Company ("SM") filed an Application to File Surreply Brief in Opposition to Plaintiff's Reply in Further Support of its Motion for Class Certification and Brief in Support Thereof ("Surreply Application"). Dkt. No. 52.

2. In the Surreply Application, SM stated it needed to file a Surreply in order to address "new issues" not addressed in Plaintiff's Motion for Class Certification or SM Energy's Response to Plaintiff's Motion for Class Certification, including "Chieftain's proposed addition of a new class representative and proposed addition of new claims against SM Energy." Dkt. No. 52 at ¶1.

3. Taking SM at its word that the scope of its proposed Surreply would be limited and address only these narrow issues, and despite the fact that SM already addressed these same issues in its Response to Plaintiff's Motion for Leave to Amend the Fourth Amended Complaint and File the Fifth Amended Complaint filed just six days earlier on June 20, 2019 (Dkt. No. 51), Plaintiff did not oppose SM's Surreply Application. *Id.* at ¶3.

4. On April 16, 2020, this Court entered an Order granting SM's Surreply Application. Dkt. No. 66.

5. On May 14, 2020, SM filed its 22-page Surreply, and attached six exhibits, spanning 166 pages. Dkt. No. 73. Among those exhibits were two supplemental reports from two of SM's purported experts—Kyle L. Pearson and Eric R. Krause. Dkt. Nos. 73-1 & 73-2 (the "Supplemental Expert Reports"). The Supplemental Expert Reports were

both signed on July 8, 2019. *Id*. Yet, SM never disclosed the Supplemental Expert Reports to Plaintiff prior to the filing of SM's Surreply on May 14, 2020, over ten months after the date they were signed.

6. In the Supplemental Expert Reports, SM's experts did not even mention the narrow issues SM represented to the Court and Plaintiff that its Surreply would address, but rather (1) offered improper legal opinions on an entirely different issue on which SM did not seek leave to address—the Tenth Circuit's ruling affirming certification of a class of royalty owners in *Naylor Farms, Inc. v. Chaparral Energy, LLC* ("*Chaparral*"), (2) regurgitated the opinions offered in their initial expert reports dated December 4, 2018 (the "Initial Expert Reports") that SM fully addressed in its Response to Plaintiff's Motion for Class Certification (the "Response"); and (3) attempted to impeach SM's own 30(b)(6) corporate representative.

7. Plaintiff and the putative Class are severely prejudiced by SM's filing of what is essentially a second 61-page response to Plaintiff's Motion for Class Certification, comprised of 20 pages[1] of SM's Surreply that have nothing to do with the narrow issues it claimed it would address in its Surreply Application, plus the improper Supplemental Expert Reports of Mr. Krause and Mr. Pearson, comprising 18 and 21 pages, respectively.

8. The Scheduling Order in this case does not contemplate supplemental expert reports at this juncture of the litigation. *See* Dkt. No. 1-2 (Scheduling Order containing

---

[1] Only 2 of the 22 pages of SM's Surreply actually address one of the issues SM sought leave to address in its Surreply Application– the proposed addition of a class representative.

2

deadline for Defendant's expert reports on December 4, 2018, and no further deadlines for additional reports).

9. Because the Supplemental Expert Reports offer improper legal opinions, simply rehash opinions rendered in prior expert reports, improperly attempt to impeach SM's 30(b)(6) corporate representative and do not address, discuss, or even mention SM's purported basis for filing a Surreply, which was to address "Chieftain's proposed addition of a new class representative and proposed addition of new claims against SM Energy," Plaintiff respectfully requests the Court strike the Supplemental Expert Reports, as well as all portions of SM's Surreply that cite, quote, or otherwise rely on such reports.

## ARGUMENT

SM's Surreply and the Supplemental Expert Reports on which it's based amount to an additional 61-page second response to Plaintiff's Motion for Class Certification. SM's Surreply is not limited to the issues it represented to Plaintiff and the Court that it would address. Instead, SM's Surreply rehashes, restates, misrepresents and relies on Supplemental Expert Reports that have nothing to do with the stated bases for SM's Surreply. The Supplemental Expert Reports render improper legal opinions, merely restate opinions offered in the Initial Expert Reports and attempt to impeach SM's own 30(b)(6) corporate representative. As such, the Supplemental Expert Reports and all portions of SM's Surreply that cite, quote, or rely on the Supplemental Expert Reports should be stricken. *See, e.g., Adams v. Entercom Kan. City, LLC*, Case No. 08-2643-JWL, 2009 U.S. Dist. LEXIS 101400 (D. Kan. Oct. 30, 2009) (granting motion to strike portion of surreply that "clearly exceeds the scope of the court's order").

**I.     The Supplemental Expert Reports Should be Stricken**

As stated above, SM asked Plaintiff and this Court for permission to file a Surreply in order to address limited issues raised in Plaintiff's Reply in Further Support of its Motion for Class Certification, namely, the addition of a proposed class representative and "new claims" (that were not really new at all). *See* Dkt. No. 52 at ¶1. However, SM took this opportunity to submit arguments and additional expert reports that are improper and go far beyond the scope of the stated bases for its Surreply. SM's tactics should not be tolerated and significantly prejudice Plaintiff and the putative Class by essentially allowing SM to submit a second 61-page response to Plaintiff's Motion for Class Certification.

As a fundamental matter, SM did not seek leave to file supplemental expert reports—it sought leave to file a Surreply limited to certain issues raised in Plaintiff's Reply. The parties exchanged expert reports over 18 months ago pursuant to the Court's scheduling order. *See* Dkt. No. 1-2. The scheduling order does not contemplate additional expert reports at this stage of the case. *See id*. Moreover, despite the fact that the Supplemental Expert Reports were both signed July 8, 2019, SM never provided these reports to Plaintiff until it filed its Surreply on May 14, 2020—over 10 months later. Thus, the mere filing of the Supplemental Expert Reports without leave of Court constitutes a clear abuse of the limited leave SM was granted.

Further, the Supplemental Expert Reports clearly exceed the limited issues on which SM sought to address in its Surreply. In fact, they do not even address or mention those issues. *See* Dkt. Nos. 73-1 & 73-2 (no mention of the words "Castlerock," "Profit Fee" or "Double Charges" in either of the Supplemental Expert Reports). Instead, the Supplemental

Expert Reports (1) offer improper legal opinions on an entirely different issue on which SM did not seek leave to address—the Tenth Circuit's decision in *Chaparral*—a decision SM knows dooms its class certification arguments; (2) rehash the same opinions Mr. Krause and Mr. Pearson offered over a year ago; and (3) attempt to impeach SM's own 30(b)(6) witness, Mr. Kyle L. Pearson.

A. **The Supplemental Expert Reports Offer Improper Legal Opinions**

The Supplemental Expert Reports of Mr. Kyle. Pearson and Mr. Eric Krause offer improper legal opinions on the application of *Chaparral* to the facts of this case. In Mr. Pearson's supplemental expert report, he unambiguously states he was asked to draft and submit his supplemental report in order to address *Chaparral*. *See* Dkt. No. 73-1 at ¶¶2-3. Specifically, Mr. Pearson's Supplemental Expert Report states:

> The Reply Motion for Class Certification references a decision by the United States Court of Appeals for the Tenth Circuit in *Naylor Farms, Inc. v. Chaparral Energy, LLC*, in which the Tenth Circuit concluded the district court did not abuse its discretion by certifying a class. **This supplemental report will demonstrate why the purported class in this case contains significantly more variability than the class in *Naylor Farms*.**

*Id.* (emphasis added). Similarly, in Mr. Krause's supplemental expert report, he unambiguously states he was asked to draft and submit his supplemental report in order to address the Tenth Circuit's decision in *Chaparral*:

> **SM Energy has asked me to issue this supplemental report in order to provide the factual and evidentiary distinctions between this matter and the United States Court of Appeals (herein "USAC") affirmation of class certification in *Naylor Farms, Inc. et al., v. Chaparral Energy, LLC.* (herein, *Naylor Farms*)**.

*See* Dkt. No. 73-2 at ¶1 (emphasis added). In addition, Mr. Krause, an economist, and not a lawyer, taking on the province of the Court, offers an improper legal opinion that no common questions exist that predominate over individual issues. Mr. Krause opines, "it is my opinion there are no 'common' questions across the proposed class. Individualized inquires predominate in resolving the claims of the class members, for the reasons discussed throughout the above sections." Dkt. No. 73-2 at ¶41. Such opinions are improper legal opinions of an expert. *See, e.g., Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) ("[T]estimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process."). Moreover, SM did not seek leave to file additional expert reports addressing how its experts believe this case differs from the Tenth Circuit's decision in *Chaparral*. As such, Mr. Pearson and Mr. Krause's Supplemental Expert Reports should be stricken.

### B. The Supplemental Expert Reports Improperly Repeat the Opinions Offered in the Initial Expert Reports

Not only do the Supplemental Expert Reports have nothing to do with the narrow issues SM represented to the Court and Plaintiff that it would address in its Surreply, they simply rehash and repeat the opinions previously offered in the Initial Expert Reports filed over a year ago on December 4, 2018. In Mr. Krause's Supplemental Expert Report, other than (1) offering improper legal opinions on the meaning of the Tenth Circuit's decision in *Chaparral*, and (2) offering opinions contradicted by SM's 30(b)(6) corporate representative, Mr. Kyle Pearson, Mr. Krause simply repeats the *same* opinions he offered in his initial 45-page report. Indeed, every document Mr. Krause relies on to support his

6

"supplemental" opinions, with the exception of the Tenth Circuit opinion in *Chaparral*, was available at the time Plaintiff filed its Motion for Class Certification and thus, could have been addressed in SM's Response.[2] And, Mr. Krause repeatedly cites back to his initial expert report as support for the opinions offered in his supplemental expert report. Below is a chart demonstrating *just some* of the opinions Mr. Krause offered in his supplemental expert report that are identical to those he offered in his initial report:

| **Comparison of Krause's Opinions in his Initial and Supplemental Reports** | |
|---|---|
| **Opinion in Supplemental Report** | **Same Opinion Offered in Initial Report, Dkt. No. 33-9** |
| "As I demonstrated in my December 4, 2018 report, there exists a substantial amount of diversity in royalty payment clauses and obligations in the proposed class in this matter that range from explicit obligations to more generalized provisions regarding how the Lessee should calculate and pay royalties." Dkt. No. 73-2 at ¶8. | *See e.g.*, ¶¶28-48 |
| "As I discussed in my December 4, 2018 report, the Defendant has been an active seller in the Oklahoma wellhead markets and downstream markets. Over the period at issue, numerous contracts related to SM Energy's sales of gas in this matter are sales at the wellhead or a nearby CDP. By entering into these various types of contracts at the wellhead, SM Energy is participating in the wellhead market." Dkt. No. 73-2 at ¶12. | *See e.g.*, ¶¶51-60 |
| "Lastly, as I discussed at length in my December 4, 2018 report, SM Energy marketed its gas production in a variety of different ways over the period at issue under various types of marketing | *See e.g.*, ¶52 |

---

[2]Mr. Krause relied on the following documents to support his "supplemental" opinions all of which predate his initial report and SM's response to Plaintiff's Motion for Class Certification, i.e., the decision, *Strack v. Cont'l Res., Inc.*, 2017 OK CIV APP 53, 405 P.3d 131 decided on Feb. 2, 2017; the Expert Report of Barbara Ley dated Oct. 5, 2018; the Deposition of Thomas Ferguson dated May 8, 2012; Documents SM produced in this litigation prior to discovery completion in 2018; the July 11, 2018 Deposition of Kris Terry; Mr. Krause's own Initial Report dated December 4, 2018; and the decision, *Chieftain Royalty Co. v. XTO, Energy, Inc.*, 2013 U.S. App. Lexis 13837 (10th Cir. July 9, 2013).

| | |
|---|---|
| arrangements, including a notable diversity of terms." Dkt. No. 73-2 at ¶14. | |
| "…the various marketing arrangements SM Energy utilizes result in a diversity of how production and royalties are accounted for to SM Energy's royalty owners and substantial settlement diversity throughout the putative class. SM Energy does not pay all royalty owners the same way, nor is it obligated to, based on the terms of its leases and the manner in which it markets its gas production." Dkt. No. 73-2 at ¶15. | *See e.g.,* ¶¶52-60 |
| "As was discussed at great length in my previous report, there exists significant diversity and complexity regarding the physical nature, quality, and composition of the gas sold from across the putative class members' wells." Dkt. No. 73-2 at ¶16. | *See e.g.,* ¶¶44-47, 50, 72-73, 115 |
| "To the extent costs were, in fact, incurred and deducted from royalty owners, that cost must be evaluated to determine if it was necessary to make the gas marketable for every single well in the class in this case." Dkt. No. 73-2 at ¶17. | *See e.g.,* ¶¶79, 80-83, 95 |
| "…an individual analysis of the gas composition is required to determine the point at which gas becomes marketable. The Plaintiff contends that the gas must meet interstate pipeline quality specifications in order to be marketable. As I noted in my December 4, 2018 report, gas could meet interstate quality specifications naturally when sold off the lease. Again, under this scenario, the allegedly impermissible processing costs would not include all of the costs incurred, and an apportionment of the costs incurred to reach the specific interstate pipeline quality specifications versus the additional processing that occurred for economic reasons would be necessary." Dkt. No. 73-2 at ¶18. | *See e.g.,* ¶95 |
| "…SM Energy and its successors did not utilize a common royalty payment methodology for all the potential class members in this matter." Dkt. No. 73-2 at ¶20. | *See e.g.,* ¶¶49-60 |
| "The pricing terms under SM Energy's Coal County marketing arrangement reflected the value of the gas at the point or location that the title transferred (at the well) and by which Defendant was paid for that sale." Dkt. No. 73-2 at ¶23. | *See e.g.,* ¶52 |
| "The varying treatment of owners as it relates to the deductions creates the need for an individualized inquiry to determine not only if the fee was actually charged by the Defendant, but also | *See e.g.,* ¶¶56, 80-83 |

| | |
|---|---|
| to determine if such a charge was allowed by the obligations set forth in each individual lease." Dkt. No. 73-2 at ¶27. | |
| "However, it is important to note that while the value of the stream may be enhanced by the processing, it is not necessary for the gas from all wells to be processed in order to be marketable or to meet interstate pipeline standards for transportation." Dkt. No. 73-2 at ¶34. | *See e.g.,* ¶87 |
| "…companies will often process the gas even when it is not necessary for pipeline standards in order to enhance the overall value." Dkt. No. 73-2 at ¶35. | *See e.g.,* ¶87 |
| "In clear contrast, my previously-filed report highlight evidence that a material amount of the gas at issue in this matter did not, in fact, require processing to be in marketable condition (even under Plaintiff's unsupported definition of marketability)." Dkt. No. 73-2 at ¶36. | *See e.g.,* ¶¶84-107 |
| "However, as I noted in my December 4, 2018 report, the Plaintiff's expert has presented no proposed damages methodology that takes into account the various complexities that would burden any such calculation, such as lease obligation diversity, gas composition and marketability, actual royalty payment methodology, and other aspects of the calculation that warrant an individualized inquiry." Dkt. No. 73-2 at ¶37. | *See e.g.,* ¶¶76-79 |
| Attacks on the Expert Report of Barbara A. Ley. Dkt. No. 73-2 at ¶¶38-40. | *See e.g.,* ¶¶117-122 |
| "…it is my opinion there are no 'common' questions across the proposed class. Individualized inquiries predominate in resolving the claims of the class members, for the reasons discussed throughout the above sections." Dkt. No. 73-2 at ¶41. | *See e.g.,* ¶123 |

By submitting this improper supplemental expert report, SM has given itself an additional 18 pages of additional briefing in response to Plaintiff's Motion for Class Certification on issues it already had an opportunity to and in fact did address in its Response. This was not contemplated by either Plaintiff when agreeing not to oppose SM's

9

request for leave to file a Surreply, or the Court in granting such a request. Mr. Krause's supplemental expert report should be stricken.

Similarly, other than (1) offering improper legal opinions on the application of *Chaparral* and (2) contradicting his own prior testimony as SM's 30(b)(6) witness, Mr. Pearson's 21-page supplemental report is merely a rehashing of the opinions he offered in his initial 29-page report. Indeed, there are certain parts of Mr. Pearson's report that are taken verbatim from his initial report. *Cf.* Dkt. No. 73-1 at ¶12 (quoting the American Gas Association Report No. 4A) *with* Dkt No. 33-8 at ¶22 reciting the exact same quote. And several of the figures in Mr. Pearson's supplemental report are the same photographs attached as Exhibit 2 to his initial expert report. *Cf.* figures 1-3, 5 at ¶¶19 & 34 of Dkt. No. 73-1 with Exhibit 2 to Dkt No. 33-8. Below is chart demonstrating the opinions Mr. Pearson offered in his supplemental report are simply repeated from his initial report:

| Comparison of Pearson's Opinions in his Initial and Supplemental Reports ||
|---|---|
| **Opinion in Supplemental Report** | **Same Opinion Offered in Initial Report, Dkt No. 33-8** |
| "There is a distinction between moving and conditioning raw gas to a wellhead meter where it can be marketed to a purchaser, from gas processing, which transforms already marketable raw gas into different higher-value natural gas liquids ('NGL') and residue gas products that are capable of being marketed in separate, downstream markets. There are multiple specific examples of unprocessed gas from proposed class wells that meet the receiving pipeline's specifications. This includes rich gas, which typically is processed downstream of the lease, and lean gas, which can be delivered directly to a transmission line without any processing." *See, e.g.,* Dkt. No. 73-1 at ¶7. | *See e.g.,* ¶¶14a & g, 15- 24 |
| "It follows that GCDTP services off the lease (also known as 'post-production' services) are not always required to put the gas from all the wells at issue in | *See e.g.,* ¶¶14a & g, 15-24 (3.5 pages of Mr. Pearson's Report addressed his opinions on when |

| | |
|---|---|
| this case in marketable condition. Post-production services, when applied to gas already in marketable condition at the lease, typically enhance the value of the natural gas. SM Energy put gas in marketable condition on the lease using wellhead separation, and in some cases, dehydration to meet the receiving pipeline's specifications. When the gas is measured, sampled, and accepted at the lease by the receiving pipeline, it is in marketable condition, regardless of whether any GCDTP services have been performed." *See e.g.,* Dkt. No. 73-1 at ¶7. | the gas is in a marketable condition). |
| "Even under the named Plaintiff's view of marketability, individual analysis is required to determine when gas from each well became marketable and whether gas from each well received 'excess processing' to enhance value, such that a portion of the processing costs are deductible under plaintiff's view of the Implied Duty of Marketability ('IDM'). As shown in my initial report, there is significant variability across the class with regards to gas composition. The class includes wells that produce gas that is processed, wells that produce gas that is not processed, and wells that only require marginal processing. A detailed analysis of the composition of the gas from each well, together with effective NGL and residue gas pricing, is necessary to determine whether, and to what extent, processing might be required to either make gas marketable under Plaintiff's view of marketability or enhance the value of already marketable gas." *See e.g.,* Dkt. No. 73-1 at ¶7. | *See e.g.,* ¶¶14b & e, 15-42 (Over 4 pages of Mr. Pearson's initial report discuss how, in his opinion, the heating value, GPM and $CO_2$ content of the gas produced from the Class Wells varies). |
| "The natural gas from the named Plaintiff's wells in this case does not meet all of the receiving pipeline's contractual quality specifications, although the receiving pipeline has the right to, and chose to, accept off-specification gas. In instances where the gas does not meet the pipeline specifications, and the pipeline refuses to accept the gas, the well operator must seek a waiver, add on-lease equipment to cause the gas to meet the specifications, or connect the gas to an alternative pipeline and market. If none of these options are available, the gas is not a marketable | ¶¶14a, 15-24 & 58 (Mr. Pearson's Initial Report states multiple times that, in his opinion, gas is in a marketable condition when it is accepted into a gathering pipeline). |

| product at the lease. In this case, the receiving pipeline accepted the gas for purchase at the wellhead meter, therefore the gas was marketable." *See e.g.,* Dkt. No. 73-1 at ¶7. | |

By submitting this improper Supplemental Expert Report, SM has given itself another 21 pages of additional briefing in response to Plaintiff's Motion for Class Certification on issues it already had an opportunity to and in fact did address in its Response. This was not contemplated by either Plaintiff, when agreeing not to oppose SM's request for leave to file a Surreply, or the Court in granting such a request. Mr. Pearson's supplemental expert report should be stricken.

    **C.    SM Improperly Attempts to Impeach its Own 30(b)(6) Witness in Its Supplemental Expert Reports**

Unbelievably, SM attempts to impeach the testimony of its own 30(b)(6) witness, Mr. Kyle Pearson, on the issue of marketability through Mr. Pearson's contradictory "supplemental" opinion in his capacity as SM's expert. After vigorously fighting against presenting a corporate representative for deposition on the issue of marketability through a Motion for Protective Order (a Motion it lost), SM chose to present Mr. Pearson as its 30(b)(6) corporate representative on this topic. On July 12, 2018, SM presented Mr. Pearson for deposition as SM's corporate representative on two topics, one of which was the issue of the factual basis supporting SM's contention that it complied with each of the elements established in *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (Okla. 1998) prior to charging royalty owners and post-production costs including that: (1) the gas was already a marketable product, (2) the costs enhanced the value of an already marketable product, (3) such costs were reasonable, and (4) actual royalty revenues increased in

proportion with the costs assessed against the nonworking interest. At this deposition, Mr. Pearson testified that the commingled raw gas from all 126 CC Sys Wells did not meet at least three minimum quality requirements contained in the tariffs of the interstate pipelines where SM sold all of the gas in the first arm's-length sale for index type prices that are only available on such main transmission pipelines, namely: (1) gas pressure of the raw gas needed to be increased from under 100psi to over 600psi, which is the pressure of the receiving mainline; (2) hydrocarbon dewpoint needed to be reduced by removing NGLs from the raw gas; and (3) water vapor content of the raw gas needed to be reduced from 40 to 60 pounds per mcf to less than 7 pounds per mcf. *See* July 12, 2018 Deposition of Kyle Pearson, Exhibit 7 to Plaintiff's Motion for Class Certification at 129:5-131:17.[3] Now, in an improperly submitted supplemental expert report *nearly two years later*, Mr. Pearson, in his capacity as SM's expert, offers a contradictory opinion. Mr. Pearson now wrongly opines in his supplemental expert report that *Chaparral* is distinguishable from this case because in *Chaparral*, all gas required "GCDTP services" (gathering, compression, dehydration, treating and processing), whereas here, much of the gas is not required to undergo GCDTP services. *See, e.g.,* Dkt. No. 73-1 at ¶7.

Similarly, Mr. Krause's Supplemental Expert Report attempts to impeach SM's own testimony on this matter. Mr. Krause likewise attempts to distinguish *Chaparral* from this case by arguing that unlike in *Chaparral*, here "not all gas requires at least one of the

---

[3] Pearson also testified the gas produced from wells on the Coal County Gathering System, is all commingled before it is eventually sold by Four Winds on the main transmission pipeline. *See* Ex. 7 to Plaintiff's Motion for Class Certification, July 12, 2018 at 82:16-20.

GCDTP services defined by the USAC in its Naylor Farms ruling to become marketable." Dkt. No. 73-2 at ¶16. This again contradicts the sworn testimony of SM. Nowhere in SM's Surreply Application did SM inform Plaintiff or the Court that it would be using its Surreply to impeach prior testimony of its own 30(b)(6) witness. Moreover, as Mr. Pearson was deposed as SM's corporate representative on this topic in July 2018, this issue could have been addressed by Mr. Pearson and Mr. Krause in the Initial Expert Reports that were not filed until five months after Mr. Pearson testified on behalf of SM. And, SM certainly could have addressed this argument in its Response filed 9 months after Mr. Pearson's deposition. SM's gamesmanship should not be permitted, and the Supplemental Expert Reports should be stricken.

**II.     All Portions of Defendant's Surreply in Opposition to Plaintiff's Reply in Further Support of its Motion for Class Certification that Cite, Quote, or Otherwise Rely on the Supplemental Expert Reports Should be Stricken**

For the same reasons that the Supplemental Expert Reports themselves should be stricken, so should any and all portions of Defendant's Surreply that cite, quote, or otherwise reply on the Supplemental Expert Reports. The pages of SM's Surreply that cite, quote, or otherwise rely on the Supplemental Expert Reports are as follows:

- Page 2 – citing Krause Supplemental Report at 5, 6, 9-13;
- Page 3 – citing Krause Supplemental Report at 3, 4;
- Page 8 – citing Pearson Supplemental Report at 2;
- Page 9 – citing Pearson Supplemental Report at 8; citing Krause Supplemental Report at 5;
- Page 10 - citing Krause Supplemental Report at 7; and

- Page 11 – citing Pearson Supplemental Report at 5, 7, 16-20.

Because SM did not seek leave to file the Supplemental Expert Reports—again, both of which (1) offer improper legal opinions addressing how SMs' experts believe this case differs from *Chaparral*, (2) rehash and repeat the opinions from the Initial Expert Reports; and (3) attempt to impeach SM's 30(b)(6) corporate representative —the foregoing pages of SM's Surreply that cite, quote, or otherwise rely on the Supplemental Expert Reports, should be stricken.[4]

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court strike the Supplemental Expert Reports attached to SM's Surreply and all portions of the Surreply that cite, quote, or otherwise rely on the Supplemental Expert Reports, as set forth herein.

---

[4] SM's Surreply also misleadingly implies that, because Chieftain did not attach every single lease to its Motion for Class Certification, "it was impossible for SM Energy, at the time, to check a specific lease for accuracy of quotation or categorization." Surreply at 7. This is false. These leases have always been in SM's possession, custody and control. It produced the leases to Plaintiff in discovery. And, Plaintiff attached as Exhibit 28.6 to its Motion for Class Certification a detailed 122-page document comprised of a Coal County lease-by-lease analysis of all 3,318 leases at issue that contained (1) the internal SM identifying lease number, (2) the lease date, (3) the lessor name, (4) the lessee name, (5) the royalty clause sub lease number, (6) the royalty clause interpretation, (7) whether the leases contained specific words additionally requiring royalty to be paid on fuel gas, and (8) the associated wells. SM could thus have easily identified each and every lease at issue for analysis before filing its Response. In addition, Plaintiff filed every single lease with the Court via conventional filing on April 12, 2019. *See* Dkt. No. 37. Plaintiff provided electronic access of the leases to SM on the same day. SM's argument, therefore, is a complete red herring.

DATED: June 3, 2020.

Respectfully submitted,

*/s/ Lisa P. Baldwin*
Bradley E. Beckworth, OBA No. 19982
Jeffrey Angelovich, OBA No. 19981
Lisa P. Baldwin, OBA No. 32947
Trey Duck, OBA No. 33347
Nathan Hall, OBA No. 32790
**NIX PATTERSON, LLP**
3600 North Capital of Texas Highway
Suite 350, Building B
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335
bbeckworth@nixlaw.com
jangelovich@nixlaw.com
lbaldwin@nixlaw.com
tduck@nixlaw.com
nhall@nixlaw.com

Susan Whatley, OBA No. 30960
**NIX PATTERSON, LLP**
P.O. Box 178
Linden, Texas 75563
swhatley@nixlaw.com

Robert N. Barnes, OBA No. 537
Patranell Lewis, OBA No.12279
Emily Nash Kitch, OBA No. 22244
**BARNES & LEWIS, LLP**
208 NW 60th Street
Oklahoma City, OK 73118
Telephone: (405) 843-0363
Facsimile: (405) 832-1007
rbarnes@barneslewis.com
plewis@barneslewis.com
ekitch@barneslewis.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2020, I authorized the electronic filing of the foregoing with the Clerk of Court using the CM/ECF System which will send email notification of such filing to all registered parties.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: June 3, 2020

*/s/ Lisa P. Baldwin*
Lisa P. Baldwin